# EXHIBIT A

1                         - VOLUME 2 -

2                IN THE UNITED STATES DISTRICT COURT

3                IN AND FOR THE DISTRICT OF DELAWARE

4                            - - -

5

    GODO KASHA IP BRIDGE 1,         :    CIVIL ACTION
6                                   :
                     Plaintiff,     :
7                                   :
         vs.                        :
8                                   :
    TCL COMMUNICATION               :
9   TECHNOLOGY HOLDINGS             :
    LIMITED, a Chinese              :
10  Corporation, TCT MOBILE         :
    LIMITED, a Hong Kong            :
11  Corporation, TCT MOBILE         :
    (US), inc., A Delaware          :
12  Corporation and TCT Mobile,     :
    Inc., a Delaware                :
13  Corporation,                    :
                                    :
14                   Defendants.    :    NO. 15-634-JFB-SRF

15

16                            - - -

17                  Wilmington, Delaware
                    Wednesday, October 31, 2018
18                  8:52 o'clock, a.m.

19                            - - -

20  BEFORE:   HONORABLE JOSEPH BATAILLON, U.S.D.C.J., and a jury

21                            - - -

22
                            Valerie J. Gunning
23                          Official Court Reporter

24

25

```
 1    APPEARANCES:

 2
                    YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
 3                  BY:  ANNE SHEA GAZA, ESQ.

 4
                            -and-
 5

 6                  ROPES AND GRAY, LLP
                    BY:  JAMES R. BATCHELDER, ESQ.
 7                       STEVEN PEPE, ESQ.,
                        KEVIN J. POST, ESQ.,
 8                       ALEXANDER E. MIDDLETON, ESQ.,
                        SAMUEL L. BRENNER, ESQ. and
 9                       MATTHEW R. SHAPIRO, ESQ.

10
                            Counsel for Plaintiff
11

12

13                  GREENBERG TRAURIG LLP
                    BY:  BENJAMIN J. SCHLADWEILER  ESQ.
14

15                          -and-

16
                    ARNOLD & PORTER KAY SCHOLER LLP
17                  BY:  JOHN E. NILSSON, ESQ.,
                        EDWARD HAN, ESQ.,
18                       NICHOLAS M. NYEMAH, ESQ.,
                        MICHAEL NGUYEN, ESQ. and
19                       NICHOLAS LEE, ESQ.

20
                            Counsel for Defendants
21

22                          -   -   -

23

24

25
```

**P R O C E E D I N G S**

(Proceedings commenced in the courtroom at 8:52 a.m.)

THE COURT:  Please be seated.  It's five minutes until showtime and I just want to be sure we're all on the same page.

One of you picked up one of the typographicals in the initial instruction and we made that change, so I have a copy of jury instructions for each side, one for the court reporter, one for each of the jurors so they can read along.  Are there any issues we need to take up with respect to the jury, typos or otherwise, either side?  Okay.  So, and I ask this with great trepidation, is there anything else you want to take up.

MS. GAZA:  Your Honor, we have the juror notebooks.  Would you like us to put them on their chairs ahead of time?

THE COURT:  That would be fine if you do that now.

MS. GAZA:  Okay.  Thank you.

MR. HAN:  Your Honor, one quick matter.  Ed Han. We're anticipating today's first witness, Mr. Ogata, on our cross and Mr. Ogata we are expecting to use some of these

08:54:13    1    licensing offer letters that were at issue yesterday.

08:54:16    2                THE COURT:  Yes.

08:54:18    3                MR. HAN:  It's a different purpose for which

08:54:20    4    we're using them and we anticipate we'll get the same

08:54:23    5    objection.  We prepared a very short bench memo and with

08:54:27    6    Your Honor's leave we'd like to hand that up and serve it

08:54:30    7    and take it up before Mr. Ogata --

08:54:33    8                THE COURT:  Before he testifies.

08:54:34    9                MR. HAN:  Before he testifies, yes.

08:54:36   10                THE COURT:  Right.  Okay.

08:54:41   11                MR. HAN:  And then with Your Honor's leave,

08:54:43   12    we'll get it on file.

08:54:45   13                THE COURT:  Yes.  Leave is granted.

08:54:47   14                MR. HAN:  Thank you.

08:54:51   15                MS. GAZA:  Your Honor, counsel for TCL never

08:54:56   16    raised any issue with us yesterday or last evening or even

08:54:59   17    this morning while we've been sitting here for the last half

08:55:03   18    hour, so I am concerned about the nature of surprise.  Of

08:55:06   19    course we will address this as needed, but it may require

08:55:11   20    some more substantive response in terms of a submission of

08:55:17   21    our own.

08:55:17   22                THE COURT:  Okay.  Well, Mr. Ogata, he's being

08:55:22   23    -- when is he being called?

08:55:24   24                MS. GAZA:  This afternoon or right after

08:55:25   25    openings, Your Honor.

| | | |
|---|---|---|
| 08:55:26 | 1 | THE COURT:  All right.  So he's your first |
| 08:55:28 | 2 | witness? |
| 08:55:29 | 3 | MS. GAZA:  He is. |
| 08:55:29 | 4 | THE COURT:  So you intend to put him on the |
| 08:55:31 | 5 | witness stand?  Is there an agreement between the parties |
| 08:55:34 | 6 | that Mr. Ogata will be part of the defendants' case in chief |
| 08:55:37 | 7 | as well? |
| 08:55:37 | 8 | MS. GAZA:  There is not.  There is not. |
| 08:55:40 | 9 | THE COURT:  So if it's outside the scope of the |
| 08:55:42 | 10 | direct, I don't care what this says. |
| 08:55:44 | 11 | MS. GAZA:  Thank you, Your Honor. |
| 08:55:46 | 12 | THE COURT:  Okay.  And then the other part is |
| 08:55:49 | 13 | generally speaking negotiations that occur post trial are |
| 08:55:54 | 14 | not admissible.  We're not doing that, are we?  Negotiations |
| 08:56:01 | 15 | post trial are not generally admissible.  We're not doing |
| 08:56:05 | 16 | that, are we? |
| 08:56:05 | 17 | MR. NILSSON:  Your Honor, we're preserving the |
| 08:56:08 | 18 | argument we made yesterday.  I certainly am not going to do |
| 08:56:11 | 19 | anything beyond what the Court said that we could do |
| 08:56:14 | 20 | yesterday, unless the Court has some -- |
| 08:56:16 | 21 | THE COURT:  Okay.  So you're just raising this |
| 08:56:19 | 22 | to preserve the record? |
| 08:56:20 | 23 | MR. NILSSON:  We would hope the Court would |
| 08:56:22 | 24 | review it because I don't think it was fully briefed |
| 08:56:25 | 25 | yesterday. |

08:56:25    1          THE COURT:  Okay.  All right.

08:56:26    2          MR. NILSSON:  It was something that sort of came

08:56:27    3    up in the context of demonstratives.  We think that the

08:56:31    4    notion that anything post complaint is completely

08:56:36    5    inadmissible is outside the law.  There's a case there, that

08:56:41    6    Ericsson TCL case, which is almost directly on point,

08:56:45    7    involves TCL.

08:56:47    8          THE COURT:  I'll read the brief, okay?

08:56:49    9          MR. NILSSON:  Sure.

08:56:50   10          THE COURT:  And the plaintiffs, all the

08:56:53   11    plaintiffs will read the brief.  And then before he

08:56:56   12    testifies, we'll talk about it briefly or we will --

08:56:58   13          MR. NILSSON:  Certainly and I'd like to revisit,

08:57:01   14    we did designate Mr. Ogata, I believe, as an affirmative

08:57:05   15    witness.

08:57:06   16          THE COURT:  That you would call in your case in

08:57:08   17    chief?

08:57:08   18          MR. NILSSON:  Well, I believe that we're

08:57:10   19    entitled to, if we designate him as an affirmative witness,

08:57:15   20    we're allowed to go beyond the scope.

08:57:16   21          THE COURT:  If you call him in your case in

08:57:19   22    chief, that is correct, unless there is an agreement between

08:57:22   23    the parties otherwise.  And generally speaking, there is,

08:57:25   24    but the rules are you have to call him in your case in

08:57:29   25    chief, because that's the way we've got it set up.  But keep

08:57:34  1   it in here to do that sometimes it doesn't make any sense,

08:57:38  2   but that's between you two.

08:57:39  3            MS. GAZA:  Your Honor, I think this goes beyond

08:57:42  4   whether or not there was an agreement between counsel.

08:57:44  5   During our status call with Your Honor about two weeks ago

08:57:47  6   you asked TCL's counsel who their direct witnesses were and

08:57:51  7   they specifically gave you a list that did not include Mr.

08:57:55  8   Ogata and we specifically disclosed that we intended to do

08:57:58  9   either adverse direct or to call him in our case in chief

08:58:04  10  unless we could reach an agreement otherwise.  And we

08:58:07  11  reached an agreement that we would be calling him in our

08:58:10  12  case in chief on adverse direct.  And we heard nothing from

08:58:15  13  TCL that they would be calling Mr. Ogata.  Our understanding

08:58:20  14  is that he's here in our case on direct with cross limited

08:58:25  15  to the direct, redirect and then he should be excused.

08:58:29  16            THE COURT:  Well, yeah, that might be the rules,

08:58:38  17  but that doesn't mean I'm not going to allow him to do it,

08:58:42  18  okay?

08:58:42  19            MS. GAZA:  I understand.

08:58:43  20            THE COURT:  I'll read the brief.  And I'm not

08:58:47  21  saying that under any -- I hate to use a double negative.  I

08:58:52  22  think that under some circumstances post litigation

08:58:57  23  negotiations could be relevant.  But generally speaking,

08:59:01  24  they are not, okay?  And the reason they're not is because

08:59:05  25  it's to get parties to settle the case and not have to worry

| | |
|---|---|
| 08:59:11 | 1 |
| 08:59:15 | 2 |
| 08:59:20 | 3 |
| 08:59:24 | 4 |
| 08:59:25 | 5 |
| 08:59:26 | 6 |
| 08:59:27 | 7 |
| 08:59:27 | 8 |
| 08:59:29 | 9 |
| 08:59:33 | 10 |
| 08:59:35 | 11 |
| 08:59:38 | 12 |
| 08:59:40 | 13 |
| 08:59:44 | 14 |
| 08:59:47 | 15 |
| 08:59:51 | 16 |
| 08:59:55 | 17 |
| 08:59:58 | 18 |
| 09:00:01 | 19 |
| 09:00:03 | 20 |
| 09:00:07 | 21 |
| 09:00:08 | 22 |
| 09:00:09 | 23 |
| 09:00:12 | 24 |
| 09:00:16 | 25 |

about something coming up that has to do with negotiations post litigation.  So it's going to have to be something exceptional.  I'll read the law, Mr. Nilsson, but don't get your hopes up, okay?

MR. NILSSON:  I won't.

THE COURT:  Okay.

MS. GAZA:  Thank you.

THE COURT:  And we'll have a discussion before he testifies and then we'll go from there.

MS. GAZA:  Thank you, Your Honor.  I would just remind you of two additional points that were raised yesterday.  If it's relating to correspondence between the parties, negotiations between parties, then it also involves a foreign lawsuit, which could be very confusing to the jury.  And if it involves third parties, we had a separate argument yesterday about the third parties and why they're not relevant and should be excluded and we believe Your Honor's ruling from yesterday should stand.

THE COURT:  That's a separate issue that may have to do with damages, so I'm just going to wait on that.

MS. GAZA:  I understand.

MR. NILSSON:  We would just ask that the Court and opposing counsel review the brief.  Mr. Han is prepared to argue it.  I frankly am not.  We think the authorities are really very close to these issues.

| | | |
|---|---|---|
| 09:00:19 | 1 | THE COURT:  And I promise I will do what is -- |
| 09:00:21 | 2 | MS. GAZA:  I will look, Your Honor, but I don't |
| 09:00:24 | 3 | think there's any authority in the District of Delaware. |
| 09:00:27 | 4 | THE COURT:  Authority for what? |
| 09:00:30 | 5 | MS. GAZA:  For allowing post figure, 408 |
| 09:00:34 | 6 | discussions into evidence. |
| 09:00:35 | 7 | THE COURT:  Oh, okay.  All right. |
| 09:00:37 | 8 | MS. GAZA:  Your Honor, I also haven't read this |
| 09:00:41 | 9 | yet and I don't want to delay things, but I would ask TCL's |
| 09:00:45 | 10 | counsel if there is anything under a sensitive nature that |
| 09:00:48 | 11 | it be filed under seal. |
| 09:00:50 | 12 | THE COURT:  Is it under seal? |
| 09:00:50 | 13 | MR. HAN:  We haven't filed it, Your Honor, but |
| 09:00:53 | 14 | we intend to file it. |
| 09:00:54 | 15 | THE COURT:  Is it filed under seal? |
| 09:00:57 | 16 | MR. HAN:  You'll see it's marked. |
| 09:00:59 | 17 | MS. GAZA:  No, it's not. |
| 09:01:01 | 18 | MR. SCHLADWEILER:  We will file it confidential. |
| 09:01:03 | 19 | THE COURT:  Thank you. |
| 09:01:04 | 20 | MS. GAZA:  Thank you. |
| 09:01:05 | 21 | THE COURT:  Are we ready to go now?  Good. |
| 09:01:08 | 22 | Let's get the jury. |
| 09:03:20 | 23 | (Jury enters.) |
| 09:03:20 | 24 | THE COURT:  Please be seated, ladies and |
| 09:03:23 | 25 | gentlemen.  Welcome back to court.  Today we are going to |

|  |  |
|---|---|
| 09:03:28 | 1 |

start evidence.  You'll notice on your chairs you have a

number of documents.  The only one I want you to worry about

right now is the one that has the clip on it.  Looks like

this.  These are the initial jury instructions.  I intend to

read these instructions to you now.  You're certainly

welcome to read along or just listen.  And these are the

initial instructions for the trial and simply trying to give

you an idea of what the general law is related to this case

so that you have an idea of what the law is before you start

hearing the evidence.  You are able to keep these

instructions throughout the course of the trial.  I will

tell you, though, that if you use these, these instructions

to write notes, sometimes the instructions change and then

you would lose your notes.  So I think you have a separate

pad to write notes on.  You probably ought to use that,

because sometimes we'll change some of the instructions,

sometimes there's enough change that we just take the whole

set away from you and start from scratch.  So it's a lot of

nice paper, but it's generally not good for note taking.

          So I'm going to read these to you now and then

after that we will start the trial.  And instruction #1,

members of the jury, now that you have been sworn in, I have

the following preliminary instructions for guidance on your

role as jurors in this case.

          These instructions are intended to introduce you

09:05:01    1    to the case and the law that you will apply to the evidence

09:05:05    2    that you will hear.  I will give you more detailed

09:05:07    3    instructions on the law at the end of the trial.  Also

09:05:11    4    because this is a patent trial which will deal with subject

09:05:14    5    matter that is not within the everyday experience of most of

09:05:17    6    us, I will additionally give you some preliminary

09:05:21    7    instructions regarding patents to assist you in discharging

09:05:24    8    your duties as jurors.

09:05:29    9            #2.  It will be your duty to decide from the

09:05:31    10   evidence whether the plaintiff is entitled to a verdict

09:05:34    11   against the defendant.  From the evidence, you will decide

09:05:37    12   what the facts are.  You and only you will be the judges of

09:05:41    13   the facts.  You will have to decide what happened.  I will

09:05:44    14   play no part in judging the facts.

09:05:46    15           You are entitled to consider the evidence in the

09:05:49    16   light of your own observations and experiences in life.  You

09:05:52    17   may use reason and common sense to draw deductions from

09:05:56    18   facts established by the evidence.  You will then apply

09:05:59    19   those facts to the law which I give you in these and the

09:06:03    20   other instructions.  In that way, you will reach your

09:06:06    21   verdict.  You are the sole judges of the facts, but you must

09:06:11    22   follow the law as stated in my instructions, whether you

09:06:14    23   agree or disagree with the law stated in the instructions.

09:06:18    24           Do not allow sympathy or prejudice to influence

09:06:21    25   you.  The law requires that your verdict be unaffected by

anything except the evidence, your common sense, and the law stated in these and other instructions.

Anything that I may say or do during the trial must not be taken by you as an indication of what I think the evidence or what I think your verdict should be.

Instruction 3.  The evidence from which you will find the facts will consist of the testimony of witnesses, the documents and other things admitted into evidence.  The evidence may also include certain facts agreed to by the parties or that I may instruct you to find.

Certain things are not evidence and must not be considered by you.  I will list them for you now:  1. Statements, arguments, questions and comments by lawyers are not evidence.  2.  Exhibits that are identified by a party, but not offered or received in evidence are not evidence. 3.  Objections by lawyers are not evidence.  4.  Testimony and exhibits that I strike from the record or tell you to disregard are not evidence and must not be considered.  5. Anything you see or hear about this case outside this courtroom is not evidence, unless I specifically tell you otherwise during the trial.

There are rules that control what can be received into evidence.  When a lawyer asks a question or offers an exhibit into evidence and the lawyer on the other side thinks that it is not permitted by the rules of

evidence, the lawyer may object.   This simply means that the
lawyer is requesting that I make a decision on a particular
rule of evidence.   You should not be influenced by the
lawyer's objection or by my ruling on that objection.
Objections to questions are not evidence.   Lawyers have an
obligation to their clients to make objections when they
believe that evidence being offered is improper under the
rules have evidence.   If the objection is sustained, ignore
the question.   If it is overruled, treat the answer like any
other.

          Furthermore, sometimes a particular item of
evidence is received for a limited purpose only.   That is,
it can be used by you only for one particular purpose, and
not for any other purpose.   I will tell you when that occurs
and instruct you on the purposes for which the item can and
cannot be used.   You should also pay particularly close
attention to such an instruction, because it may not be
available to you in writing later in the jury room.

          Also, certain testimony or other evidence may be
ordered struck from the record and you will be instructed to
disregard this evidence.   Do not consider any testimony or
other evidence that gets struck or excluded.   Do not
speculate about what a witness might have said or what an
exhibit might have shown.

          During trial you will see many exhibits.   Many

09:09:16  1   of these will be admitted as evidentce.  You will have these

09:09:19  2   admitted exhibits in the jury room for your deliberations.

09:09:23  3   The other exhibits, including charts and animations, will be

09:09:26  4   offered to help illustrate the testimony of witnesses.

09:09:30  5   These illustrative exhibits, called demonstrative exhibits,

09:09:34  6   are not admitted into evidence and should not be considered

09:09:38  7   as evidence.  Rather, it is the underlying testimony of the

09:09:41  8   witness that you will hear when you see the demonstrative

09:09:44  9   exhibits that is the evidence of the case.

09:09:52  10              Instruction 4.  During the trial it may become

09:09:56  11  necessary for me to talk with the lawyers outside your

09:09:59  12  hearing, either by having a bench conference while you are

09:10:03  13  present in the courtroom, sometimes called a sidebar or by

09:10:06  14  calling a recess.  Please understand that while you are

09:10:09  15  waiting, the Court and counsel are working.  The purpose of

09:10:12  16  these conferences is to decide how certain evidence is to be

09:10:17  17  treated under the rules of evidence which govern the trial

09:10:20  18  and to avoid confusion and error.  We will, of course, do

09:10:24  19  what we can to keep the number and length of these

09:10:26  20  conferences to a minimum.

09:10:30  21              I may not always grant an attorney's request for

09:10:32  22  a side bar.  Do not consider my granting or denying a

09:10:35  23  request for a conference as any indication of my opinion of

09:10:39  24  the case or of what your verdict should be.

09:10:44  25              Instruction 5.  While evidence is being

09:10:46    1    presented, you are not allowed to raise your hands to ask

09:10:48    2    questions about the evidence.  However, if you do have

09:10:51    3    questions about something you hear during the examination of

09:10:54    4    a witness, you may write your questions down on a piece of

09:10:58    5    paper.  When the attorneys have finished examining that

09:11:01    6    witness, you may submit your written question or questions.

09:11:03    7    I will review each question with the attorneys.  You may not

09:11:08    8    receive an answer to your question because I may decide that

09:11:11    9    the question is not proper under the rules of evidence.  I

09:11:13   10    may ask your question to the witness or the attorneys may

09:11:17   11    choose to answer your questions by asking more questions of

09:11:21   12    the witness.  But even if the question is proper, you may

09:11:24   13    not get an immediate answer to your question.  For instance,

09:11:27   14    a witness or an exhibit that you will see later in the trial

09:11:30   15    may answer your question.

09:11:34   16            Instruction 6.  If you wish, you may, but are

09:11:38   17    not required to, take notes to help you remember what

09:11:42   18    witnesses said.  Notes may be helpful to you because at the

09:11:44   19    end of the trial, you must make your decision based on what

09:11:48   20    you recall of the evidence.  You will not have a written

09:11:51   21    transcript to consult, and it may not be practical for the

09:11:55   22    court reporter to read back lengthy testimony.  Therefore,

09:11:57   23    you should pay close attention to the testimony as it is

09:12:00   24    given.

09:12:01   25            If you do take notes, please keep them to

09:12:04   1   yourself until you and your fellow jurors go to the jury

09:12:08   2   room to decide the case.  Do not let note taking district

09:12:14   3   you to the point that you miss hearing other testimony from

09:12:17   4   the witness.

09:12:18   5          During the trial, documents or other physical

09:12:20   6   items may be received into evidence.  At the present,

09:12:23   7   however, you will not be supplied with a list of exhibits

09:12:26   8   which are received in evidence.  Therefore, you may wish to

09:12:29   9   make notes about the exhibits, especially their description

09:12:32   10  and number, so that you can refer to those exhibits while

09:12:35   11  you are deliberating.

09:12:36   12         When we take our recess each day for the

09:12:39   13  lunchtime break and when we take our recess each night,

09:12:44   14  please take your notes to the jury room and leave your notes

09:12:48   15  there.  The courtroom deputy will take custody of your notes

09:12:52   16  and secure them.  No one will read your notes but you.  Your

09:12:57   17  notes will be destroyed after the trial is offer.

09:13:03   18         Instruction 7.  In any legal action facts must

09:13:06   19  be proven by a required standard of evidence, that is known

09:13:09   20  as the burden of proof.  In a patent case such as this,

09:13:13   21  there are two different burdens of proof that are used.  The

09:13:15   22  first is called preponderance of the evidence.  The second

09:13:18   23  is called clear and convincing evidence.  Your verdict

09:13:21   24  depends on whether you find certain facts have been proved

09:13:27   25  either by a preponderance of the evidence or by a clear and

09:13:30    1    convincing evidence.

09:13:31    2        A party asserting patent infringement has the

09:13:35    3    burden of providing infringement and willful infringement by

09:13:39    4    a preponderance of the evidence.  That means the party

09:13:41    5    asserting infringement and willful infringement has to

09:13:47    6    produce evidence that, when considered in light of all the

09:13:50    7    facts, leads you to believe that what that party claims is

09:13:54    8    more likely true than not.  To put it differently, if you

09:13:58    9    were to put the parties' evidence on opposite sides of a

09:14:03    10    scale, the evidence supporting the claims of the party

09:14:06    11    asserting infringement must make the scales tip somewhat on

09:14:10    12    its side.

09:14:11    13        A party challenging the validity of a patent has

09:14:14    14    the burden of proving by clear and convincing evidence that

09:14:17    15    the patent is invalid.  Clear and convincing evidence means

09:14:21    16    that it is highly probable the fact is true.  Proof by clear

09:14:25    17    and convincing evidence is, thus, a higher burden of proof

09:14:31    18    than a preponderance of the evidence.  When a party has the

09:14:34    19    burden of proof by clear and convincing evidence, it means

09:14:37    20    that you must be persuaded that it is highly probably that

09:14:42    21    what the party seeks to prove is true.

09:14:48    22        Some of you may have heard the phrase proof

09:14:51    23    beyond a reasonable doubt.  That burden of proof applies

09:14:54    24    only in criminal cases and has nothing to do with a civil

09:15:00    25    case like this one.  You should therefore not consider it in

09:15:03  1      this case.

09:15:07  2                  Instruction 8.  In deciding what the facts are,

09:15:09  3      you may have to decide what testimony you believe and what

09:15:11  4      testimony you do not believe.  You may believe all of what a

09:15:15  5      witness said or only part of it or none of it.  You are the

09:15:18  6      sole judges of each witness's credibility.

09:15:20  7                  You should consider each witness's means of

09:15:22  8      knowledge, strength of memory, opportunity to observe, how

09:15:25  9      reasonable or unreasonable the testimony is, whether it is

09:15:29  10     consistent or inconsistent, whether it is has been

09:15:32  11     contradicted, the witness's biases, prejudices or interests,

09:15:38  12     the witnesses manner or demeanor on the witness stand, and

09:15:42  13     all circumstances that, according to the evidence, could

09:15:44  14     affect the credibility of the testimony.

09:15:45  15                 If you find the testimony to be contradictory,

09:15:48  16     you must try to reconcile it, if reasonably possible, to

09:15:54  17     make one harmonious story of it all.  But if you cannot do

09:16:00  18     this, then it is your duty and privilege to believe the

09:16:04  19     testimony that, in your judgment, is most believable and

09:16:08  20     disregard any testimony that, in your judgment, is not

09:16:11  21     believable.  This instruction applies to the testimony of

09:16:14  22     all witnesses, including expert witnesses.

09:16:19  23                 Instruction 9.  Now a few words about your

09:16:23  24     conduct as jurors.

09:16:24  25                 First, I instruct you that during the trial you

| | |
|---|---|
| 09:16:28 | 1 |
| 09:16:31 | 2 |
| 09:16:34 | 3 |
| 09:16:38 | 4 |
| 09:16:42 | 5 |
| 09:16:47 | 6 |
| 09:16:50 | 7 |
| 09:16:53 | 8 |
| 09:16:57 | 9 |
| 09:17:01 | 10 |
| 09:17:05 | 11 |
| 09:17:09 | 12 |
| 09:17:13 | 13 |
| 09:17:14 | 14 |
| 09:17:17 | 15 |
| 09:17:21 | 16 |
| 09:17:24 | 17 |
| 09:17:27 | 18 |
| 09:17:30 | 19 |
| 09:17:33 | 20 |
| 09:17:37 | 21 |
| 09:17:41 | 22 |
| 09:17:44 | 23 |
| 09:17:47 | 24 |
| 09:17:50 | 25 |

are not to discuss the case with anyone or permit anyone to discuss it with you.  Until you retire to the jury room at the end of the case to deliberate on your verdict, you simply are not to talk about the case.  If any lawyer, party or witness does not speak to you when you pass in the hall, ride in the elevator or the like, remember it is because they are not supposed to talk with you, nor you with them.  That is why you are asked to wear your juror tags while in the courthouse.  It shows that you are someone who is not to be approached in any way.  In this way, any unwarranted and unnecessary suspicion about your fairness can be avoided.  If anyone should try to talk to you about the case, bring it to the court's attention promptly.

Second, do not read or listen to anything touching on this case in any way.  By that I mean, if there may be a newspaper or internet article or radio or television report relating to this case, do not read the article or watch or listen to the report.

Third, do not try to do any research or make any investigation about the case on your own.  Let me elaborate. During the course of the trial, you must not conduct any independent research about the case, the matters in the case, and the individuals or entities involved in the case. In other words, you should not consult dictionaries or reference materials, search the internet, websites, blogs or

| | |
|---|---|
| 09:17:54 | 1 |

any other electronic means.  Also, again, should there

happen to be a newspaper article or radio or television

report relating to this case, do not read the article or

watch or listen to the report.  It is important that you

decide this case based solely on the evidence presented in

the courtroom.  Please do not try to find out information

from any other sources.

Many of you use cell phones, smartphones, the

internet, and other tools of technology.  You also must not

talk to anyone about this case or use these tools to

communicate electronically with anyone about the case.  This

includes your family and friends.  You may not communicate

with anyone about the case on your cell phone, through

e-mail, your smartphone, text messaging, on Twitter, through

any blog or website, through any internet chat room, or by

way of any other social networking websites, including

Facebook, Linked In, and YouTube.

Finally, do not form any opinion until all the

evidence has been presented.  Keep an open mind until you

start your deliberations at the end of the case.

Instruction 10.  You, as jurors, must decide

this case based solely on the evidence presented here within

the four walls of the courtroom because the parties must

have an opportunity to respond to any information you

consider in deciding this case.  This means that during the

09:19:27  1    trial you must not conduct any independent research about

09:19:30  2    this case, the matters in the case, the individuals or

09:19:33  3    entities involved in the case.  In other words, you should

09:19:37  4    not consult dictionaries or reference materials, search the

09:19:41  5    internet, websites, blogs, chat rooms, social networking

09:19:43  6    websites, including Facebook, Instagram, LinkedIn or

09:19:47  7    YouTube, or use your cell phones, iPhones, text messaging,

09:19:50  8    Twitter or any other electronic tools or devices to obtain

09:19:53  9    information about this case or to help you decide the case.

09:19:56  10         Until you retire to deliberate, you may not

09:19:59  11   discuss this case with anyone, even your fellow jurors.

09:20:03  12   After you retire to deliberate, you may begin discussing the

09:20:07  13   case with your fellow jurors, but you cannot discuss the

09:20:10  14   case with anyone else until you have returned a verdict and

09:20:13  15   the case is at an end.  I hope that for all of you this case

09:20:18  16   is interesting and noteworthy.  However, until you have

09:20:21  17   returned a verdict and the case is at an end, you must not

09:20:25  18   talk to anyone or communicate with anyone about the case by

09:20:28  19   any means, electronic or otherwise.  This includes

09:20:31  20   communications with your family and friends.  Such

09:20:33  21   communication would compromise your fairness as jurors and

09:20:38  22   may require your removal from the case and a retrial of this

09:20:42  23   matter at considerable expense to the parties.

09:20:49  24         Instruction 11.  The trial will proceed in the

09:20:50  25   following manner:

09:20:51  1          First, the attorney for the plaintiff may make

09:20:53  2  an opening statement.  Next, the attorney for the defendant

09:20:56  3  may make an opening statement.  An opening statement is not

09:20:59  4  evidence, but is an outline of what the party intends to

09:21:04  5  prove, a summary of what the attorney expects the evidence

09:21:06  6  to be.

09:21:07  7          The plaintiff's attorney will then present

09:21:09  8  evidence through a direct examination of a witness.  The

09:21:12  9  defendants' attorney may then cross examine that witness.

09:21:16  10  After the cross-examination, the plaintiffs attorney may ask

09:21:18  11  additional questions on redirect.  The defendants' attorney

09:21:21  12  may also ask questions on recross.  After all of the

09:21:28  13  plaintiff's witnesses have been presented, the plaintiff

09:21:30  14  will rest.  The defendants' attorney will then present the

09:21:33  15  defendants case.  The defendant may present evidence through

09:21:36  16  direct examination of witnesses and plaintiff's attorney may

09:21:39  17  cross examine those witnesses.  Redirect and recross

09:21:42  18  examinations may also take place.

09:21:44  19          The plaintiff also may present rebuttal

09:21:47  20  witnesses and evidence.

09:21:48  21          After the presentation of evidence is completed,

09:21:51  22  the attorneys will make their closing arguments to summarize

09:21:54  23  and interpret the evidence for you.  Just as with opening

09:21:57  24  statements, these closing arguments are not evidence.  I

09:22:00  25  will then instruct you further on the law.  After that, you

09:22:04  1   will retire to deliberate on your verdict.

09:22:10  2             Instruction 12.  This is a patent case.  The

09:22:14  3   plaintiff in the case is Godo Kaisha IP Bridge I, which I

09:22:19  4   will refer to as IP Bridge.  The defendants in this case are

09:22:23  5   TCL Communication Technology Holdings Limited, TCT Mobile

09:22:28  6   Limited, TCT mobile (US), Inc., and TCT Mobile, Inc., which

09:22:34  7   I will refer to collectively as TCL.

09:22:37  8             There are two patents for your consideration in

09:22:40  9   this case:  U.S. Patent No. 8,351,538 (which I will refer to

09:22:45  10  as the '538 Patent) and U.S. Patent No. 8,385,239 (which I

09:22:51  11  will refer to as '239 patent).  I will refer to these

09:22:54  12  patents collectively as the asserted patents.  IP Bridge is

09:22:59  13  the owner of the asserted patents.  A copy of each of the

09:23:02  14  patents will be given to you along with these primary

09:23:05  15  instructions.

09:23:06  16            Specific patents are usually referred to by

09:23:11  17  their last three digits.  For example, U.S. Patent No.

09:23:16  18  8,351,538 may be called the '538 Patent, while the U.S.

09:23:20  19  Patent No. 8,385,239 may be called the '239 Patent.  You may

09:23:27  20  hear the lawyers and witnesses in the case refer to the

09:23:30  21  asserted patents or a particular one of the patents using

09:23:34  22  its last three digits.

09:23:35  23            IP Bridge alleges that TCL infringes claims and

09:23:40  24  15 and 16 of the '538 Patent and claims 9 and 12 of the '239

09:23:45  25  Patent by making, using, selling, offering for sale or

09:23:48    1    importing mobile phones that are covered by those claims of

09:23:52    2    the asserted patents.  I will refer to these products

09:23:55    3    collectively as the accused products and to the claims

09:23:59    4    collectively as the asserted claims.  IP Bridge also

09:24:02    5    contends that TCL's alleged infringement of the asserted

09:24:07    6    claims is willful.

09:24:12    7              IP Bridge alleges that the asserted patents are

09:24:17    8    standard essential patents.  Here the relevant technical

09:24:20    9    standard is the LTE wireless telecommunications standard.

09:24:26    10             TCL denies that the asserted patents are truly

09:24:30    11   standard essential.  It also denies it infringes the

09:24:33    12   asserted claims, and it contends that the asserted claims

09:24:37    13   are invalid because the supposed inventions were shown in

09:24:43    14   previous documents or would have been obvious to a skilled

09:24:49    15   engineer working in this field.

09:24:55    16             Instruction 13.  Before you decide whether TCL

09:24:58    17   has infringed the claims of IP Bridge's patents or whether

09:25:03    18   IP Bridge's patents are invalid, you will have to understand

09:25:08    19   the patents claims.  The claims are what define the patent

09:25:11    20   owners' rights under the law.  That is, the claims define

09:25:15    21   what the patent owners may exclude others from doing during

09:25:18    22   the term of that patent.

09:25:20    23             The claims of a patent serve two purposes.

09:25:24    24   First, they set the boundaries of the patented invention,

09:25:27    25   what the patent covers.  Second, they provide notice to the

09:25:31  1   public of what those boundaries are.

09:25:33  2           The patent claims are numbered sentences at the

09:25:36  3   end of the patent.  The claims are intended to define, in

09:25:41  4   words, the boundaries of the inventor's rights.  Only the

09:25:44  5   claims of the patent can be infringed.  Neither the written

09:25:48  6   description nor the drawings of a patent can be infringed.

09:25:52  7   Each of the claims must be considered individually.  You

09:25:54  8   must use the same claim meaning for both your decision on

09:25:57  9   infringement and your decision on invalidity.

09:26:01  10          Claims are usually divided into parts, called

09:26:03  11  limitations.  For example, a claim that covers the invention

09:26:08  12  of a table may recite the tabletop, four legs and the glue

09:26:13  13  that secures the legs to the tabletop.  The tabletop, legs

09:26:17  14  and glue are each a separate limitation of the claim.

09:26:23  15          Instruction 14.  While the claims define the

09:26:28  16  invention, sometimes the words or phrases of the claims need

09:26:31  17  to be further defined or interpreted.  It's the Court's duty

09:26:36  18  under the law to define what the patent claims mean and to

09:26:40  19  instruct you about that meaning.  You must accept the

09:26:43  20  meanings, sometimes called constructions, that I give you

09:26:46  21  and use the meaning of each claim when you decide whether

09:26:50  22  any claim of the patent has been infringed or whether any

09:26:54  23  claim is invalid.

09:26:55  24          I will now tell you the meanings of the

09:26:58  25  following words and the groups of words from the patent

claims.

So the claim limitation, quote, an arranging unit.  Construction, circuitry or a combination of circuitry and software that operates to insert signals into symbols of a CQI transmission slot.

Claim limitation, format for transmitting an ACK/NACK signal.  Construction, a first slot structure for transmitting an ACK/NACK signal and a reference signal.

Claim limitation, format for transmitting CQI signals.  Construction, a second slot structure for transmitting the CQI signal and the second reference signals.

Claim limitation, a physical resource that supports a mixture of a format for transmitting an ACK/NACK signal and a format for transmitting CQI signals.  Construction, a physical resource that supports transmitting, at the same time, a first slot structure for transmitting an ACK/NACK signal and the first reference signals, and a second slot structure for transmitting the CQI signals and the second reference signals.

Claim limitation, multiplexing the aperiodic channel quality indicator report with data.  Construction, multiplexing the aperiodic channel quality indicator report with user data.

Claim limitation, without multiplexing the

09:29:00   1   aperiodic channel quality indicator report with user data.

09:29:04   2   Construction, without multiplexing the aperiodic channel

09:29:09   3   quality interest indicator report with user data.

09:29:13   4           A copy of these instructions is included in your

09:29:16   5   jury notebooks.  You must ignore any different

09:29:20   6   interpretation given to these terms by witnesses or by the

09:29:21   7   attorneys.

09:29:25   8           You should not take the definition of the

09:29:27   9   language of these claims as an indication that I have a view

09:29:29   10  of regarding how you should decide the issues that you are

09:29:33   11  being asked to decide, such as infringement and invalidity.

09:29:36   12  These issues are for you to decide.

09:29:41   13          Instruction 15.  The parties have stipulated

09:29:43   14  that certain facts are true and some of those stipulations

09:29:47   15  may be read to you during this trial.  You must, therefore,

09:29:49   16  treat these facts as having been proved for the purposes of

09:29:52   17  this case.

09:29:56   18          Instruction 16.  In this case, you must decide

09:29:58   19  several things according to the instructions that I give

09:30:00   20  you.  At the end of the trial you may be given more detailed

09:30:03   21  instructions.  In essence, you may be asked to decide the

09:30:07   22  following issues.  1.  Whether IP Bridge can prove by a

09:30:12   23  preponderance of the evidence that TCL directly infringes

09:30:15   24  one or more asserted claims; that is, claim 15 or 16 of the

09:30:23   25  '538 Patent or claim 9 or 12 of the '239 Patent.  2.

| | |
|---|---|
| 09:30:26 | 1 |
| 09:30:29 | 2 |
| 09:30:33 | 3 |
| 09:30:37 | 4 |
| 09:30:42 | 5 |
| 09:30:45 | 6 |
| 09:30:50 | 7 |
| 09:30:54 | 8 |
| 09:30:59 | 9 |
| 09:31:04 | 10 |
| 09:31:08 | 11 |
| 09:31:12 | 12 |
| 09:31:16 | 13 |
| 09:31:16 | 14 |
| 09:31:20 | 15 |
| 09:31:23 | 16 |
| 09:31:26 | 17 |
| 09:31:29 | 18 |
| 09:31:33 | 19 |
| 09:31:38 | 20 |
| 09:31:42 | 21 |
| 09:31:45 | 22 |
| 09:31:53 | 23 |
| 09:31:56 | 24 |
| 09:32:01 | 25 |

Whether TCL can prove by clear and convincing evidence that one or more of the asserted claims; that is, claim 15 or 16 of the '538 Patent or claim 9 or 12 of the '239 Patent, is invalid.  3.  If you find any of the asserted claims is infringed and is not invalid, whether IP Bridge has shown that such infringement is willful.  4.  If you find any of the asserted claims is infringed and is not invalid, what has IP Bridge proven that would be adequate to compensate it for TCL's infringement of the valid claims.

Instruction 17, the patent office and its examiners do not decide infringement issues.  If there is a dispute about infringement, it is brought to the Court to decide.

Here, you also are asked to decide about validity, that is, whether the asserted claims of the asserted patents should have been allowed by the patent office.  A party accused of infringement is entitled to challenge whether the asserted patent claims are sufficiently new or nonobvious in light of the prior art and whether other requirements of patentability have been met. In other words, a defense to an infringement lawsuit is that the asserted claims in question are invalid.

Instruction 18.  If any person or business entity makes, uses, sells (within the United States), offers to sell (from within the United States), or imports (into

09:32:06  1    the United States) what is covered by the patent claims

09:32:09  2    without the patent owner's permission, that person is said

09:32:12  3    to infringe the patent.

09:32:13  4          In this case, IP Bridge asserts that TCL has

09:32:16  5    directly infringed claims 15 and 16 of the '239 Patent and

09:32:20  6    claims 9 and 12 of the '538 Patent, by literal infringement.

09:32:26  7          Infringement is assessed on a claim by claim

09:32:29  8    basis.  Therefore there can be infringement as to one claim,

09:32:33  9    but no infringement as to another.  As explained further in

09:32:37  10   the following instructions, direct infringement results if

09:32:40  11   the accused product is covered by at least one claim of the

09:32:43  12   patent.

09:32:47  13         Instruction 18.  In order to recover on its

09:32:50  14   claim of direct infringement by literal infringement, IP

09:32:55  15   Bridge must prove by a preponderance of the evidence that

09:32:58  16   TCL made, used, sold, offered for sale within or imported

09:33:02  17   into the United States a product that meets all of the

09:33:05  18   requirements of the invention defined in a claim and did so

09:33:08  19   without the permission of IP Bridge during the time the 239

09:33:13  20   and/or the '538 Patent was in force.

09:33:16  21         You must compare the accused products with each

09:33:18  22   and every one of the requirements of a claim to determine

09:33:22  23   whether the requirements of that claim are met.  You must

09:33:26  24   determine whether or not there is infringement separately

09:33:28  25   for each asserted claim.  Proof of direct infringement does

09:33:32  1    not require proof that TCL intended to infringe.

09:33:38  2                Instruction 20.  This case involves two types of

09:33:42  3    patent claims, independent claims and dependent claims.  An

09:33:46  4    independent claim sets forth all of the requirements that

09:33:48  5    must be met in order to be covered by that claim.

09:33:51  6                An independent claim does not refer to any other

09:33:54  7    claim of the patent.  For example, claim 8 of the '239

09:33:58  8    Patent is an independent claim.  Thus, it is not necessary

09:34:00  9    to look at any other claim to determine what an independent

09:34:03  10   claim covers.

09:34:04  11               Claim 9 of the '239 Patent is a dependent claim.

09:34:09  12   A dependent claim does not itself recite all of the

09:34:12  13   requirements of the claim but refers to another claim for

09:34:15  14   some of its requirements.  In this way, the claim depends on

09:34:19  15   another claim.  A dependent claim incorporates all of the

09:34:22  16   requirements of the claim to which it refers.  The dependent

09:34:26  17   claim then adds its own additional requirements.

09:34:28  18               To determine what a dependent claim covers, it

09:34:32  19   is necessary to look at both the dependent claim and any

09:34:36  20   other claim to which it refers.  A product that meets all of

09:34:39  21   the requirements of both the dependent claim and the claim

09:34:42  22   to which it refers is covered by that dependent claim.

09:34:47  23               An independent claim does not refer to any other

09:34:50  24   claim of the patent.  For example, claim 8 of the '239 is an

09:34:54  25   independent claim.

| | | |
|---|---|---|
| 09:34:57 | 1 | Instruction 21, you must evaluate the invalidity |
| 09:35:01 | 2 | of each asserted claim separately.  Even if an independent |
| 09:35:04 | 3 | claim is invalid, this does not mean that the dependent |
| 09:35:08 | 4 | claims that depend from it are automatically invalid. |
| 09:35:12 | 5 | Rather, you must consider the validity of each asserted |
| 09:35:16 | 6 | claim separately.  You must decide this issue of validity on |
| 09:35:21 | 7 | a claim-by-claim basis.  However, if you find that a |
| 09:35:24 | 8 | dependent claim is invalid, then you must find that the |
| 09:35:28 | 9 | independent claim from which it depends is also invalid. |
| 09:35:33 | 10 | This is because the dependent claim includes all of the |
| 09:35:36 | 11 | elements of the independent claim from which it depends. |
| 09:35:41 | 12 | Instruction 22.  Patent invalidity is a defense |
| 09:35:45 | 13 | to patent infringement.  I will now instruct you on the |
| 09:35:49 | 14 | rules you must follow in deciding whether or not TCL has |
| 09:35:54 | 15 | proven that any asserted claim is invalid. |
| 09:35:56 | 16 | To prove that any claim of a patent is not |
| 09:35:59 | 17 | valid, TCL must persuade you by clear and convincing |
| 09:36:04 | 18 | evidence, i.e., you must be left with a clear conviction, |
| 09:36:07 | 19 | that the claim is not valid.  The law presumes, in the |
| 09:36:11 | 20 | absence of clear and convincing evidence to the contrary, |
| 09:36:15 | 21 | that the patent office acted correctly in issuing the |
| 09:36:18 | 22 | patent - that is, the law presumes that patent claims are |
| 09:36:22 | 23 | valid. |
| 09:36:23 | 24 | Claims of an issued patent may be found to be |
| 09:36:26 | 25 | invalid.  Thus, you must determine whether each of the |

09:36:29    1    asserted claims is invalid.

09:36:31    2            TCL contends that the asserted claims are

09:36:33    3    invalid for the following reasons:  Because they are

09:36:37    4    anticipated by the prior art or would have been obvious to

09:36:42    5    one of ordinary skill in the art at the time of invention.

09:36:49    6            Instruction 23.  Under the patent laws a person

09:36:52    7    should be granted a patent only if the invention claimed in

09:36:56    8    the patent is new and not obvious in light of what came

09:36:59    9    before.  That which came before is referred to as the prior

09:37:02   10    art.

09:37:03   11            Prior art may include items that were publicly

09:37:06   12    known or that have been used or offered for sale or

09:37:09   13    references such as publications or patents, that disclose

09:37:13   14    the claimed invention or elements of the claimed invention.

09:37:17   15    To be prior art, the item or reference must have been made,

09:37:20   16    known, used, published or patented either before the

09:37:25   17    invention was made or more than one year before the filing

09:37:28   18    date of the patent application.

09:37:30   19            For the claim to be invalid because it is not

09:37:35   20    new, TCL must show by clear and convincing evidence that all

09:37:38   21    of the requirements of that claim were present in a single

09:37:42   22    previous device or method that was known of, used or

09:37:46   23    described in a single previous printed publication or

09:37:49   24    patent.  We call these things anticipating prior art.  To

09:37:53   25    anticipate the invention, the prior art does not have to use

380

09:37:56  1    the same words as the claim, but all of the requirements of

09:37:59  2    the claim must have been disclosed, either stated expressly

09:38:03  3    or inherently to a person having ordinary skill in the art

09:38:08  4    in the technology of the invention, so that looking at that

09:38:11  5    one reference, that person could make and use the claimed

09:38:16  6    invention.

09:38:19  7         Instruction 24.  In order to be entitled to a

09:38:23  8    patent, an invention must actually be new and the inventor

09:38:27  9    must not have lost her or his rights by delaying the filing

09:38:31  10   of an application claiming the invention.  In general,

09:38:34  11   inventions are new when the identical product or process has

09:38:38  12   not been made, used or disclosed before.  Anticipation must

09:38:42  13   be determined on a claim-by-claim basis.

09:38:45  14        In this case, TCL contends that claims 9 and 12

09:38:48  15   of the '239 Patent are invalid because the claimed invention

09:38:52  16   is anticipated or because IP Bridge lost the right to obtain

09:38:56  17   a patent.  TCL must convince you of this by clear and

09:39:00  18   convincing evidence, i.e., that the evidence highly probably

09:39:05  19   demonstrates that the claims are invalid.

09:39:06  20        Here is a list of ways that TCL can show that a

09:39:10  21   patent claim was not new:  (1) an invention is not new if it

09:39:15  22   was already patented or described in a printed publication,

09:39:18  23   anywhere in the world before the date of invention.  A

09:39:21  24   description is a printed publication only if it was publicly

09:39:24  25   accessible.  (2) a patent holder has lost her or his rights

if the claimed invention was already patented or described in a printed publication, anywhere in the world by the patent holder or anyone else, more than a year before the effective filing date of the application for the '239 Patent.  An invention was patented by another if the other patent describes the same invention claimed by the patent holder to a person having ordinary skill in the technology. (3) an invention is not new if the claimed invention was described in a patent granted on an application for patent by another filed in the United States or under the PCT system and designated the United States, and was published in English and the application was filed before the effective filing date of the application for the '239 Patent.

Instruction 25.  TCL contends that certain asserted claims are anticipated or obvious because the inventions defined in such claims were described in printed publications before the priority date of each of the asserted patents.  A patent claim is invalid if the invention defined by that claim was described in a printed publication before it was invented by the patentee.  An inventor's disclosure of his or her own work within one year of the priority date is not prior art.

A printed publication must have been maintained in some tangible form, such as printed pages, photographs,

| | |
|---|---|
| 09:40:59 | 1 |
| 09:41:04 | 2 |
| 09:41:08 | 3 |
| 09:41:09 | 4 |
| 09:41:12 | 5 |
| 09:41:16 | 6 |
| 09:41:20 | 7 |
| 09:41:24 | 8 |
| 09:41:27 | 9 |
| 09:41:31 | 10 |
| 09:41:34 | 11 |
| 09:41:37 | 12 |
| 09:41:39 | 13 |
| 09:41:43 | 14 |
| 09:41:46 | 15 |
| 09:41:50 | 16 |
| 09:41:54 | 17 |
| 09:41:58 | 18 |
| 09:42:02 | 19 |
| 09:42:06 | 20 |
| 09:42:09 | 21 |
| 09:42:13 | 22 |
| 09:42:16 | 23 |
| 09:42:20 | 24 |
| 09:42:22 | 25 |

photocopies, and/or an internet publication, and must have been sufficiently accessible to persons interested in the subject matter of its contents.

Information is publicly accessible if it was distributed or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter exercising reasonable diligence can locate it.  It is not necessary for the printed publication to have been available to every member of the public.  An issued patent is a printed publication.  A published patent application is a printed publication as of its publication date.

The disclosure of the claimed invention in the printed publication must be complete enough to enable one of ordinary skill in the art to make and use the invention without undue experimentation.  In determining whether the disclosure is enabling, you should take into account what would have been within the knowledge of a person of ordinary skill in the art at the time the invention of the asserted patents were made.  You may consider evidence that sheds light on the knowledge such a person would have had.

TCL has the burden of showing that a document is a printed publication.

Instruction 26.  Regardless of whether or not a particular prior art reference was considered by the patent examiner during the prosecution of the application which

09:42:25   1   matured into asserted patents, TCL must prove by clear and

09:42:30   2   convincing evidence that the challenged claims are invalid.

09:42:34   3   This burden of proof on TCL never changes regardless of

09:42:39   4   whether or not the patent examiner considered the reference.

09:42:45   5          Instruction 27.  The question of invalidity of a

09:42:49   6   patent claim is determined from the perspective of a person

09:42:52   7   of ordinary skill in the art in the field of the asserted

09:42:55   8   invention as of the effective filing date of the respective

09:42:59   9   patent.

09:43:00   10          In order to determine the obviousness of the

09:43:03   11   invention, you must determine the level of ordinary skill in

09:43:07   12   the field of the invention.  Regardless of whether you

09:43:10   13   decide to articulate in your verdict what you believe was

09:43:15   14   the level of ordinary skill in the field of the invention,

09:43:19   15   you must consider and assess this factor before reaching

09:43:22   16   your conclusion in this case.

09:43:26   17          Instruction 28.  Even though an invention may

09:43:30   18   not have been identically disclosed or described before it

09:43:35   19   was made by an inventor, in order to be patentable, an

09:43:40   20   invention must not have been obvious to a person of ordinary

09:43:43   21   skill in the art at the time the invention was made.  TCL

09:43:47   22   contends that the asserted claims are obvious in view of

09:43:50   23   several combinations of prior art and the knowledge of a

09:43:53   24   person of ordinary skill in the art.

09:43:55   25          TCL may establish that a patent claim is invalid

09:43:58  1    by showing, by clear and convincing evidence, that the

09:44:01  2    claimed invention would have been obvious to persons having

09:44:04  3    ordinary skill in the art at the time the invention was

09:44:07  4    made.   Unlike anticipation, which allows consideration of

09:44:10  5    only one item of prior art, obviousness may be shown by

09:44:14  6    considering one or more than one item of prior art.

09:44:17  7         In deciding obviousness, you must avoid using

09:44:22  8    hindsight; that is, you should not consider what is known

09:44:24  9    today or what was learned from the teachings of the patent.

09:44:29  10   You should not use the patent as a road map for selecting

09:44:32  11   and combining items of prior art.   You must put yourself in

09:44:37  12   the place of a person of ordinary skill in the art at the

09:44:40  13   time the invention was made.

09:44:41  14        The following factors must be evaluated to

09:44:44  15   determine whether TCL has established that the claimed

09:44:47  16   invention(s) is obvious:  1.   The scope and content of the

09:44:52  17   prior art relied upon by TCL; 2.   The difference or

09:44:59  18   differences, if any, between each claim of the asserted

09:45:02  19   patents that TCL contends is obvious and the prior art; 3.

09:45:10  20   The level of ordinary skill in the art at the time the

09:45:14  21   invention of the asserted patents was made; and 4.

09:45:19  22   Additional considerations, known as objective indicators, if

09:45:23  23   any, that indicate that the invention was obvious or not

09:45:27  24   obvious.

09:45:28  25        Each of these factors must be evaluated,

09:45:31   1   although they may be analyzed in any order, and you must

09:45:35   2   perform a separate analysis for each of the asserted claims.

09:45:39   3          It is TCL's burden to prove by clear and

09:45:42   4   convincing evidence that the invention would have been

09:45:44   5   obvious.  Again, you must analyze whether TCL has met its

09:45:47   6   burden separately for each asserted claim that TCL contends

09:45:52   7   is obvious.

09:45:56   8          Instruction 29.  In considering whether the

09:46:00   9   claimed invention was obvious, you must first determine the

09:46:04  10   scope and content of the prior art.

09:46:06  11          The scope and content of prior art for deciding

09:46:09  12   whether the invention was obvious includes at least prior

09:46:12  13   art in the same field as the claimed invention.  It also

09:46:17  14   includes prior art from different fields that a person of

09:46:20  15   ordinary skill in the art would have considered when trying

09:46:22  16   to solve the problem that is addressed by the invention.

09:46:26  17          Where the party challenging the validity of the

09:46:28  18   patent is relying on prior art that was not considered by

09:46:31  19   the PTO during examination, you may consider whether that

09:46:35  20   prior art is significantly different or more relevant than

09:46:38  21   the prior art that the PTO did consider.  If you decide it

09:46:42  22   was different or more relevant, you may weigh that prior art

09:46:45  23   more heavily when considering whether the challenger has

09:46:49  24   carried its clear and convincing burden of proving

09:46:53  25   invalidity.

| | |
|---|---|
| 09:46:54 | 1 |
| 09:46:56 | 2 |
| 09:47:00 | 3 |
| 09:47:03 | 4 |
| 09:47:07 | 5 |
| 09:47:10 | 6 |
| 09:47:14 | 7 |
| 09:47:18 | 8 |
| 09:47:21 | 9 |
| 09:47:24 | 10 |
| 09:47:28 | 11 |
| 09:47:31 | 12 |
| 09:47:34 | 13 |
| 09:47:37 | 14 |
| 09:47:41 | 15 |
| 09:47:44 | 16 |
| 09:47:47 | 17 |
| 09:47:50 | 18 |
| 09:47:52 | 19 |
| 09:47:56 | 20 |
| 09:48:00 | 21 |
| 09:48:03 | 22 |
| 09:48:07 | 23 |
| 09:48:13 | 24 |
| 09:48:16 | 25 |

A prior art reference may be considered if it discloses information designed to solve any problem or need addressed by the patent or if the reference discloses information that has obvious uses beyond its main purpose that a person of ordinary skill in the art would reasonably examine to solve any problem or need addressed by the patent.

Instruction 30.  You should analyze whether there are any relevant differences between the prior art and the claimed invention from the view of a person of ordinary skill in the art at the time of the invention.  Your analysis must determine the impact, if any, of such differences on the obviousness or nonobviousness of the invention as a whole, and not merely some portion of it.

In analyzing the relevance of the differences between the claimed invention and the prior art, you do not need to look for precise teaching in the prior art directed to the subject matter of the claimed invention.  You may take into account the inferences and creative steps that a person of ordinary skill in the art would have employed in reviewing the prior art at the time of the invention.  For example, if the claimed invention combined elements known in the prior art and the combination yielded results that were predictable to a person of ordinary skill in the art at the time of the invention, then this evidence would make it more

09:48:19  1   likely that the claim was obvious.  On the other hand, if

09:48:23  2   the combination of known elements yielded unexpected or

09:48:28  3   unpredictable results, or if the prior art teaches away from

09:48:32  4   combining the known elements, then this evidence would make

09:48:35  5   it more likely that the claim that successfully combined

09:48:38  6   those elements was not obvious.

09:48:40  7          Importantly, a claim is not proved obvious

09:48:42  8   merely by demonstrating that each of the elements was

09:48:46  9   independently known in the prior art.  Most, if not all,

09:48:50  10  inventions rely on building blocks long known, and claimed

09:48:57  11  discoveries almost of necessity will likely be combinations

09:49:00  12  of what is already known.  Therefore, you should consider

09:49:04  13  whether a reason existed at the time of the invention that

09:49:11  14  would have prompted a person of ordinary skill in the art in

09:49:14  15  the relevant field to combine the teachings in the way the

09:49:18  16  claimed invention does.  The reason could come from prior

09:49:21  17  art, the background knowledge of one of ordinary skill in

09:49:24  18  the art, the nature of any problem or need to be addressed,

09:49:27  19  market demand or common sense.  You may also consider

09:49:31  20  whether the problem or need was known, the possible

09:49:34  21  approaches to solving the problem or addressing the need

09:49:38  22  were known and finite, and the solution was predictable

09:49:43  23  through use of known option.  Further you may consider

09:49:46  24  whether the prior art teaches away from the proposed

09:49:50  25  combination.  If the prior art teaches away from combining

09:49:53  1   the known elements, then this evidence would make it more

09:49:56  2   likely that the claim that successfully combined those

09:49:59  3   elements was not obvious.

09:50:01  4           If you find that a reason existed at the time of

09:50:04  5   the invention to combine the elements of the prior art to

09:50:07  6   arrive at the claimed invention, and there would have been a

09:50:11  7   reasonable expectation of success for doing so, this

09:50:15  8   evidence would make it more likely that the claimed

09:50:17  9   invention was obvious.  Again, you must undertake this

09:50:20  10  analysis separately for each claim that TCL contends is

09:50:26  11  obvious.

09:50:33  12          Instruction 31 million.  The determination of

09:50:35  13  whether a claimed invention is obvious is based on the

09:50:38  14  perspective of a person of ordinary skill in the art.  A

09:50:41  15  person of ordinary skill is presumed to know all prior art

09:50:46  16  that you have determined to be reasonably relevant.  The

09:50:48  17  person of ordinary skill is also a person of ordinary

09:50:51  18  creativity that can use common sense to solve problems.

09:50:55  19          When determining the level of ordinary skill in

09:50:58  20  the art, you should consider all of the evidence submitted

09:51:00  21  by the parties, including the evidence of:  1.  The level of

09:51:03  22  education and experience of persons actively working in the

09:51:06  23  field at the time of the invention, including the inventors;

09:51:12  24  2.  The types of problems encountered in the art at the time

09:51:16  25  of the invention; 3.  Prior art solutions to those problems;

**4.   Rapidity with which innovations are made; and 5.   The sophistication of the technology in the art at the time of the invention.**

          **Instruction 32.   In considering whether an asserted prior art reference anticipates one or more of the asserted claims or whether alone or in combination with other references would have rendered one or more of the asserted claims obvious, you must first consider whether the reference in question qualifies as prior art to the asserted patent.**

          **Instruction 33.   Certain testimony in this case will be presented to you through a deposition.  A deposition is the sworn, recorded answers to questions asked of a witness before trial.  The witness is placed under oath and swears to tell the truth, and lawyers for each party may ask questions.  A court reporter is present and records the questions and answers.  The deposition may be read aloud by one of the attorneys here.  Also the deposition may have been filmed, so the video of the testimony can be played back as well.  If played by video, the deposition testimony may have been edited or cut to exclude irrelevant testimony. However, the parties and the Court have conferred regarding what portions of deposition videos are to be played.  You should therefore not attribute any significance to the fact that deposition videos may appear to have been edited.**

09:52:59   1           Deposition testimony is entitled to the same

09:53:03   2   consideration as live witness testimony.  And it is to be

09:53:06   3   judged by you as to credibility and weight and otherwise

09:53:09   4   considered by you insofar as possible the same as if the

09:53:14   5   witness had been present and had testified from the witness

09:53:17   6   stand in court.

09:53:18   7           In this trial, you may hear from certain Rule

09:53:21   8   30(b)(6) corporate witnesses for the parties via deposition.

09:53:25   9   A Rule 30(b)(6) corporate witness is a person that a

09:53:28   10   corporation has chosen to designate to speak on behalf of

09:53:32   11   itself with respect to specific identified topics.  This

09:53:35   12   type of witness must be knowledgeable to speak on the

09:53:38   13   specific identified topics and is required to give complete

09:53:41   14   and knowledgeable answers on the corporation's behalf.  The

09:53:44   15   testimony of Rule 30(b)(6) witness at his or her deposition

09:53:48   16   is binding on the corporate party on those topics, and, at

09:53:53   17   trial, the party cannot contradict this earlier deposition

09:53:59   18   testimony.  Before any Rule 30(b)(6) corporate witnesses

09:54:04   19   testify, you will be told that the witness is a Rule

09:54:08   20   30(b)(6) witness.

09:54:12   21           Instruction 34.  There are two kinds of

09:54:14   22   evidence, direct and circumstantial.  Direct evidence is

09:54:17   23   direct proof of a fact, such as testimony of an eyewitness.

09:54:20   24   If a witness testified that he saw it raining outside, and

09:54:25   25   you believed him, that would be direct evidence that it was

1   raining.

2         Circumstantial evidence is proof of facts from

3   which you may infer or conclude that other facts exist.  If

4   someone walked into the courtroom wearing a raincoat covered

5   with drops of water and carrying a wet umbrella, that would

6   be circumstantial evidence from which you could conclude

7   that it was raining outside.

8         As a general rule, the law makes no distinction

9   between these two types of evidence, but simply requires

10  that you find facts from all of the evidence in the case,

11  whether direct or circumstantial, or a combination of the

12  two.  In judging the facts, it will be up to you to decide

13  which witnesses to believe, which witnesses to not believe,

14  and how much of any witness's testimony to accept or reject.

15        Instruction 35.  If you find that an accused

16  product infringes any of the asserted claims and that the

17  infringed claim is not invalid, you must determine the

18  amount of damages to be awarded IP Bridge for the

19  infringement.  On the other hand, if you find that each of

20  the asserted claims is either invalid or is not infringed,

21  then you should not consider damages in your deliberations.

22        IP Bridge must prove each element of its

23  damages, including the amount of the damages, by a

24  preponderance of the evidence.  If proven by IP Bridge,

25  damages must be adequate to compensate IP Bridge for TCL's

392

09:55:48    1    infringement.  But the damage award cannot be less than a

09:55:53    2    reasonable royalty.  You may not add anything to the amount

09:55:57    3    of damages to punish an accused infringer or to set an

09:56:01    4    example.  You also may not add anything to the amount of

09:56:06    5    damages for interest.

09:56:07    6           The fact that I am instructing you on damages

09:56:11    7    does not mean that the Court believes that one party or the

09:56:15    8    other should win in this case.  My instructions about

09:56:18    9    damages are for your guidance only in the event you find in

09:56:22    10    favor of IP Bridge.  You will need to decide the issue of

09:56:27    11    damages only if you find that one or more of the asserted

09:56:30    12    claims are both infringed and not invalid.

09:56:37    13           Instruction 36.  If you find that IP Bridge has

09:56:41    14    established infringement, IP Bridge is entitled to at least

09:56:44    15    a reasonable royalty to compensate it for that infringement.

09:56:51    16           Instruction 37.  A royalty is a payment made to

09:56:54    17    a patent holder in exchange for the right to make, use, or

09:56:58    18    sell the claimed invention.  A reasonable royalty is the

09:57:03    19    amount of royalty payment that a patent holder and the

09:57:08    20    alleged infringer would have agreed to in a hypothetical

09:57:11    21    negotiation taking place at a time prior to when the

09:57:14    22    infringement first began.  In considering this hypothetical

09:57:17    23    negotiation, you should focus on what the expectations of

09:57:20    24    the patent holder and the alleged infringer would have been

09:57:23    25    had they entered into an agreement at that time, and had

they acted reasonably in their negotiations.  In determining
this, you must assume that both parties believed the patent
was valid and infringed and that both parties were willing
to enter into an agreement.  The reasonable royalty you
determine must be a royalty that would have resulted from
the hypothetical negotiation, and not simply a royalty
either party would have preferred.  Evidence of things that
happened after the infringement first began can be
considered in evaluating the reasonable royalty only to the
extent that the evidence aids in assessing what royalty
would have resulted from a hypothetical negotiation.
Although evidence of the actual profits an alleged infringer
made may be used to determine the anticipated profits at the
time of the hypothetical negotiation, the royalty may not be
limited or increased based on the actual profits the alleged
infringer made.

        Instruction 38.  In determining the reasonable
royalty, you should consider all the facts known and
available to the parties at the time the infringement began.
Some of the kinds of factors that you may consider in making
your determination are: (1) the value that the claimed
invention contributes to the accused product; (2) the value
that factors other than the claimed invention contribute to
the accused product; (3) comparable license agreements, such
as those covering the use of the claimed invention or

09:59:03   1    similar technology.

09:59:05   2         No one factor is dispositive and you can and

09:59:08   3    should consider the evidence that has been presented to you

09:59:11   4    in this case on each of these factors.  You may also

09:59:15   5    consider any other factors which in your mind would have

09:59:19   6    increased or decreased the royalty the alleged infringer

09:59:24   7    would have been willing to pay and the patent holder would

09:59:27   8    have been willing to accept, acting as normally prudent

09:59:30   9    business people.

09:59:39   10        Instruction 39.  Expert testimony is testimony

09:59:42   11   from a person who has special skill or knowledge in some

09:59:45   12   evidence, profession, or business.  This skill or knowledge

09:59:49   13   is not common to the average person but has been acquired by

09:59:53   14   the expert through special study or experience.  In weighing

09:59:57   15   expert testimony, you may consider the expert's

09:59:59   16   qualifications, the reasons for the expert's opinions, and

10:00:02   17   the reliability of the information supporting the expert's

10:00:06   18   opinions, as well as the factors I have previously mentioned

10:00:10   19   for weighing testimony of any other witness.  Expert

10:00:13   20   testimony should receive whatever weight and credit you

10:00:16   21   think appropriate, given all the other evidence in the case.

10:00:20   22   You are free to accept or reject the testimony of experts,

10:00:23   23   just as with any other witness.

10:00:28   24        Instruction 40, in the course of this case, the

10:00:33   25   parties have entered into agreements that would protect the

confidential and sensitive business information of the

parties and of third parties from disclosure to the public

or third parties.  Under those agreements, confidentiality

labels have been added to documents, and the parties have

redacted, i.e., obscured or removed information, from

documents to protect the confidential nature of the

information.  You may have seen documents with

confidentiality labels or redactions duration the course of

the trial.  The use of confidentiality labels and redactions

has no bearing on the evidence, and should not be construed

in any way against any party.

Instruction 41.  Though you have heard me say

this during the jury selection process, I want to again

outline the schedule I expect to maintain during the course

of this trial.  As I mentioned previously, once trial

begins, this case is expected to take up to six business

days to try.  We will normally begin the day at 9 a.m.  We

Will break for an hour at noon for lunch.  There will be a

short break in the morning and two short breaks in the

afternoon.  What I have put just outlined is the general

schedule.  It is possible there will be some interruptions

as I have to attend to other matters.

Please keep in mind that this is a timed trial.

That means I have allocated each party a maximum number of

hours in which to present all portions of its case.  This

396

10:02:14   1   allows me to assure you that we expect to finish this case

10:02:21   2   in six to eight days.

10:02:24   3          One final word.  I told you when I intend to

10:02:27   4   take breaks and how often I aim to take breaks, but if any

10:02:31   5   of you need an additional break at any time, that is fine.

10:02:35   6   You just need to get my attention or my courtroom deputy's

10:02:39   7   attention.  That can be done usually by waving or raising a

10:02:44   8   hand or, if need be, standing.  And so if you need a break

10:02:48   9   for any reason at any other times, please just get our

10:02:51   10   attention.

10:02:54   11          Instruction 42.  Claims:  That part of a patent

10:03:01   12   which defines the metes and bounds of the invention.  These

10:03:07   13   are found at the end of the patent specification in the form

10:03:11   14   of numbered paragraphs.

10:03:12   15          File wrapper/file history/prosecution history:

10:03:17   16   The written record of proceedings in the Patent Office,

10:03:21   17   including the original patent application and subsequent

10:03:25   18   communications between the patent office and applicant.

10:03:27   19          FRAND:  Fair, reasonable and non-discriminatory.

10:03:33   20          FRAND royalty:  The fair, reasonable and

10:03:35   21   non-discriminatory royalty.

10:03:37   22          License:  Permission to make, use or sell a

10:03:40   23   patented invention, which may be granted by a current or

10:03:43   24   prior patent owner, or a current or prior licensee in

10:03:48   25   exchange for a fee called a royalty or other compensation.

|        |    |
|--------|----|
| 10:03:52 | 1 |

                    Limitation:   A required part of an invention set

forth in a patent claim.   A limitation is a requirement of

the invention.   The word limitation is often used

interchangeably with the word requirement.   The phrase claim

limitation is often used interchangeably with the phrase

claim element.

                    Patent application:   The papers filed in the

United States Patent and Trademark Office (Patent Office,

PTO or USPTO) by an applicant.   These typically include a

specification, drawings and the oath (declaration) of

applicant.

                    Patent examiners:   Personnel employed by the

patent office having expertise in various technical areas

who review (examine) patent applications to determine

whether the claims of a patent application are patentable

and the disclosure adequately describes the invention.

                    Prior art:   Any information that is used to

describe public, technical knowledge prior to the invention

by applicant or more than a year prior to his/her

application.

                    Reference:   Any item of prior art (publication

or patent) used to determine patentability.

                    Specification:   That part of the patent

application or patent that describes the invention and

concludes with one or more claims.

| 10:05:25 | 1 | Written description:  That part of the patent |
| 10:05:27 | 2 | specification that explains how the invention works and |
| 10:05:30 | 3 | usually includes one or more drawings. |
| 10:05:36 | 4 | Instruction 43.  As I mentioned, to assist you |
| 10:05:42 | 5 | in your deliberations, you have been provided with a juror |
| 10:05:45 | 6 | notebook that contains the following:  Glossary of patent |
| 10:05:49 | 7 | terms, sample patent, the Court's claim constructions, a |
| 10:05:53 | 8 | copy of the asserted patents, pictures of witnesses who will |
| 10:05:57 | 9 | testify live, common names and acronyms used during the |
| 10:06:02 | 10 | trial. |
| 10:06:02 | 11 | These materials have been jointly submitted by |
| 10:06:04 | 12 | the parties.  Please refer to these materials to assist you |
| 10:06:10 | 13 | during the trial. |
| 10:07:01 | 14 | Okay.  I think next in line is the video from |
| 10:07:05 | 15 | the administrative office is that right? |
| 10:07:08 | 16 | MR. BATCHELDER:  That's correct, Your Honor. |
| 10:07:10 | 17 | THE COURT:  How long does that take?  I can't |
| 10:07:13 | 18 | remember. |
| 10:07:13 | 19 | MR. BATCHELDER:  It's about 15 minutes. |
| 10:07:14 | 20 | THE COURT:  15 minutes.  Well, I think we'll |
| 10:07:18 | 21 | watch the video and then you can go back and take a short |
| 10:07:21 | 22 | break, okay?  So who is playing the video?  You may begin |
| 10:07:31 | 23 | the video. |
| 10:07:31 | 24 | (Video playing.) |
| 10:08:33 | 25 | Hello.  I'm Jeremy Fogel.  I've been a United |

| | |
|---|---|
| 10:08:37 | 1 |
| 10:08:40 | 2 |
| 10:08:44 | 3 |
| 10:08:47 | 4 |
| 10:08:52 | 5 |
| 10:08:55 | 6 |
| 10:08:58 | 7 |
| 10:09:00 | 8 |
| 10:09:02 | 9 |
| 10:09:06 | 10 |
| 10:09:09 | 11 |
| 10:09:13 | 12 |
| 10:09:17 | 13 |
| 10:09:20 | 14 |
| 10:09:25 | 15 |
| 10:09:29 | 16 |
| 10:09:35 | 17 |
| 10:09:39 | 18 |
| 10:09:42 | 19 |
| 10:09:46 | 20 |
| 10:09:50 | 21 |
| 10:09:54 | 22 |
| 10:09:57 | 23 |
| 10:10:01 | 24 |
| 10:10:02 | 25 |

States district judge since 1998 and I am now the director

of the Federal Judicial Center.  As you probably know by

now, this is a patent case.  So you may be wondering how can

I sit in judgment on a case like this when I'm not entirely

sure what a patent is?  We hope to answer that concern with

this brief video, which will give you some of the background

needed to do your job.

This case will involve some special issues that

the judge and lawyers will explain to you, but all patent

cases involve some basics that you will learn about.  This

video will discuss what patents are, why we have them, how

people get them, and why there are disputes that require us

to call in a jury like you.  We'll also show you what

patents look like.  The United States Constitution gives

Congress the power to pass laws relating to patents.

Article 1, section 8, clause 8, allows Congress to promote

the progress of science and useful arts by securing for

limited times to authors and inventors the exclusive right

to their respective writings and discoveries.  A patent then

is an official grant by the United States government that

gives its owners certain rights to an invention.  Those

include the right to stop others from making, using, selling

or offering for sale the invention that is claimed in the

patent.

A patent lasts for a specific period of time.

10:10:05  1   Usually 20 years from the date that the application is filed

10:10:08  2   by the inventor.  But because it takes an average of three

10:10:12  3   years for the Patent and Trademark Office to act on the

10:10:14  4   application, the effective life of the patent is closer to

10:10:18  5   17 years.

10:10:20  6          A patent represents a bargain made between the

10:10:23  7   government and the inventor.  In return for the right to

10:10:27  8   prevent others from using the invention, the inventor must

10:10:30  9   enhance the public knowledge or what we sometimes call the

10:10:34  10  state of the art by adding something new and useful to it.

10:10:37  11  A famous example is Thomas Edison's invention of the light

10:10:41  12  bulb.  Harnessing electrical power for illumination

10:10:46  13  transformed society and led to many other important

10:10:49  14  breakthroughs.

10:10:49  15          During the lifetime of the patent, its

10:10:52  16  disclosure may inspire new inventions and after it expires,

10:10:55  17  the invention is free for anyone to use.  It is this

10:10:59  18  combination of something new and valuable to the public that

10:11:05  19  justifies granting time-limited, patented protection to the

10:11:08  20  inventor.

10:11:09  21          A patent is in many ways like a deed to a piece

10:11:12  22  of property.  It grants the owner the right to keep people

10:11:15  23  off the property or it charges them a fee like rent for

10:11:19  24  using it.  And just as a deed indicates boundaries defining

10:11:23  25  the land owner's property, a patent claim defines the

| | |
|---|---|
| 10:11:26 | 1 |

patentees domain.   The patent system works because the
inventor is required to describe the invention in clear and
specific terms so that the public knows what the boundaries
of the invention are.   Once a patent is issued by the
government, it becomes available for public inspection.   In
that way, anyone who learns of the patent can read it and
understand exactly what the inventor invented and the limits
of the patent set forth in the claims.

Now that we understand what a patent is, let's
take a closer look at the term invention.   An invention is a
new way of solving a problem or a useful new machine,
manufacture or composition of matter.   The patent process
begins in the mind of the inventor.   And in particular when
the invention is formulated in the mind of the inventor.
Patent lawyers call this conception.   This is when the idea
occurs to the inventor clearly enough that he or she can
write it down and explain it to someone.   To qualify for a
patent the invention needs to be new and useful.   Also, it
must not be obvious to one of ordinary skill in the field.
If the inventor believes these requirements are met, he or
she will prepare an application for filing of the patent and
trademark office whose headquarters are in Alexandria,
Virginia, just outside of Washington, D.C.   The patent and
trademark office, often called the PTO is the agency of the
federal government whose job it is to examine patent

10:13:02   1    applications to make sure they were in proper form and

10:13:06   2    comply with the requirements of the law.  The inventor could

10:13:10   3    prepare an application for filing with the PTO, but usually

10:13:13   4    it is drafted by a patent attorney or a patent agent who

10:13:17   5    specializes in what is called prosecuting patent

10:13:19   6    applications; that is, the process through which they

10:13:23   7    evaluate.  The attorney or agent works with the inventor to

10:13:27   8    be sure the invention is described and claimed in a way that

10:13:30   9    complies with the law and the regulations of the PTO.

10:13:34   10           98 percent of patent applications are made

10:13:36   11   online using the PTO's electronic filing system, although a

10:13:41   12   few paper applications are still made.  When the PTO

10:13:44   13   receives the inventor's application, it is first checked to

10:13:48   14   see if it is complete and complies with all the PTO's

10:13:51   15   application requirements.  It then assigns a submission to a

10:13:55   16   patent examiner, a staff person with a background in the

10:13:58   17   field or art the invention falls within, to evaluate the

10:14:03   18   application and decide whether a patent can be granted.

10:14:06   19           You've been given a sample patent to refer to as

10:14:09   20   you watch this video.  So you already have a sense of what a

10:14:13   21   patent looks like, but now let's take a closer look at the

10:14:16   22   three main parts of the patent.  To begin with, there are

10:14:20   23   some basic identifying information on the first page.  This

10:14:24   24   material is highlighted in your handout.  On the upper right

10:14:29   25   side of the page is the number assigned to the patent by the

| | | |
|---|---|---|
| 10:14:32 | 1 | PTO.  And on the left side is a title that describes the |
| 10:14:35 | 2 | invention and the names of the inventors and sometimes the |
| 10:14:38 | 3 | company to whom they've assigned the patent.  Also on the |
| 10:14:42 | 4 | left is the date when the patent application was filed.  And |
| 10:14:46 | 5 | back on the right the date when the patent was issued. |
| 10:14:50 | 6 | There also is more detailed information on the first page, |
| 10:14:53 | 7 | including a list of numbers following the caption field of |
| 10:14:56 | 8 | search.  These numbers identify previously issued patents |
| 10:15:01 | 9 | the examiner looked at or searched to make sure the |
| 10:15:04 | 10 | applicant's claimed invention really is something new, not |
| 10:15:07 | 11 | obvious and thus patentable.  Also listed on the first page |
| 10:15:13 | 12 | are what we call references; that is, previous patents or |
| 10:15:17 | 13 | articles that describe the technology or prior art known at |
| 10:15:20 | 14 | the time the application was filed.  It may seem strange to |
| 10:15:24 | 15 | you that we call this preexisting technology prior art, even |
| 10:15:28 | 16 | though it has nothing to do with artists.  We use the word |
| 10:15:32 | 17 | art in its historical sense to include inventions and other |
| 10:15:36 | 18 | subject matter reasonably related to the claimed invention. |
| 10:15:40 | 19 | We also refer to the latest technology as state of the art |
| 10:15:43 | 20 | and we say of someone who can understand and apply the |
| 10:15:47 | 21 | technology that he or she is skilled in the art. |
| 10:15:50 | 22 | The second major part of the patent is what we |
| 10:15:53 | 23 | call the specification or written description.  As is the |
| 10:15:57 | 24 | case in your sample, it is usually the longest part of the |
| 10:16:00 | 25 | patent.  It includes an abstract, which is a brief summary |

10:16:03  1  of the invention, a background section that describes the

10:16:07  2  nature of the problem the invention is supposed to solve,

10:16:11  3  one or more drawings called figures that illustrate various

10:16:15  4  aspects of the application and a detailed description of one

10:16:19  5  or more embodiments of the invention.  An embodiment is a

10:16:23  6  specific device or method that uses the invention, such as a

10:16:27  7  particular form of light bulb.

10:16:29  8        The third and most important part of the patent

10:16:32  9  is the claims.  These are the numbered paragraphs that

10:16:36  10 appear at the end.  The claims are what give the public

10:16:40  11 notice of the boundaries of the invention.  They are similar

10:16:43  12 to the description of property you may have seen in a deed,

10:16:46  13 referring to precise measurements taken on the ground.  The

10:16:50  14 judge will instruct you further on how any technical or

10:16:55  15 ambiguous terms in the patent claims should be understood.

10:16:57  16        Now that we've discussed the main parts of the

10:17:00  17 patent, let's look at how the PTO processes patent

10:17:04  18 applications, what we referred to earlier as prosecution of

10:17:08  19 the patent application.  This process begins when the

10:17:12  20 inventor's application arrives at the PTO.  There it

10:17:15  21 receives a filing date.  Under the American Patent Act of

10:17:21  22 2011, filing dates will determine who is awarded the patent

10:17:26  23 if there are competing applications.  In 2012 the PTO

10:17:29  24 received nearly 600,000 patent applications and issued more

10:17:35  25 than 270,000 patents.  After determining that the

10:17:37   1   application is complete, the receiving branch also decides

10:17:41   2   what field of technology an application relates to and

10:17:44   3   assigns it to the appropriate examining group.  In order to

10:17:48   4   make that decision, the patent examiner usually looks at

10:17:51   5   patents that have been issued previously in the same or

10:17:53   6   closely related fields of art.  The examiner has computer

10:17:58   7   databases that contain information used to accomplish this

10:18:01   8   task.  Another part of the job is to decide if the

10:18:05   9   inventor's description of the invention is complete and

10:18:08   10   clear enough to meet the requirements for a patent,

10:18:11   11   including the requirement that the description enables

10:18:14   12   someone of ordinary skill in the field to actually make and

10:18:17   13   use it.  However, because the job of examining so many

10:18:22   14   applications is challenging, the law requires the applicant

10:18:26   15   to tell the examiner whatever he or she knows about the

10:18:29   16   prior art that might be important to the examiner's decision

10:18:33   17   on whether to allow the patent.  We call this the

10:18:36   18   applicant's duty of candor.  One way the applicant can

10:18:40   19   satisfy this duty is by bringing pertinent prior art to the

10:18:43   20   attention of the examiner either in the original application

10:18:46   21   or in other submissions called information disclosure

10:18:49   22   statements.  In this way the decisions of the examiner are

10:18:53   23   based on both the information provided by the applicant and

10:18:56   24   on the information the examiner finds during his or her

10:19:00   25   prior art search.

10:19:02    1          Sometimes the examiner concludes that the

10:19:05    2   application meets all the requirements we've discussed and

10:19:07    3   allows the patent to issue at this first stage.   But more

10:19:13    4   frequently the examiner will reject the application as

10:19:15    5   deficient in some respect.   This decision will be

10:19:18    6   communicated by the examiner in what is called an office

10:19:21    7   action, which is a preliminary notice to the applicant of

10:19:24    8   what the examiner finds insufficient or unpatentable.   For

10:19:28    9   example, the examiner may reject certain claims as being

10:19:31   10   unpatentable because a journal article written and published

10:19:34   11   by another person prior to the effective filing date of the

10:19:37   12   patent application disclosed what the applicant was

10:19:41   13   currently claiming.   At that point the applicant prepares a

10:19:44   14   written response either agreeing or disagreeing with the

10:19:46   15   examiner.   An applicant who agrees with the examiner can

10:19:51   16   suggest amendments to the application designed to overcome

10:19:54   17   the examiner's rejection.   Alternatively an applicant who

10:19:58   18   disagrees with the examiner's office action can explain the

10:20:01   19   reasons for the disagreement.   This exchange of office

10:20:04   20   actions and responses goes on until the examiner issues a

10:20:09   21   final office action, which may reject or allow some or all

10:20:12   22   of the applicants claims.   The overall process is referred

10:20:16   23   to as the prosecution history of the application.   The

10:20:21   24   written incoming and outgoing correspondence between the PTO

10:20:24   25   examiner and the application is also called the file

10:20:29   1    wrapper.  In the past these file wrappers were all in paper

10:20:32   2    form as were the submitted applications.  Now, they are most

10:20:36   3    often electronic and may occasionally be paper as well.

10:20:40   4    Most patent applications filed on or after November 29th,

10:20:44   5    2000, are published by the PTO 18 months after the inventor

10:20:48   6    has filed his or her application, so that the public may

10:20:51   7    inspect it.

10:20:53   8            Once a final PTO office action has occurred and

10:20:56   9    one or more claims have been allowed, the applicant is

10:21:00   10   required to pay an issuance fee and the patent is printed.

10:21:04   11   Then on the date shown on the upper right-hand corner of the

10:21:07   12   first page of the patent, it is issued by the PTO and the

10:21:11   13   inventor receives all the rights of the patent.  That date

10:21:14   14   is highlighted on your sample.  Once a patent has issued,

10:21:19   15   the inventor or the person or company the inventor has

10:21:22   16   assigned a patent to can enforce the patent against anyone

10:21:26   17   who uses the invention without permission.  We call such

10:21:29   18   unlawful use infringement.  But the PTO and its examiners

10:21:34   19   have no jurisdiction over questions relating to infringement

10:21:37   20   of patents.  If there is a dispute about infringement, it is

10:21:40   21   brought to the court to decide.  Sometimes in a court case

10:21:45   22   you are also asked to decide about validity.  That is

10:21:48   23   whether the patent should have been allowed at all by the

10:21:50   24   PTO.

10:21:52   25           A party accused of infringement is entitled to

10:21:55  1    challenge whether the asserted patent claims are

10:21:57  2    sufficiently new or nonobvious in light of the prior art or

10:22:01  3    whether other requirements of patentability have been met.

10:22:04  4    In other words, a defense to an infringement lawsuit is that

10:22:08  5    the patent in question is invalid.

10:22:10  6              You may wonder why it is that you would be asked

10:22:12  7    to consider such things when the patent has already been

10:22:14  8    reviewed by a government examiner.  There are several

10:22:18  9    reasons for this.  First, there may be facts or arguments

10:22:21  10   that the examiner had not considered, such as prior art that

10:22:25  11   was not located by the PTO or provided by the applicant.  In

10:22:29  12   addition, there is of course the possibility that mistakes

10:22:32  13   were made or important information overlooked.  Examiners

10:22:36  14   have a lot of work to do and no process is perfect.  Also,

10:22:40  15   unlike a court proceeding, prosecution of a patent

10:22:43  16   application takes place without input from people who might

10:22:46  17   later be accused of infringement.  So its important that we

10:22:50  18   provide a chance for someone who is accused of infringement

10:22:53  19   to challenge the patent in court.  The deciding issues of

10:22:57  20   infringement, it is your job to decide the facts of the

10:23:01  21   case.  The judge will instruct you about the law, which may

10:23:04  22   include the meaning of certain words or phrases contained in

10:23:07  23   the patent.  So its your primary duty as jurors to resolve

10:23:13  24   any factual disputes and in some cases such as infringement

10:23:16  25   and validity, to apply the law to those facts.

10:23:20    1          To prove infringement, the patent holder must

10:23:23    2    persuade you by what is called a preponderance of the

10:23:25    3    evidence relating to the facts of the case that the patent

10:23:29    4    has been infringed.  To prove invalidity, the alleged

10:23:33    5    infringer must persuade you by what is called clear and

10:23:37    6    convincing evidence that the patent is invalid.  The judge

10:23:40    7    in your case will explain these and other terms and provide

10:23:45    8    additional specific instructions at the appropriate time.

10:23:49    9          Good luck with your task and thank you for your

10:23:51   10    service.

10:24:11   11          (Video ends.)

10:24:11   12          THE COURT:  All right.  Ladies and gentlemen,

10:24:13   13    I've talked a lot, you've got to see a movie and now it is

10:24:20   14    time to take a short break.  So we're going to take -- we'll

10:24:24   15    take 10 minutes and then we'll come back and start opening

10:24:27   16    statements.  We're in recess.

10:24:29   17          (Short recess.)

10:36:15   18          THE COURT:  Please be seated.  So before the

10:36:20   19    jury comes out, just to make clear of what we're doing as

10:36:26   20    far as the timing is concerned.  At the end of each witness

10:36:29   21    I'll ask the jurors if they have any written questions, so

10:36:34   22    the time that's consumed for the jurors to write down their

10:36:37   23    questions and, for the time being, the time that's taken for

10:36:42   24    you to ask the questions that the jurors ask, I won't count,

10:36:47   25    okay?  Unless it gets out of control, then we'll see, okay?

| | |
|---|---|
| 10:36:51 | 1 |
| 10:36:54 | 2 |
| 10:38:09 | 3 |
| 10:38:09 | 4 |
| 10:38:11 | 5 |
| 10:38:19 | 6 |
| 10:38:21 | 7 |
| 10:38:27 | 8 |
| 10:38:30 | 9 |
| 10:38:35 | 10 |
| 10:38:37 | 11 |
| 10:38:43 | 12 |
| 10:38:46 | 13 |
| 10:38:51 | 14 |
| 10:38:57 | 15 |
| 10:39:00 | 16 |
| 10:39:04 | 17 |
| 10:39:09 | 18 |
| 10:39:13 | 19 |
| 10:39:19 | 20 |
| 10:39:19 | 21 |
| 10:39:21 | 22 |
| 10:39:25 | 23 |
| 10:39:30 | 24 |
| 10:39:35 | 25 |

But for the time being, that's the way we'll go.  So we can get the jurors.

(Jury enters.)

THE COURT:  Please be seated, ladies and gentlemen.  The plaintiff may present its opening statement.

MR. BATCHELDER:  Thank you, Your Honor.

THE COURT:  You're welcome.

MR. BATCHELDER:  Ladies and gentlemen, good morning.  I met you briefly yesterday.  My name is James Batchelder and I represent the plaintiff in this case, which is as you've heard is a called IP Bridge.  I'd like to start by thanking you all for taking the time out of your busy lives to serve as jurors in this case.  Whenever I talk to a jury, I wear this American flag on my lapel because I believe that other than serving in the military, there's no more important way to serve this country than by serving as jurors in this case.  Our jury system is the platform for our justice system and it would not be possible without the service and self sacrifice of citizens like you.  So thank you.

For the remainder of my time with you this morning, I will explain to you why we're here and why it was necessary for IP Bridge to come to this court and to you all for help in resolving a dispute it had with another company called TCL.  TCL is a large Chinese company with many

10:39:40   1   subsidiaries and four of those TCL entities are the

10:39:44   2   defendants in this case.  And as the court did, I will refer

10:39:46   3   to them together in this trial as TCL.

10:39:52   4        This case is about TCL using and making money

10:39:57   5   off of IP Bridge's property, refusing to stop and refusing

10:40:03   6   to pay for it.  That property, as you've heard now, is two

10:40:08   7   patents, two patents owned by IP Bridge and issued by the

10:40:13   8   United States Patent Office.

10:40:16   9        Now, long before this lawsuit was filed, IP

10:40:19   10  Bridge gave TCL notice, the opportunity to do the right

10:40:24   11  thing.  You need a license.  IP Bridge reached out to other

10:40:28   12  companies in the same way and they did do the right thing.

10:40:31   13  They responded promptly.  They met with IP Bridge and they

10:40:34   14  took a license.  Not TCL.  TCL ignored IP Bridge's outreach.

10:40:42   15  In fact, four separate letters IP Bridge wrote to TCL.  TCL

10:40:47   16  ignored every single one of them.  And instead they just

10:40:51   17  kept right on selling phones that infringed these patents,

10:40:53   18  making money, hoping to get away with it.

10:40:59   19        And we just heard from Judge Fogel in that

10:41:02   20  patent video that a patent is like a property deed.  It

10:41:06   21  shows that you own something and it shows the boundaries of

10:41:09   22  what you own.  And the way the system works, as he

10:41:14   23  explained, is an inventor may come up with a great idea,

10:41:18   24  submits an application to the patent office and after some

10:41:22   25  back and forth the patent office may decide to grant the

10:41:25   1   patent, but will do so if and only if the patent office

10:41:29   2   concludes that the invention disclosed in that patent is

10:41:34   3   new, useful and not obvious.

10:41:38   4        Now, the patent has a limited term.  And once it

10:41:42   5   expires, again, it's a publicly disclosed document, so the

10:41:46   6   invention disclosed in that document, that application is

10:41:49   7   free for the world to use.  And that's the beauty of our

10:41:53   8   patent system.  But until then, that patent grant from the

10:41:57   9   United States Patent Office gives patent owners the right to

10:42:00  10   exclude others from practicing that patent invention without

10:42:03  11   the permission of the patent owner.  And here that's IP

10:42:08  12   Bridge.

10:42:08  13        Now, if someone tries to steal your car, you can

10:42:11  14   call the police, get them to stop.  It doesn't work with

10:42:15  15   patents.  If you are the patent owner and someone misuses

10:42:19  16   your patented property, refuses to stop, refuses to pay for

10:42:23  17   it, your only recourse is to come to a court like this and a

10:42:27  18   jury like you all and ask for help.  And that's why we're

10:42:31  19   here.

10:42:32  20        By using IP Bridge's patented property without

10:42:35  21   its permission, TCL is misusing that property.  And as Judge

10:42:43  22   Fogel explained in the patent video, that use is unlawful

10:42:47  23   and it's called infringement.  Like our jury system, our

10:42:53  24   patent laws are borne in our constitution.  And they entitle

10:43:00  25   patent owners like IP Bridge here to bring a lawsuit to

10:43:03  1  recover money to compensate for the wrong that its suffered

10:43:08  2  as a result of that unlawful infringing behavior.  That

10:43:11  3  money is called damages.  You are here today to decide

10:43:18  4  whether TCL has infringed and if so how much money in

10:43:21  5  damages TCL should pay IP Bridge for using these two

10:43:25  6  patented inventions.

10:43:27  7          Now, before I get into the details of the

10:43:29  8  patents and how TCL has used them without permission, I'd

10:43:34  9  like to explain a little bit more about IP Bridge.  Imagine

10:43:39  10  that you invent something and you get a patent on it and you

10:43:43  11  learn that a big company is using your patented invention,

10:43:46  12  but you don't have experience licensing patents and you're

10:43:49  13  afraid that if you go directly to the big company, you're

10:43:52  14  not going to get fair value for your invention.  Well,

10:43:56  15  that's where IP Bridge comes in.  It works with inventors

10:43:59  16  big and small, sometimes universities, sometimes companies

10:44:03  17  to help them get fair value for their inventions.  Now, some

10:44:08  18  of the companies that come to IP Bridge for that kind of

10:44:10  19  help are small and some of them are big, but they go to IP

10:44:15  20  Bridge because they want help realizing fair value for an

10:44:19  21  especially valuable set of patents.  Whether or not the

10:44:23  22  company that IP works with is small or large, it provides an

10:44:27  23  important service.  By off-loading the job of licensing

10:44:30  24  patents, IP Bridge frees up those inventive companies to do

10:44:35  25  what they do best, invent more.  And in that important way,

10:44:39  1    IP Bridge partners with innovators to foster innovation.

10:44:47  2            I'm going to put up a picture now of Mr. Ogata.

10:44:51  3    He will be our first witness in this case and he's the

10:44:54  4    executive manager of IP Bridge.  You met him briefly

10:44:57  5    yesterday, but Mr. Ogata, would you briefly stand to meet

10:45:01  6    the jury, please?  Mr. Ogata will explain how IP Bridge

10:45:07  7    fosters innovation in the very way I've just described and

10:45:10  8    he also will explain that one of the companies for which its

10:45:14  9    provided that innovation fostering service was Panasonic.

10:45:18  10   Over the last two decades Panasonic understood pioneering

10:45:23  11   research in the telecommunications field.  And these two

10:45:28  12   patents along with some others resulted from that important

10:45:31  13   work.  And Panasonic turned to IP Bridge for help, realizing

10:45:37  14   the value of these important inventions.

10:45:41  15           Now, these two patents improve the performance

10:45:43  16   of what are called LTE or 4G networks.  Put up on this

10:45:52  17   slide, it's titled LTE or 4G mobile phones and we've got a

10:45:57  18   photograph in the middle of a TCL phone and you can see on

10:46:01  19   the left there's a callout and it says right on there, this

10:46:04  20   is a 4G or LTE network that it's operating on and then

10:46:08  21   there's a graphic with it communicating with a cell tower.

10:46:13  22   These are called -- it's called an LTE network because it

10:46:17  23   practices something called the LTE industry standard.

10:46:24  24           Put up now a picture of one of the three experts

10:46:28  25   that IP Bridge will call in this case.  This is Doctor

| | |
|---|---|
| 10:46:32 | 1 |
| 10:46:35 | 2 |
| 10:46:42 | 3 |
| 10:46:46 | 4 |
| 10:46:52 | 5 |
| 10:46:58 | 6 |
| 10:47:04 | 7 |
| 10:47:07 | 8 |
| 10:47:11 | 9 |
| 10:47:16 | 10 |
| 10:47:19 | 11 |
| 10:47:24 | 12 |
| 10:47:27 | 13 |
| 10:47:31 | 14 |
| 10:47:36 | 15 |
| 10:47:39 | 16 |
| 10:47:42 | 17 |
| 10:47:48 | 18 |
| 10:47:53 | 19 |
| 10:47:58 | 20 |
| 10:48:02 | 21 |
| 10:48:06 | 22 |
| 10:48:09 | 23 |
| 10:48:13 | 24 |
| 10:48:17 | 25 |

Jonathan Wells.  And Doctor Wells, would you please stand up
briefly to greet the jury?  Doctor Wells has over 25 years
of academic and industry experience in wireless networks,
cellular technology and wireless standards.  He's written
books and papers on wireless communication systems.  He's
taught in among other universities, University of California
Berkley and Carnegie Mellon University and he's also the
named inventor on four patents.  Doctor Wells will explain
what industry standards are and he'll do it much more
elegantly than I can, but essentially they are a set of
rules, a set of rules that embody cutting edge technology
and they are designed to make sure that the devices that
practice those rules work together as well as they can.  And
that working together is called interoperability.  But
interoperability only works if all the devices follow the
same rules, because if they do, they can interoperate
seamlessly and work to the best of their ability.

Let me give you a simple example.  In our
country all modern electrical outlets look like this one on
the bottom of that slide and there are actually some in this
courtroom.  And they do that because they follow an industry
standard that standardized the rules for what electrical
outlets should do.  And that means that anywhere you go in
this country you can buy a toaster, a lamp, a TV and you
know for sure that when you bring it home, you go plug it

| | |
|---|---|
| 10:48:21 | 1 |

in, the plug will fit and it will power on.  It's a simple

example.

        But industry standards of course apply not just

to simple examples like electrical outlets.  They also apply

to much more complex technology.  Telecommunications is a

prime example.  And here's a simple illustration why.  I'm

going to use this red laser pointer.  The title here we

called it interoperability over LTE networks and you'll see

that everything on this slide has one thing in common and

that is LTE.  On the left we have an AT&T LTE cell tower, on

the right a Sprint LTE cell tower and then the middle we

have three phones, one from Samsung, one Google, one TCL and

all using LTE.  And because they're all practicing that

standard, because they all comply with that standard, all

following the same set of rules, you know exactly how to

talk to each other, what signals to send when, et cetera.

And it helps these devices to interoperate and work together

beautifully.  And it also ensures they're all using cutting

edge technology because that is specified in the LTE

industry standard.

        Now, in this standard, again, we talked about

outlets.  An electrical outlet, the standard specifies how

many holes it has, how those holes are configured, what kind

of voltage it carries.  In the LTE standard, it specifies

things like what calculations all these devices use, what

10:49:59    1    formulas to use to make those calculations, what signals to

10:50:03    2    send to each other, what data to include in those signals,

10:50:07    3    exactly when to send what signal right down to the

10:50:11    4    microsecond, what bits within those signals have, what

10:50:15    5    meaning, what adjustments and new calculations one device

10:50:18    6    should make when it receives a signal from another.  It's

10:50:21    7    very complex, but it's what gets all of these devices to

10:50:25    8    work together so well.  And it's what makes LTE so

10:50:30    9    effective.  These rules and the technology that underline

10:50:34   10    them were chosen by experts, industry experts in the LTE

10:50:40   11    standard, not paid by any parties here, independent industry

10:50:45   12    experts and they were chosen of course to make this

10:50:47   13    technology as good as they could make it, so they chose the

10:50:51   14    best technology available.  And these rules ensure that LTE

10:50:56   15    devices implement this cutting edge technology, including

10:51:00   16    the technology embodied in these two patents.  And to that

10:51:07   17    end, and to that point, given its standards are designed to

10:51:11   18    embody cutting edge technology, it's no surprise that some

10:51:14   19    of the technology in these cutting edge patents are

10:51:18   20    incorporated into the industry standards.

10:51:23   21              When a standard requires technology that is

10:51:25   22    patented, we call that patent a standard essential patent.

10:51:31   23    This means that the patented technology is an essential part

10:51:34   24    of the standard, so the standard can't be practiced without

10:51:39   25    using the patent.  This is a slide, pictures of the two

10:51:48  1    patents, covers of them, that are asserted in this case and

10:51:52  2    you'll have copies of the patents in your juror notebooks

10:51:55  3    and it may be useful, if you would, to open up your

10:51:59  4    notebooks to see where those are now, because you may want

10:52:02  5    to take some notes as I go along.

10:52:04  6          And, Your Honor, in the meantime, may I approach

10:52:06  7    the jury to hand up the ribbon copies of these two patents

10:52:10  8    as they were issued by the United States Patent Office as

10:52:14  9    demonstratives?

10:52:14  10          THE COURT:  Just hand them to my courtroom

10:52:17  11   deputy and she'll start the process.

10:52:20  12          MR. BATCHELDER:  Thank you, sir.  Thank you.

10:52:37  13   Now, again, the technology of these two patents is

10:52:41  14   incorporated into the LTE standard, mandatory provisions in

10:52:45  15   that standard and this patented technology is used every day

10:52:48  16   to make our mobile phones work better.  So on the left we

10:52:54  17   have the patent that ends in the numbers 239 and so we'll

10:52:59  18   sometimes refer to this patent as the '239 Patent.  I will

10:53:05  19   also refer to this patent during trial as the channel

10:53:09  20   optimization patent, for reasons I'll explain in a moment.

10:53:14  21   So you may want to write those words over the '239 Patent in

10:53:17  22   your jury notebooks, again, over the '239 Patent, channel

10:53:21  23   optimization patent.  And then the patent on the right ends

10:53:36  24   in the numbers 539.  We'll sometimes refer to that as the

10:53:41  25   '538 Patent.  And I will also refer to that patent in this

| | |
|---|---|
| 10:53:45 | 1 |
| 10:53:49 | 2 |
| 10:53:54 | 3 |
| 10:53:59 | 4 |
| 10:54:05 | 5 |
| 10:54:07 | 6 |
| 10:54:11 | 7 |
| 10:54:18 | 8 |
| 10:54:23 | 9 |
| 10:54:28 | 10 |
| 10:54:31 | 11 |
| 10:54:36 | 12 |
| 10:54:41 | 13 |
| 10:54:45 | 14 |
| 10:54:49 | 15 |
| 10:54:52 | 16 |
| 10:54:55 | 17 |
| 10:55:01 | 18 |
| 10:55:04 | 19 |
| 10:55:11 | 20 |
| 10:55:14 | 21 |
| 10:55:18 | 22 |
| 10:55:20 | 23 |
| 10:55:26 | 24 |
| 10:55:33 | 25 |

trial as the interference reduction patent.  So you may want to write those two words down over the '538 Patent in your juror notebook.  Again, interference reduction patent.  Both of these patents provide important technology of the LTE standard to improve the performance of your phone.

So let's talk first about the '239 Patent, the channel optimization patent.  This slide that I put up is titled today's crowded cellular networks.  And what you see in the middle is a cell tower and then it's surrounded, as you see, by dozens of phones, each trying to talk to that cell tower at the same time.  And I'll tell you that this slide significantly understates the problem, because at any given time, a given cell tower may have not just a couple dozen cell phones trying to talk to it, but actually hundreds of cell phones trying to talk to it and each of those hundreds of cell phones, believe it or not, may be sending 500 signals per second to that cell tower and all expecting to have signal sent back to those phones from the cell tower in that kind of lickety split speed.  What that means is in the snap of a finger that cell tower is receiving tens of thousands of signals from these phones and expecting to respond.  As you can imagine, given that volume of communication, it is incredibly important to this system that efficient use is made of every one of these signals of a cell phone tower.

| 10:55:35 | 1 | Well, that's what the channel optimization |
| 10:55:37 | 2 | patent is designed to do and that's what it does.  It |
| 10:55:41 | 3 | optimizes the content of the messages that all these phones, |
| 10:55:44 | 4 | and again, hundreds of them, are sending, many, many, many |
| 10:55:49 | 5 | times a second to these cell towers.  We all know from |
| 10:56:02 | 6 | having cell phones that sometimes you have a strong signal, |
| 10:56:06 | 7 | sometimes you have a week signal.  When you have a strong |
| 10:56:09 | 8 | signal you can download data like a video or a picture, a |
| 10:56:13 | 9 | news feed, quite quickly.  Wheels know what happened when |
| 10:56:16 | 10 | you had a weak signal.  You took out your phone, you stared |
| 10:56:20 | 11 | at it and saw the spinning dial and just wait for that data |
| 10:56:23 | 12 | to download. |
| 10:56:25 | 13 | In addition to that kind of data, there's also |
| 10:56:28 | 14 | other data that cell phones and cell towers use to |
| 10:56:31 | 15 | communicate with each other called control information.  And |
| 10:56:34 | 16 | one very important piece of control information is called |
| 10:56:39 | 17 | CQI or channel quality indicator information.  Once the cell |
| 10:56:47 | 18 | tower receives CQI from the phone it can improve the way |
| 10:56:51 | 19 | that the communication over this network happens and make |
| 10:56:54 | 20 | all this work better.  So before the inventors of the |
| 10:57:00 | 21 | channel optimization patent came along, there were two ways |
| 10:57:04 | 22 | in the prior art that CQI was sent.  You've got here at the |
| 10:57:10 | 23 | top an imagine of a video camera and it's just a symbol to |
| 10:57:16 | 24 | show that's a video, that's a chunk of data, video bits. |
| 10:57:21 | 25 | And the first way in the prior art before these inventors |

| | |
|---|---|
| 10:57:24 | 1 |
| 10:57:32 | 2 |
| 10:57:36 | 3 |
| 10:57:41 | 4 |
| 10:57:45 | 5 |
| 10:57:49 | 6 |
| 10:57:51 | 7 |
| 10:57:54 | 8 |
| 10:57:58 | 9 |
| 10:58:01 | 10 |
| 10:58:04 | 11 |
| 10:58:08 | 12 |
| 10:58:10 | 13 |
| 10:58:12 | 14 |
| 10:58:15 | 15 |
| 10:58:24 | 16 |
| 10:58:29 | 17 |
| 10:58:32 | 18 |
| 10:58:35 | 19 |
| 10:58:39 | 20 |
| 10:58:46 | 21 |
| 10:58:51 | 22 |
| 10:58:57 | 23 |
| 10:59:03 | 24 |
| 10:59:07 | 25 |

came along, was to never send data with a CQI, so we're putting that international no symbol on the video and here's the CQI and it was never sent under this one way to the tower, so the CQI alone was sent and the data of this video stayed behind, had to be sent later in yet another transmission to the cell tower, again with hundreds of phones, 10,000 signals a second. When you miss that opportunity to send that data, that's a cost in the system that slows everything down. And it worked okay when you had a weak signal because maybe you didn't want to burden the system with that data when the signal was weak but when you had a strong signal, it was a lost opportunity to send that data when it could have been sent.

Now, the other way, before these inventors came along, was to always send data with CQI, every time, package it up and send it along. And if you happened to have a strong signal, that was fine, but if you had a weak signal, that created real problems, because that data often didn't get to the cell tower reliably. It required retransmission of that data and bogged the system down. And the inventors of the channel optimization patent recognized that these systems had shortcomings. And so they figured out a way to solve the problem. Under this invention the signal strength is very quickly determined by the phone and that's used to decide whether to include data with the CQI message. And

10:59:11    1    believe me that was not easy, because again, these are 500

10:59:15    2    signals being sent every second.  It's hard to imagine.  And

10:59:19    3    the phone needs to very quickly then determine exactly what

10:59:23    4    to do for each separate signal, but these inventors figured

10:59:27    5    out a way to get that done.  Not only that, but you'll hear

10:59:31    6    evidence in trial that they figured out a way to leverage

10:59:35    7    the existing LTE infrastructure to make that work.  There

10:59:39    8    was hardware already contemplated for the standard.  They

10:59:43    9    figured out a way to get that to do this, so you didn't have

10:59:46   10    to invest in more hardware and further complicate and slow

10:59:50   11    down the system.  They also figured out a way to leverage

10:59:52   12    existing technologies with fancy names that I'm just going

10:59:56   13    to introduce you to now, but you'll hear much more about at

10:59:59   14    trial, something called a modulation coding scheme and

11:00:04   15    something else called resource block allocation information.

11:00:06   16    They figured out how to use those existing infrastructures

11:00:10   17    to accomplish this, all that much more efficient because

11:00:14   18    they figured out a way to get that done too.  And before

11:00:17   19    these inventors, no one else had figured out how to do this.

11:00:22   20    And the result of this invention, again, is that hundreds of

11:00:26   21    determinations are made within the snap of a finger and the

11:00:29   22    system works so much better because it exploits the strength

11:00:33   23    of a strong signal and maximizes the amount of data that

11:00:36   24    goes out, but it also avoids burdening the system when the

11:00:40   25    system is weak with data that's going to be unreliable or

| | |
|---|---|
| 11:00:45 | 1 |
| 11:00:51 | 2 |
| 11:00:53 | 3 |
| 11:00:58 | 4 |
| 11:01:01 | 5 |
| 11:01:04 | 6 |
| 11:01:06 | 7 |
| 11:01:10 | 8 |
| 11:01:15 | 9 |
| 11:01:19 | 10 |
| 11:01:22 | 11 |
| 11:01:25 | 12 |
| 11:01:31 | 13 |
| 11:01:37 | 14 |
| 11:01:41 | 15 |
| 11:01:45 | 16 |
| 11:01:49 | 17 |
| 11:01:53 | 18 |
| 11:01:57 | 19 |
| 11:02:01 | 20 |
| 11:02:05 | 21 |
| 11:02:07 | 22 |
| 11:02:10 | 23 |
| 11:02:12 | 24 |
| 11:02:17 | 25 |

sent so slowly that it would bog down the system.  It was an elegant solution to a vexing problem.  It reduces errors, it maximizes the amount of data that's sent efficiently and it improves the speed of your cell phone's operation.  And believe me, speed matters in cell phones.  And I'll sure you all understand.

Now, let's turn to the interference reduction patent.  In some ways it looks like a similar picture.  We have a cell tower in the middle.  It's a little murky for reasons I'll explain in a moment and you again have dozens of phones surrounding the cell tower which we all know is really hundreds in real life.  The problem, as we say in the title of this slide here, is interference.  All of these phones surrounding this tower are sending signals and those signals can interfere with each other and distort each other so that the cell tower in the middle either never gets them, can't read them or can't figure out which phone a given signal was from and so doesn't know how to respond to that phone.  Imagine, if you would, if you took two pebbles and dropped them into a puddle, each would form waves that would be nice and smooth in the beginning but then those waves in the middle would crash into each other, distort each other and after a while you wouldn't be able to figure out which waves came from which pebble.  And the same thing is true here, all of these waves crash into each other, distort each

| | | |
|---|---|---|
| 11:02:21 | 1 | other and either they don't get to the tower or can't read |
| 11:02:24 | 2 | them or can't figure out where a given signal came from. |
| 11:02:28 | 3 | Well, the interference reduction patent inventors solved |
| 11:02:33 | 4 | this problem too. |
| 11:02:34 | 5 | So what I'm going to do now is take two of these |
| 11:02:37 | 6 | phones from this figure and put them on the top of this next |
| 11:02:41 | 7 | slide. Here's two of those phones and two of these signals |
| 11:02:47 | 8 | are interfering with each other at the end, resulting in |
| 11:02:51 | 9 | fuzziness. It may never reach that tower or if they do, the |
| 11:02:55 | 10 | tower may not be able to read them because they're too fuzzy |
| 11:02:58 | 11 | or the tower may not know which phone sent which signal. |
| 11:03:02 | 12 | All of those things cause problems as you can imagine. And |
| 11:03:05 | 13 | the inventors of the interference reduction patent |
| 11:03:08 | 14 | recognized that this CQI, the channel quality indicator is |
| 11:03:13 | 15 | especially vulnerable to this problem, because the CQI |
| 11:03:17 | 16 | message looks a lot like another control signal that's also |
| 11:03:21 | 17 | sent within the LTE standard. And so those two signals, |
| 11:03:25 | 18 | those two kinds of signals were especially vulnerable to |
| 11:03:28 | 19 | being confused. So if there was any distortion when those |
| 11:03:33 | 20 | signals got to the cell tower, CQI was especially vulnerable |
| 11:03:37 | 21 | to being misunderstood. And so the inventors of the |
| 11:03:41 | 22 | interference reduction patent figured out a way to change |
| 11:03:43 | 23 | the way the CQI was sent so that as illustrated on the |
| 11:03:49 | 24 | bottom here, each signal from each phone comes through nice |
| 11:03:53 | 25 | and clear, cell tower knows exactly who sent what, gets both |

| | |
|---|---|
| 11:03:58 | 1 |
| 11:04:03 | 2 |
| 11:04:07 | 3 |
| 11:04:10 | 4 |
| 11:04:15 | 5 |

1  signals and can operate as efficiently as possible.  The

2  benefits of this patent include improving battery life of

3  the phone, which again, as we all know, is really important,

4  avoiding retransmission of signals, and again, boosting

5  speed.  Speed matters.

6          The LTE industry standard, also known as 4G, is

7  faster than its predecessor 3G and the evidence will show

8  that these three patents are an important reason why.  And

9  as I said at the outset, we're here because TCL has used,

10  without permission, these two patented inventions.  And

11  again, as Judge Fogel explained, that's called infringement

12  and it's unlawful.

13          TCL sells dozens of models of LTE phones and

14  because these two patents are needed to practice the LTE

15  standard, every time TCL makes or sells an LTE phone, it's

16  infringing these two patents.  I've introduced you to Doctor

17  Wells, the first of our experts.  Let me now introduce you

18  to the second.  This is Doctor Paul Min.  And Doctor Min,

19  would you please stand briefly to greet the jury?  Doctor

20  Min has enormous experience with wireless telecommunications

21  systems, including LTE.  He received his PhD from the

22  University of Michigan.  He is a senior professor in the

23  School of Engineering and Applied Sciences at Washington

24  university at St. Louis.  He has chaired both the graduate

25  and under graduate curriculum.  Before teaching he worked in

industry to develop cellular networks and telecommunication

systems and he will explain how he determined that TCL

infringes these two IP Bridge patents.

Now, the fact that an industry standard, that's

the LTE standard at the heart of this case, makes the

infringement case straightforward.  My wife and I have three

kids and they were taught in their middle school algebra

that if A equals B and B equals C, then A equals C.  It must

every time equal C if these two things are true.  An example

using similar logic, if Wilmington is a city in Delaware and

if Delaware is a state in the United States, then Wilmington

must be a city of the United States.  It has to be.  It

follows inescapably.  Well, same logic applies in our

infringement case, because it involves an industry standard,

LTE.

And here's the logic.  If the patent claims are

essential to the LTE essential, in other words, the standard

can't be practiced without practicing these patent claims,

and if a phone complies with the LTE industry standard, then

that phone infringes.  And I emphasize Doctor Min agrees

with that and so does TCL's expert on these issues and the

logic is inescapable.  It just makes sense.  You can't

practice the standard without infringing a patent essential

to that standard, just like I can't stand here in Wilmington

without standing in the United States.  It just makes sense.

| 11:08:16 | 1 | And ladies and gentlemen, I submit to you that |
| 11:08:18 | 2 | you're going to learn lots of facts in this case, but there |
| 11:08:22 | 3 | are two of them that are the most important.  In fact, |
| 11:08:26 | 4 | they're so important that I'm going to refer to them in this |
| 11:08:29 | 5 | case as the two Bedrock Facts and I've even made a board of |
| 11:08:34 | 6 | them that we'll come back to from time to time, just want to |
| 11:08:39 | 7 | have them in front of you.  Bedrock Fact #1 -- and again, |
| 11:08:50 | 8 | you may want to jot these down in your juror notebooks, |
| 11:08:54 | 9 | we'll come back to these graphics and the board, but you |
| 11:08:57 | 10 | just may want to have them.  Number one, these two IP Bridge |
| 11:09:02 | 11 | patents are essential to the LTE standard.  How do we know |
| 11:09:06 | 12 | that that's true?  Doctor Min will explain that he's done |
| 11:09:11 | 13 | intensive analysis.  And you will also learn that Doctor Min |
| 11:09:25 | 14 | wrote that analysis up in a report, it was provided to TCL |
| 11:09:30 | 15 | long before trial and it was given to its expert long before |
| 11:09:33 | 16 | trial.  And when he had time to respond, he said I haven't |
| 11:09:41 | 17 | analyzed that question, so I have no opinion to rebut Doctor |
| 11:09:45 | 18 | Min.  Bedrock Fact #1 is true. |
| 11:09:53 | 19 | What about #2?  The accused products comply with |
| 11:09:56 | 20 | the LTE standard.  How do we know that is true?  Well, first |
| 11:10:03 | 21 | of all, TCL tells its carriers that that's true.  It's |
| 11:10:08 | 22 | carriers like AT&T and T-mobile, it certifies to them that |
| 11:10:13 | 23 | it is true.  It also hires third parties to test for the |
| 11:10:16 | 24 | compliance of its phones and those third parties, again, |
| 11:10:19 | 25 | folks hired by TCL issue certification reports confirming |

| | |
|---|---|
| 11:10:23 | 1 |
| 11:10:28 | 2 |
| 11:10:32 | 3 |
| 11:10:35 | 4 |
| 11:10:38 | 5 |
| 11:10:42 | 6 |
| 11:10:47 | 7 |
| 11:10:54 | 8 |
| 11:10:59 | 9 |
| 11:11:04 | 10 |
| 11:11:08 | 11 |
| 11:11:12 | 12 |
| 11:11:17 | 13 |
| 11:11:19 | 14 |
| 11:11:23 | 15 |
| 11:11:27 | 16 |
| 11:11:34 | 17 |
| 11:11:39 | 18 |
| 11:11:44 | 19 |
| 11:11:50 | 20 |
| 11:11:53 | 21 |
| 11:11:59 | 22 |
| 11:12:02 | 23 |
| 11:12:06 | 24 |
| 11:12:10 | 25 |

that those phones comply with the LTE industry standard.
Doctor Min himself has analyzed that compliance and
determined that these phones comply with the industry
standard.  And again, he wrote up that analysis in a report
provided to TCL long before trial.  It was given to their
expert.  And again, his response was, I haven't analyzed
that question.  I have no opinion to rebut Doctor Min.
Bedrock Fact #2 is true.  These facts are critically
important here because they establish TCL's infringement.
When patents are essential to the LTE industry standard, as
these two are, and when products comply with that standard,
those products infringe those patents, again, just like when
I'm standing in Wilmington, I'm standing in the United
States.

Now, given again that both sides' experts agree
with the logic, the fact that TCL did not ask its expert to
examine the truth of these two Bedrock Facts, it's okay,
just don't do the analysis, that speaks volumes about the
merits of this case.  Rather than confront the truth of
these two Bedrock Facts and take responsibility for its
infringement of these two patents, TCL shields its eyes from
these facts and goes right on infringing.

Now, you may hear TCL say well, we're not going
to look at these facts even if they're true, they will
establish our infringement.  We're not going to look at

| | |
|---|---|
| 11:12:13 | 1 |
| 11:12:17 | 2 |
| 11:12:20 | 3 |
| 11:12:24 | 4 |
| 11:12:27 | 5 |
| 11:12:30 | 6 |
| 11:12:33 | 7 |
| 11:12:38 | 8 |
| 11:12:42 | 9 |
| 11:12:46 | 10 |
| 11:12:52 | 11 |
| 11:12:56 | 12 |
| 11:12:58 | 13 |
| 11:13:01 | 14 |
| 11:13:05 | 15 |
| 11:13:08 | 16 |
| 11:13:11 | 17 |
| 11:13:17 | 18 |
| 11:13:22 | 19 |
| 11:13:28 | 20 |
| 11:13:32 | 21 |
| 11:13:35 | 22 |
| 11:13:38 | 23 |
| 11:13:42 | 24 |
| 11:13:46 | 25 |

1    those, but we don't think the phones quite line up with IP

2    Bridge's patents.  They don't perform certain checks or they

3    don't look for 20 blocks instead of 4.  They don't do

4    something called an orthogonal sequence.  Ladies and

5    gentlemen, the evidence will show that TCL's phones

6    absolutely infringe.  Doctor Min has looked at the source

7    code from a dozen models of TCL phones and he will tell you

8    that all those points by TCL just don't hold water.  Put

9    another way, TCL's products do exactly what the LTE standard

10   requires, they comply with the standard and they do exactly

11   what IP Bridge's patents require.  Again, that's no

12   coincidence because you can't practice the standard without

13   practicing these patents.  These patents are directed to

14   mandatory provisions of the standard.  TCL infringes these

15   patents.  And again, infringement is unlawful.

16            And meanwhile, TCL continues to make piles of

17   money selling these infringing LTE phones and hasn't paid IP

18   Bridge a dime.  Now, as an excuse for its infringement, TCL

19   is going to say well, the United States Patent Office and

20   the expert who works there made huge mistakes not just once,

21   but twice, so neither of these patents should have issued in

22   the first place, they'll say.  Well, as the court instructed

23   you this morning, the law presumes the patent claims issued

24   by the United States Patent Office are valid.  United States

25   patents, like the two here, are issued by examiners in the

11:13:50   1   United States Patent Office who are technology experts.   TCL

11:13:55   2   would need to come forward not just with argument but with

11:13:58   3   clear and convincing evidence as his honor said of

11:14:03   4   invalidity in this case and they won't be able to come close

11:14:06   5   to that high standard here.   These inventions, again, were

11:14:10   6   chosen by the independent experts at the LTE standard for

11:14:15   7   inclusion in that standard because they are the best of the

11:14:18   8   best.   They do the best job of any alternatives available at

11:14:22   9   solving the problems that they address.   That's not obvious,

11:14:25   10   that's inventive, it's useful.   And as Doctor Min will

11:14:29   11   confirm, these inventions are new, they're novel, they're

11:14:34   12   important and the experts at the United States Patent Office

11:14:37   13   are correct to issue them as patents.   These patents are

11:14:43   14   valid and TCL needs to be held accountable for it's unlawful

11:14:48   15   infringement of them.

11:14:51   16        We've talked about the importance of the

11:14:54   17   inventions and that will also come into play given the

11:14:59   18   responsibility vested in you, the jury, to determine the

11:15:01   19   appropriate level of damages in this case.   And remember,

11:15:06   20   the concept of damages relates to the amount of money that

11:15:11   21   TCL should be held to pay so that it is accountable for its

11:15:15   22   unlawful use without permission of IP Bridge's patented

11:15:19   23   inventions.

11:15:21   24        I've introduced to you now Mr. Ogata and to the

11:15:24   25   first two of IP Bridge's two experts.   Let me now introduce

| | |
|---|---|
| 11:15:28 | 1 |
| 11:15:33 | 2 |
| 11:15:38 | 3 |
| 11:15:43 | 4 |
| 11:15:47 | 5 |
| 11:15:52 | 6 |
| 11:15:56 | 7 |
| 11:16:01 | 8 |
| 11:16:07 | 9 |
| 11:16:13 | 10 |
| 11:16:16 | 11 |
| 11:16:23 | 12 |
| 11:16:29 | 13 |
| 11:16:32 | 14 |
| 11:16:34 | 15 |
| 11:16:40 | 16 |
| 11:16:43 | 17 |
| 11:16:48 | 18 |
| 11:16:52 | 19 |
| 11:16:59 | 20 |
| 11:17:05 | 21 |
| 11:17:08 | 22 |
| 11:17:14 | 23 |
| 11:17:18 | 24 |
| 11:17:22 | 25 |

you to the third.  This is Mr. David Kennedy.  Mr. Kennedy, would you please stand and greet the jury?  Mr. Kennedy has 30 years of experience as a certified public accountant, auditor and accounting consultant for corporations, financial institutions, government agencies and other firms. He has negotiated or served as an advisor in over a hundred patent-related transactions, both as an owner of patents and on behalf of companies, universities and inventors.  He has assisted in negotiations, valuing portfolios and determining royalty rates for standard essential patents for many major telecommunications companies, including AT&T, Verizon, Ericsson, U.S. Cellular, T-mobile and Nokia.  That's quite a list.

Now, because the asserted patents are essential to the LTE standard, if TCL had been willing to negotiate in good faith for a license, IP Bridge would have licensed the patents to TCL on what are called FRAND terms and His Honor mentioned that term this morning.  FRAND is an acronym for fair, reasonable and non-discriminatory.  The standards bodies, like the LTE industry standard body, asks parties to make commitments to licensed standard essential patents on FRAND terms so that everyone involved, patent owners, would-be licensees are treated fairly and so the standard can be commercialized on reasonable terms.  So here's how Mr. Kennedy went about calculating a FRAND royalty in this

11:17:27   1   case.  Here's his approach.

11:17:29   2        So step one, he says calculate appropriate

11:17:32   3   reasonable royalty rate for the patent in two ways.  So he

11:17:36   4   took two independent methodologies and he calculated a FRAND

11:17:40   5   royalty and low and behold they came up with almost the

11:17:44   6   identical number.  That told him that that number was quite

11:17:46   7   reliable, so he took those two, they're almost identical in

11:17:50   8   the first place, averaged them and that was his calculation

11:17:53   9   from step one.  He also checked that rate against a rate

11:17:57   10  paid by TCL to another company for a patent license.  And

11:18:04   11  then he performed yet another check, a reasonableness check

11:18:08   12  by comparing this rate to rates used by patent pools.  And

11:18:14   13  patent pools are entities that also license standard

11:18:16   14  essential patents to third parties.  And these two checks

11:18:20   15  told him a couple things.  First of all, step two.  And step

11:18:26   16  two yielded numbers that were in the same ballpark as step

11:18:30   17  one and that told him again that my number in step one is

11:18:33   18  reliable.  Second, step two and step three each yielded a

11:18:39   19  number higher than his number from step one and that told

11:18:42   20  him that his step one calculation was, if anything,

11:18:46   21  conservatively low.  It was on the low side of fair.

11:18:51   22        So using that conservatively low number, he

11:18:54   23  calculated that a FRAND royalty for both patents here would

11:19:01   24  be 33/100ths of one percent of the selling price of the

11:19:04   25  phone for each patent or for the patents together.

11:19:09    1    33/100ths of one percent.  It's a small number.  And

11:19:12    2    applying that FRAND royalty to the infringement generated

11:19:16    3    revenues of TCL, in fact to its own financial data, Mr.

11:19:20    4    Kennedy has determined that again, a conservatively low

11:19:24    5    FRAND royalty would be just under $3.85 million.  $3.85

11:19:32    6    million.

11:19:34    7            Now, you will also hear from someone who TCL

11:19:37    8    proffers as a damages expert here.  But TCL did not ask him

11:19:42    9    to put forward his own independent methodology for

11:19:45   10    calculating a FRAND royalty.  Instead they say, well, use

11:19:49   11    Mr. Kennedy's methodology.  So he did that, but then he

11:19:54   12    altered the numbers.  Well, the evidence will show that

11:19:57   13    those alterations are not reliable, both because TCL asked

11:20:02   14    him not to look at certain key analyses, but also because he

11:20:06   15    just was not in a position to speak to much of Mr. Kennedy's

11:20:09   16    evidence.  He also, by the way, and Mr. Kennedy wrote up his

11:20:17   17    opinions, again, sent, you know, a report to TCL long before

11:20:22   18    trial.  Their expert had a chance to look at them.  He

11:20:26   19    didn't have a thing to say about step #3, that

11:20:29   20    reasonableness check.  Not a single question, not a single

11:20:33   21    criticism, must be pretty darn reasonable.

11:20:39   22            Now, the amount of damages here of course is up

11:20:42   23    to you the jury.  There are a few things you want to pay

11:20:45   24    careful attention to as the evidence comes in.  Number one

11:20:48   25    is, again, this was technology chosen by experts at the

11:20:54   1   industry standard, independent experts, not here or paid by

11:20:57   2   either party.  The fact that they were chosen as the best of

11:21:01   3   the best, the best way to solve problems they address among

11:21:06   4   all the other alternatives available, that speaks to the

11:21:09   5   value of these patents and the appropriate level of damages.

11:21:13   6   Second, these inventions make our phones work better for

11:21:16   7   reasons we've talked about.  They also touch many facets of

11:21:20   8   our phones, again, the battery lasts longer, they work

11:21:23   9   faster, the camera is more useful because the picture and

11:21:27   10   videos that it takes get uploaded faster and you can send

11:21:31   11   them more effectively because we download those images more

11:21:35   12   quickly, they get to other parts of the phone more quickly,

11:21:37   13   the antenna, receiver, display, the speakers so we can watch

11:21:41   14   and listen to them more quickly.  These patents improve the

11:21:44   15   value of the infringing phones in lots of ways.  Third,

11:21:50   16   TCL's infringement here has not been small.  To the

11:21:54   17   contrary, it has been extensive.  Dozens of models of phones

11:22:00   18   use these two patented inventions and they use them, again,

11:22:04   19   every second to send hundreds of signals.  Every moment the

11:22:07   20   phone is powered on, this patented technology is being

11:22:12   21   exploited by these phones and that infringement has reaped

11:22:16   22   TCL big piles of money.  And sometimes it's easier to see

11:22:21   23   some of this in a picture.  Again, Mr. Kennedy's damages

11:22:26   24   calculation, this red pie is TCL's infringing revenue, the

11:22:31   25   revenue that is garnered from selling infringing phones.

11:22:34    1    And this green sliver down on the right there, that's his

11:22:38    2    reasonable royalty, 33/100ths of one percent.  And as it

11:22:45    3    says in the red pie what that means is basically that TCL

11:22:50    4    gets to keep 99.67 percent of the revenue that its garnered

11:22:56    5    from its infringement.

11:23:01    6            I should say too, it was important to IP Bridge

11:23:05    7    that I deliver this opening statement to you in a public

11:23:08    8    open courtroom.  There will be times in this trial when His

11:23:12    9    Honor will close the courtroom so that confidential

11:23:15    10   information can be shared with you the jury.  And when the

11:23:18    11   courtroom is closed, I'll have an opportunity to tell you

11:23:21    12   what the dollars are associated with this red pie, but I can

11:23:25    13   tell you now, it is an eye popping number.  They have made

11:23:29    14   huge revenues from their infringement.  So for all of these

11:23:35    15   reasons, that $3.85 million number that Mr. Kennedy

11:23:40    16   calculated is, if anything, a low number.  It is certainly

11:23:47    17   not too high, it is certainly not unfair.

11:23:50    18           Now, in contrast, what is TCL going to say?

11:23:53    19   It's going to say the amount of damages they should be asked

11:23:57    20   to pay if the patents are infringed and valid are about

11:24:04    21   $270,000.  That is, they're going to say that this green

11:24:08    22   sliver should be 14 times skinnier than it already is.

11:24:13    23   Ladies and gentlemen, if this sliver were 14 times skinnier,

11:24:16    24   I don't think we could even see it.  Given the value of

11:24:20    25   these phones -- excuse me, the value of these patented

11:24:24   1   inventions, given how extensively TCL has used them, that

11:24:29   2   number is just not credible.  And instead it's just another

11:24:33   3   example of TCL refusing to take responsibility for its

11:24:37   4   unlawful infringement.

11:24:44   5          Now, as I promised I would at the outset, I'd

11:24:47   6   like to come back to one final topic before I sum up.

11:24:50   7   Because you may be wondering why a lawsuit was necessary

11:24:53   8   here, why couldn't the parties sit down and work it out.

11:24:57   9   And the answer is, IP Bridge tried and TCL refused.  Four

11:25:05  10   times IP Bridge wrote letters to TCL and every one of those

11:25:10  11   letters was ignored, which is why we had to come here.

11:25:13  12   Let's take a look at these letters.  So the December 15th,

11:25:18  13   2014 letter, this is JTX 178.  This was written to CEO and

11:25:27  14   executive director of the lead defendant in this case, TCL

11:25:33  15   Communication Technology Holdings Limited, the headquarters.

11:25:35  16   You can see this is kind of a big daddy company.  Sent to

11:25:36  17   their CEO and what does the letter say.  Go up.  Says IP

11:25:42  18   Bridge is the owner of portfolios of patents, with the LTE

11:25:49  19   standard, what we've been talking about.  We would welcome

11:25:51  20   the opportunity to discuss an amicable business solution as

11:25:55  21   soon as possible.  We seek an expression of good-faith

11:25:57  22   willingness to meet or otherwise engage in discussions

11:26:00  23   leading toward a license.  So how did TCL respond?  It

11:26:04  24   didn't.  It ignored the letter.  Never wrote back.

11:26:09  25          Let's look at the next letter, JTX 179.  It was

11:26:15   1    a letter written on January 26th, 2015.  It referred back to

11:26:21   2    the first letter, said we never heard from you.  And then

11:26:24   3    seeks an expression of good-faith willingness to meet or

11:26:27   4    otherwise engage in discussions leading toward a license.

11:26:31   5    How did TCL respond to this one?  Didn't again.  Ignored

11:26:35   6    this letter too.

11:26:37   7            IP Bridge wrote again.  On February 27th, 2015,

11:26:44   8    we have twice attempted to initiate good-faith negotiations

11:26:49   9    leading toward a license under IP Bridge's WCDMA and LTE

11:26:55  10    standard essential patents and we have been twice ignored.

11:26:58  11    And let me emphasize, LTE essential patents as of course we

11:27:03  12    just discussed, include the two we've been talking about

11:27:05  13    here.  Now, these two patents were not mentioned by number

11:27:08  14    and other patents are.  These two are the essential patents.

11:27:13  15    The letter goes on and says we remain interested.  Let's go

11:27:17  16    backwards.  Can we go back to that last one, please?  We

11:27:25  17    remain interested in resolving this matter amicably, but

11:27:29  18    cannot do so unless you respond.  So how did TCL respond

11:27:34  19    this time?  They didn't.  They ignored this letter too.

11:27:39  20            So IP Bridge wrote a fourth time, this time

11:27:43  21    asked an outside lawyer to write a letter, maybe they'll

11:27:47  22    take that seriously.  He again refers to the LTE patent

11:27:52  23    portfolio which again includes these two patents and says to

11:27:56  24    remain eligible for FRAND rates on IP Bridge's patents, TCL

11:28:03  25    must negotiate with IP Bridge in good faith.  If TCL wishes

| | |
|---|---|
| 11:28:07 | 1 |
| 11:28:11 | 2 |
| 11:28:13 | 3 |
| 11:28:17 | 4 |
| 11:28:26 | 5 |
| 11:28:30 | 6 |
| 11:28:36 | 7 |
| 11:28:39 | 8 |
| 11:28:43 | 9 |
| 11:28:46 | 10 |
| 11:28:50 | 11 |
| 11:28:53 | 12 |
| 11:28:57 | 13 |
| 11:29:01 | 14 |
| 11:29:07 | 15 |
| 11:29:10 | 16 |
| 11:29:13 | 17 |
| 11:29:14 | 18 |
| 11:29:18 | 19 |
| 11:29:21 | 20 |
| 11:29:27 | 21 |
| 11:29:31 | 22 |
| 11:29:35 | 23 |
| 11:29:39 | 24 |
| 11:29:43 | 25 |

to negotiate with IP Bridge, please contact us immediately. How did they respond is to that?  They didn't.  They ignored that letter too.  So IP Bridge sent four letters to TCL and in response it received silence.

Now, again, unlike TCL, other technologies, household names you hear about at trial, famous technology companies, good ones, they acted very differently.  They responded promptly, sat down with IP Bridge and they took a license.  In fact, you'll hear there's a license for IP Bridge's standard essential telecommunications portfolio for well over a hundred million dollars, which reflects the value of IP Bridge's portfolio, over a hundred million dollars and here the FRAND rate calculated by Mr. Kennedy is just under $3.85 million for these two important patents. IP Bridge has bent over backwards here to be fair and reasonable.

Ladies and gentlemen, over the course of this trial, IP Bridge will present evidence to prove the facts that I have just outlined for you and most importantly these two Bedrock Facts, number one, these two IP Bridge patents are essential to the LTE standard.  And number two, the accused products comply with the LTE standard.  And at the end of the trial, I will ask you to enter a verdict requiring TCL to pay a reasonable royalty for its unlawful infringement of these two patents.

| | |
|---|---|
| 11:29:46 | 1 |
| 11:29:50 | 2 |
| 11:29:54 | 3 |
| 11:29:58 | 4 |
| 11:30:03 | 5 |
| 11:30:06 | 6 |
| 11:30:13 | 7 |
| 11:30:19 | 8 |
| 11:30:25 | 9 |
| 11:30:26 | 10 |
| 11:30:28 | 11 |
| 11:30:30 | 12 |
| 11:30:32 | 13 |
| 11:30:34 | 14 |
| 11:30:40 | 15 |
| 11:30:41 | 16 |
| 11:30:43 | 17 |
| 11:30:46 | 18 |
| 11:30:46 | 19 |
| 11:30:48 | 20 |
| 11:30:52 | 21 |
| 11:30:55 | 22 |
| 11:31:00 | 23 |
| 11:31:04 | 24 |
| 11:31:08 | 25 |

I want to thank you again for your time, your attention and your service and I look forward to speaking with you directly at the end of the trial when I get to talk to you during closing arguments.  Thank you.

And Your Honor, for the record, if I may, the demonstratives that we've used, the '538 Patent is PDX100, the '239 ribbon-stamped copy is PDX101.  The algebra on the easel is PDX102 and the Bedrock Facts board is PDX103.

THE COURT:  Thank you, counsel.

MR. BATCHELDER:  Thank you, sir.

THE COURT:  Mr. Nilsson.

MR. NILSSON:  Yes, Your Honor.

THE COURT:  Mr. Nilsson, do you think you can complete your opening more or less give or take around noon?

MR. NILSSON:  No, Your Honor.

THE COURT:  No, Your Honor.

MR. NILSSON:  I think it will be 45 to 50 minutes.

THE COURT:  Here's what we're going to do, ladies and gentlemen.  We're going to get a jump on lunch so we don't have to break Mr. Nilsson's opening statement up or have you not listen to him because your stomach is growling. So we're going to take an hour for lunch and we'll be back here at 12:30 and start with Mr. Nilsson's opening statement.  I'll just remind you, ladies and gentlemen,

11:31:10  1   you've only heard a part of this case, just like a sliver,

11:31:13  2   so keep an open mind and of course don't talk to anybody

11:31:17  3   else about your thinking on this matter.  So we'll see you

11:31:19  4   at 12:30.

11:31:22  5            (The jury was excused for a luncheon recess.)

11:31:44  6            THE COURT:  The record should reflect we're

11:31:58  7   outside the presence of the jury.  So with respect to the

11:32:01  8   defendants' bench brief concerning admitting evidence of

11:32:05  9   settlement communications with IP Bridge, I will ask you,

11:32:11  10  Ms. Gaza, do you believe that you will be prepared to

11:32:14  11  respond to this at least with an oral argument before lunch,

11:32:18  12  or do you want to wait until -- what difference does it

11:32:23  13  make?  You are not going to get anything done while Nilsson

11:32:26  14  is doing his opening statement, so I would like to at least

11:32:30  15  talk about it, if we can, before lunch.  So if you can come

11:32:34  16  back about, if all of us would come back about 12:15, so

11:32:39  17  that will give us 45 minutes for lunch.  Then we'll talk

11:32:42  18  about it a little bit.  If we need to revisit it more, then

11:32:46  19  we will.

11:32:47  20            MS. GAZA:  Thank you, you.

11:32:48  21            THE COURT:  We're in recess.

11:33:05  22            (Luncheon recess taken.)

12:08:41  23                      -  -  -

12:08:41  24            Afternoon session, 12:15 p.m.

12:14:13  25            THE COURT:  Please be seated.

12:14:19    1            Mr. Nilsson doesn't need to be here because he's

12:14:22    2    preparing himself for the show?

12:14:25    3            MR. SCHLADWEILER:  That's right, Your Honor.

12:14:26    4            THE COURT:  Okay.  So who wants to talk to me

12:14:29    5    from the defense side about this request to add these

12:14:33    6    documents, to cross-examine on these documents?

12:14:38    7            MR. HAHN:  I would like to, your Honor.

12:14:39    8            THE COURT:  Mr. Hahn, okay.

12:14:51    9            MS. GAZA:  Your Honor, we may need to seal the

12:14:53   10    courtroom at this time because they involve confidential

12:14:55   11    communications.

12:14:56   12            THE COURT:  All right.  So is there anyone

12:14:58   13    in the courtroom that ought not to be in the courtroom?

12:15:06   14    Okay.

12:15:16   15            Are we satisfied?  Okay.  Are we satisfied?

12:15:30   16            MS. GAZA:  Yes, sir.  Thank you.

12:15:32   17            THE COURT:  All right.  The courtroom is sealed.

12:15:34   18    Thank you.

12:15:34   19            ***(REPORTER'S NOTE:  This portion of the

12:15:35   20    transcript is under seal.)

12:15:37   21            THE COURT:  Okay.  So, Mr. Hahn, I think I

12:15:42   22    understand where you're coming from on this, so let me let

12:15:47   23    Ms. Gaza make her pitch, or whoever on the team wants to

12:15:51   24    make their pitch, and then I will come back to you.

12:15:54   25            MR. HAHN:  All right.  That's fine Your Honor.

| | | |
|---|---|---|
| 12:15:55 | 1 | MS. GAZA:  Thank you, Your Honor.  I will move. |
| 12:16:04 | 2 | THE COURT:  Sure. |
| 12:16:05 | 3 | MS. GAZA:  I apologize for that.  Let me turn |
| 12:16:07 | 4 | this around, make it more presentable. |
| 12:16:10 | 5 | Your Honor, Anne Gaza on a behalf of plaintiff, |
| 12:16:12 | 6 | IP Bridge. |
| 12:16:12 | 7 | Your Honor, as we discussed yesterday, the |
| 12:16:14 | 8 | correspondence between IP Bridge and third parties is not |
| 12:16:20 | 9 | relevant and should not be permitted under Rule 402, 403, or |
| 12:16:26 | 10 | Rule 408. |
| 12:16:27 | 11 | Our arguments are not limited to just Rule 408. |
| 12:16:31 | 12 | In particular, the letter that they wish to use, which is |
| 12:16:34 | 13 | marked DX-63 -- |
| 12:16:37 | 14 | THE COURT:  Right. |
| 12:16:38 | 15 | MS. GAZA:  -- is a ██████████████ letter |
| 12:16:41 | 16 | between IP Bridge and ████████████ |
| 12:16:44 | 17 | THE COURT:  So what's the date again? |
| 12:16:46 | 18 | MS. GAZA:  ███████████████. |
| 12:17:03 | 19 | THE COURT:  All right.  And that's clearly after |
| 12:17:05 | 20 | this suit was filed? |
| 12:17:07 | 21 | MS. GAZA:  That's correct, Your Honor. |
| 12:17:08 | 22 | THE COURT:  Okay. |
| 12:17:09 | 23 | MS. GAZA:  That's exactly where I was going.  I |
| 12:17:11 | 24 | was after this suit was filed, but even more importantly it |
| 12:17:14 | 25 | was ██████████████████████████ |

| | |
|---|---|
| 12:17:17 | 1 |
| 12:17:20 | 2 |
| 12:17:23 | 3 |
| 12:17:25 | 4 |
| 12:17:28 | 5 |
| 12:17:29 | 6 |
| 12:17:30 | 7 |
| 12:17:34 | 8 |
| 12:17:34 | 9 |
| 12:17:37 | 10 |
| 12:17:46 | 11 |
| 12:17:47 | 12 |
| 12:17:49 | 13 |
| 12:17:54 | 14 |
| 12:17:59 | 15 |
| 12:18:03 | 16 |
| 12:18:08 | 17 |
| 12:18:11 | 18 |
| 12:18:13 | 19 |
| 12:18:14 | 20 |
| 12:18:17 | 21 |
| 12:18:20 | 22 |
| 12:18:26 | 23 |
| 12:18:29 | 24 |
| 12:18:42 | 25 |

1    So by this point the parties were well underway in

2    litigation, and this is clearly an attempt to resolve the

3    claims involved in that litigation.

4         THE COURT:  And the

5

6         MS. GAZA:  That's correct, Your Honor, regarding

7

8         THE COURT:  Okay.

9         MS. GAZA:  And I believe the reason they want to

10   get this in is to just identify the number of patents in the

11   case.  Is that correct?

12        THE COURT:  Well, if I understand what they are

13   saying, they are saying that this $3.8 million that you're

14   asking for is just a sliver of what you really want.  Okay.

15   And to be honest with you, if I'm litigating a lawsuit over

16   $3.8 million, I am not a happy camper.  Okay.  So I know

17   darn good well there's something else going on, and that's

18   why we're talking about this.

19        MS. GAZA:  Well, Your Honor --

20        THE COURT:  So they are saying that you are

21   going to require not just the license for these two patents

22   and the .33 percent of the price of every phone, you're

23   asking for a whole lot of other technology that is not

24   essential technology, and so to say that they are.

25        MR. NILSSON:  Full infringers, among other

| | | |
|---|---|---|
| 12:18:44 | 1 | things, or that the FRAND standard applies is inappropriate. |
| 12:18:48 | 2 | So how do you respond to that? |
| 12:18:50 | 3 | MS. GAZA:  Your Honor, first, we only have in |
| 12:18:52 | 4 | this case two patents and we're only seeking damages on two |
| 12:18:54 | 5 | patents. |
| 12:18:55 | 6 | THE COURT:  I understand that. |
| 12:18:56 | 7 | MS. GAZA:  And -- |
| 12:18:57 | 8 | THE COURT:  You have not settled it because |
| 12:18:59 | 9 | there's something else involved. |
| 12:19:00 | 10 | MS. GAZA:  Well, and, Your Honor -- |
| 12:19:02 | 11 | THE COURT:  I don't need to know what that is. |
| 12:19:04 | 12 | I'm worried about it having to do with this. |
| 12:19:07 | 13 | MS. GAZA:  I understand, Your Honor.  And what |
| 12:19:09 | 14 | Mr. Nilsson indicated yesterday morning was that they wanted |
| 12:19:12 | 15 | to be able to tell the jury that what IP Bridge wants is a |
| 12:19:16 | 16 | portfolio license. |
| 12:19:17 | 17 | THE COURT:  Correct. |
| 12:19:18 | 18 | MS. GAZA:  And IP Bridge said that.  They said |
| 12:19:20 | 19 | that in their fourth letter. |
| 12:19:22 | 20 | THE COURT:  Right. |
| 12:19:22 | 21 | MS. GAZA:  That went pre-filing of this |
| 12:19:25 | 22 | lawsuit.  So to the extent they want to go and wave around |
| 12:19:28 | 23 | IP Bridge wants a portfolio license, not just these two |
| 12:19:32 | 24 | patents, they have it, and anything more than that is |
| 12:19:34 | 25 | cumulative. |

| 12:19:35 | 1 | THE COURT:  Or at least risks problems with |
| 12:19:36 | 2 | other lawsuits and all of that. |
| 12:19:38 | 3 | MS. GAZA:  Certainly.  And I think it's very |
| 12:19:40 | 4 | confusing to the jury to introduce the differences |
| 12:19:44 | 5 | between -- |
| 12:19:44 | 6 | THE COURT:  Except that all the four letters |
| 12:19:48 | 7 | that you have highlighted in opening statement are four |
| 12:19:53 | 8 | letters that say we want to negotiate with you about this |
| 12:19:56 | 9 | package of patents. |
| 12:19:58 | 10 | |
| 12:20:02 | 11 | |
| 12:20:05 | 12 | |
| 12:20:11 | 13 | |
| 12:20:12 | 14 | Is that correct or incorrect? |
| 12:20:14 | 15 | MS. GAZA:  That's not correct, Your Honor. |
| 12:20:15 | 16 | THE COURT:  Okay.  And why not? |
| 12:20:16 | 17 | MS. GAZA: |
| 12:20:18 | 18 | |
| 12:20:18 | 19 | THE COURT: |
| 12:20:20 | 20 | |
| 12:20:21 | 21 | MS. GAZA: |
| 12:20:24 | 22 | |
| 12:20:26 | 23 | THE COURT:  Okay. |
| 12:20:26 | 24 | MS. GAZA: |
| 12:20:28 | 25 | |

12:20:31    1   ▮▮▮▮▮▮▮▮

12:20:32    2           THE COURT:  Okay.

12:20:32    3           MS. GAZA:  So what we have here is, you know,

12:20:36    4   this in terms of what they want to introduce from ▮▮▮▮▮

12:20:39    5           THE COURT:  Right.

12:20:39    6           MS. GAZA:  What we have in a similar time frame,

12:20:43    7   I believe, I don't have the exact date on this, but

12:20:47    8   certainly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

12:20:53    9   ▮▮▮▮▮▮▮▮▮

12:20:54   10           THE COURT:  Okay.  And the exhibit, DX-63, is

12:21:01   11   how big, how large a document?  Is it the big thing you're

12:21:05   12   showing here or just part of the letter?

12:21:07   13           MS. GAZA:  I don't know, Your Honor.  All I

12:21:08   14   have -- all they submitted in DX-63 is this.

12:21:12   15           THE COURT:  Okay.

12:21:12   16           MS. GAZA:  I was able to pull quickly what we

12:21:15   17   have for DX-428 and what they have not submitted for DX-428.

12:21:21   18   I don't have with me the background for DX-63.

12:21:27   19           THE COURT:  Well, I'm looking at DX-63 now.

12:21:30   20           MS. GAZA:  But --

12:21:31   21           THE COURT:  It's a 12-page document.

12:21:33   22           MS. GAZA:  Correct, Your Honor.  What often

12:21:34   23   happens is with pulling just portions of full packages that

12:21:39   24   were sent to be used in exhibits, because that's the only

12:21:44   25   portion that was needed for whatever purpose --

| | | |
|---|---|---|
| 12:21:48 | 1 | THE COURT:  Well, it looks to be, it looks to be |
| 12:21:51 | 2 | effectively the cover letter to anything that would be added |
| 12:21:54 | 3 | to it.  We can ask Mr. Hahn about that.  All right. |
| 12:21:59 | 4 | MS. GAZA:  Your Honor -- |
| 12:22:00 | 5 | THE COURT:  But your position though is that |
| 12:22:02 | 6 | this is really a negotiation letter |
| 12:22:05 | 7 | and |
| 12:22:11 | 8 | that it would be privileged under the rule. |
| 12:22:14 | 9 | MS. GAZA:  That's correct, Your Honor. |
| 12:22:15 | 10 | THE COURT:  All right. |
| 12:22:16 | 11 | MS. GAZA:  And that there's no basis under the |
| 12:22:18 | 12 | rules to permit its admission. |
| 12:22:20 | 13 | THE COURT:  Okay. |
| 12:22:21 | 14 | MS. GAZA:  To the extent that they cite in |
| 12:22:24 | 15 | their, you know, bench memo things regarding, you know, |
| 12:22:33 | 16 | questions about what type of information is provided in this |
| 12:22:38 | 17 | letter, it's just simply not relevant, and it doesn't go to |
| 12:22:45 | 18 | TCL's state of mind, which is one of the things that they |
| 12:22:49 | 19 | put in the letter, you know, as an other acceptable purpose. |
| 12:22:53 | 20 | So it's really just to put it in for the truth, you know, |
| 12:22:56 | 21 | alleged truth of the matter asserted in the document, and |
| 12:23:00 | 22 | it's just not relevant here. |
| 12:23:01 | 23 | THE COURT:  Okay. |
| 12:23:02 | 24 | MS. GAZA:  Moreover, it's prejudicial. |
| 12:23:05 | 25 | THE COURT:  I understand. |

12:23:06  1          So, Mr. Hahn?

12:23:07  2          MS. GAZA:  Do you want me to address the other

12:23:09  3   letter or shall we go one by one?

12:23:11  4          THE COURT:  This is the biggest letter, I think.

12:23:13  5   The 428 letter is more of the same, isn't it?

12:23:16  6          MS. GAZA:  So the other letter is ███████████

12:23:18  7   ████████████████████████████████████████████████████████

12:23:22  8   ███████████████████████████████████

12:23:24  9          THE COURT:  ████████████████████████████████████

12:23:27  10  █████████

12:23:28  11         MS. GAZA:  ████████████████████████████████████████

12:23:30  12         THE COURT:  Okay.  ████████████████████████████

12:23:33  13  ███████████████████████████  Okay?

12:23:35  14         MS. GAZA:  I think that's probably clear, Your

12:23:38  15  Honor.

12:23:38  16         THE COURT:  Okay.  Mr. Hahn?

12:23:40  17         MS. GAZA:  Thank you.

12:23:42  18         MR. HAHN:  Yes, Your Honor.  First of all, thank

12:23:46  19  you for indulging the bench memo.  We made an effort to keep

12:23:53  20  it very brief.  You probably don't get too many two-page

12:23:58  21  briefs.

12:23:59  22         THE COURT:  Not from you folks.

12:24:02  23         MR. HAHN:  We're kind of proud of that.

12:24:03  24         THE COURT:  Okay.

12:24:05  25         MR. HAHN:  So, Your Honor, you heard

| | | |
|---|---|---|
| 12:24:08 | 1 | Mr. Batchelder start and end his opening with the assertion |
| 12:24:13 | 2 | that TCL is unwilling, an unwilling licensee, and we think |
| 12:24:18 | 3 | we're entitled to show that in response to that, that we |
| 12:24:24 | 4 | were not offered a FRAND license to the two patents-in-suit |
| 12:24:29 | 5 | in this case. |
| 12:24:29 | 6 | THE COURT:  So what were you offered?  You were |
| 12:24:31 | 7 | just offered -- you were offered -- |
| 12:24:34 | 8 | MR. HAHN:  ██████████████████████ |
| 12:24:36 | 9 | ███████████████████████████████ |
| 12:24:41 | 10 | ████████████████████████████████████ |
| 12:24:44 | 11 | ██████████████████████████████████ |
| 12:24:48 | 12 | ████████████████████████████████ |
| 12:24:52 | 13 | ██████ |
| 12:24:54 | 14 | And, by the way, on the quick question of 63, |
| 12:24:57 | 15 | we're just interested in what has been provided, the 12-page |
| 12:25:04 | 16 | letter, not all the attachments to it. |
| 12:25:06 | 17 | THE COURT:  Well, why hasn't this already been |
| 12:25:08 | 18 | covered by the four letters previously identified by |
| 12:25:11 | 19 | plaintiff's counsel in opening? |
| 12:25:13 | 20 | MR. HAHN:  It is more -- well, Your Honor, first |
| 12:25:17 | 21 | of all, we can use those letters.  We intend to use those |
| 12:25:20 | 22 | letters, but we think that once you start the process and |
| 12:25:24 | 23 | you open the door -- |
| 12:25:26 | 24 | THE COURT:  Well, why should you be able to do |
| 12:25:27 | 25 | letters that are negotiation letters in the context of |

12:25:32    1    another lawsuit post judgment, or post suit to do that?

12:25:36    2            MR. HAHN:  Well, first of all, Your Honor, Rule

12:25:39    3    408 doesn't actually differentiate between --

12:25:42    4            THE COURT:  I just want to hear your reason.  I

12:25:44    5    don't give a hoot about Rule 408 right now.

12:25:46    6            MR. HAHN:  Okay.

12:25:47    7            THE COURT:  I just want to know why -- I mean, I

12:25:49    8    practiced law for a million years, you can tell just by

12:25:53    9    looking at me, we don't let negotiation letters come into

12:25:57   10    evidence, and there's a good reason for that, and it's a

12:25:59   11    historic reason and it goes back a long way.  So I want to

12:26:03   12    hear a really, really good reason why I should allow you to

12:26:08   13    put into evidence negotiation letters post suit in another

12:26:14   14    lawsuit.

12:26:16   15            Talk to me.

12:26:18   16            MR. HAHN:  Well, Your Honor, as you surmised,

12:26:21   17    that ███████████████████████████████████████

12:26:24   18    ████████.  You know, I don't want to introduce a lot of

12:26:28   19    evidence that is improper, but the reality is, I think

12:26:33   20    you've already figured it out, that this lawsuit is part of

12:26:38   21    something much bigger.

12:26:40   22            THE COURT:  Of course.

12:26:41   23            MR. HAHN:  And that, and that letter ████████

12:26:45   24    █████████████████████████████████████████████

12:26:48   25    █████████████████████████████████████████████

```
12:26:52    1          THE COURT:  Well, does the DX-63 letter ███
12:26:58    2   ████████████████████████████████
12:27:01    3          MR. HAHN:  ██████████████████
12:27:02    4          THE COURT:  Okay.  And the letters, the previous
12:27:05    5   four letters that were referred to in the opening statement,
12:27:08    6   does it bring up ████████████?
12:27:10    7          MR. HAHN:  ██████████   I think we saw that this
12:27:13    8   morning.
12:27:13    9          THE COURT:  So why do I need to now go outside
12:27:15   10   of what we have right here to a case in ████████████
12:27:19   11   ████████████████████████████████████████████
12:27:24   12   ████████████████████?  Just to reinforce the first
12:27:30   13   four letters?
12:27:31   14          MR. HAHN:  Well, we think that door has been
12:27:33   15   opened, and as I say, the Rules of Evidence don't
12:27:37   16   differentiate -- if the reasoning of the rules is followed,
12:27:42   17   there's as much reason to disallow the earlier letters
12:27:46   18   because there was a ripe dispute apparently, and these would
12:27:51   19   have been offers to compromise.
12:27:53   20          THE COURT:  Well, they're not really offers to
12:27:54   21   compromise.  They're letters that put you on notice that
12:27:58   22   there's a patent and put you on notice that the license,
12:28:02   23   that the patentholder wants to enter into negotiations with
12:28:05   24   you for a license.
12:28:06   25          That has to do with willfulness.  That has to do
```

```
12:28:11   1    with whether you knew that there was a patent.  All of that

12:28:17   2    goes along with that.  That's not the same as I sued you and

12:28:20   3    now I want to settle the case, and that's what I see in

12:28:24   4    DX-63.

12:28:26   5              Is my characterization wrong?

12:28:29   6              MR. HAHN:  There's a different character in the

12:28:33   7    letters.  Respectfully, Your Honor, I don't think that it

12:28:37   8    changes the nature of the correspondence.

12:28:40   9              THE COURT:  Okay.

12:28:41   10             MR. HAHN:  You know, it's more detailed, of

12:28:43   11   course.

12:28:44   12             THE COURT:  I'm sure it is.  And so DX-428,

12:28:48   13   ██████████████████████████████████████████████████████

12:28:53   14             MR. HAHN:  Well, it's directly related to the

12:28:59   15   ██████████████

12:29:00   16             MS. GAZA:  Your Honor,  ███████████████

12:29:03   17             MR. HAHN:  ███████████████████████████████████

12:29:05   18             THE COURT:  No.  I understand that.  But it's in

12:29:07   19   a different case that's in ███████████████?

12:29:09   20             MR. HAHN:  ██████████████████████████████████████

12:29:13   21   █████████████

12:29:14   22             THE COURT:  ██████████████████████████████████

12:29:17   23   ██████████████████████████████████████████████████████

12:29:20   24   ██████████████?

12:29:21   25             MR. HAHN:  ████████████████████████████████████
```

12:29:25   1   ███████████████████████ --

12:29:29   2            THE COURT:  ████████████████████

12:29:30   3   ████████████████████

12:29:32   4            MR. HAHN:  Well, as Your Honor correctly

12:29:36   5   surmised, the bigger --

12:29:37   6            THE COURT:  And it's another letter that was

12:29:41   7   ██████████████████.  It's a letter that

12:29:44   8   was --

12:29:45   9            MR. HAHN:  Yes.

12:29:46   10            THE COURT:  ███████████████████

12:29:49   11   ███████████████████████████

12:29:51   12   ██████?

12:29:52   13            MR. HAHN:  Yes, Your Honor.  In fact, I think

12:29:53   14   Mr. Nilsson is on the letter.

12:29:55   15            THE COURT:  Okay.  With all due respect to

12:29:58   16   Mr. Nilsson and his drafting abilities, I have some problems

12:30:01   17   with this.

12:30:04   18            Now, I understand that you want to ask these

12:30:06   19   questions of Mr. Ogata during his direct examination.

12:30:16   20            MR. HAHN:  During his cross.

12:30:17   21            THE COURT:  On behalf of his direct examination.

12:30:21   22            MR. HAHN:  Right.

12:30:21   23            THE COURT:  And I understand that it's your

12:30:23   24   position that IP's damages expert is going to refer to FRAND

12:30:28   25   royalties and then calculate the royalties as though they're

12:30:32 1    FRAND royalties.

12:30:33 2              MR. HAHN:  Yes.

12:30:34 3              THE COURT:  And you think that that is

12:30:35 4    incorrect, and you want to be able to establish the

12:30:39 5    foundation, if you will, to cross-examine their expert

12:30:42 6    witness based on the testimony from Mr. Ogata relating to

12:30:48 7    their position about only granting royalties on the package

12:30:53 8    as opposed to the ones here.

12:30:56 9              Is that correct?

12:30:58 10             MR. HAHN:  That, too, Your Honor, yes.

12:30:59 11             THE COURT:  Okay.  So to be honest with you, I

12:31:06 12   would like to hear their expert before I let you open the

12:31:08 13   door on this with Mr. Ogata.  The question is:  How long is

12:31:14 14   Mr. Ogata going to be available for testimony and his

12:31:18 15   interpreter?

12:31:19 16             So, Ms. Gaza, can you answer that question?

12:31:21 17             MS. GAZA:  Let me confer, Your Honor.

12:31:23 18             (Pause while counsel conferred.)

12:31:36 19             MS. GAZA:  Your Honor, my understanding is that

12:31:40 20   Mr. Ogata will be here for the duration of the trial as will

12:31:43 21   his interpreter.

12:31:44 22             The issue, however, Your Honor, is we don't

12:31:46 23   think it's appropriate for this information to be, to come

12:31:50 24   in or to be considered at all.  It's not something that goes

12:31:56 25   to any issue in the case as to damages or the pre-suit

12:32:03   1    action.

12:32:03   2                    THE COURT:  Okay.

12:32:04   3                    MS. GAZA:  Basically, as we told you yesterday,

12:32:06   4    the unwilling licensee argument that we have --

12:32:08   5                    THE COURT:  Just stop talking, because here's my

12:32:10   6    decision.

12:32:11   7                    MS. GAZA:  Okay.

12:32:11   8                    THE COURT:  My decision is that the defendants

12:32:13   9    will not able to cross-examine Mr. Ogata on the issues

12:32:17   10   raised by those two letters.  Okay?  By the two letters that

12:32:22   11   are noted in here, DX-63 and DX-428.

12:32:27   12                   After I hear the expert testimony, the

12:32:32   13   technological expert testimony from the plaintiff concerning

12:32:34   14   whether this is a, an essential technology, and after I hear

12:32:45   15   the damages expert from the plaintiff making the FRAND

12:32:51   16   computation, I might be open to letting you recall Mr. Ogata

12:32:56   17   in your case-in-chief on the defense, but I have to tell you

12:33:02   18   that I'm not really inclined to do that, but I'm willing to

12:33:09   19   listen to it after we finish those two experts to be sure

12:33:12   20   that I fully understand both sides of the issue.

12:33:15   21                   MR. HAHN:  Understand, Your Honor.  I think

12:33:16   22   that's a fair resolution.

12:33:17   23                   THE COURT:  Well, thank you for that.  All

12:33:21   24   right.

12:33:21   25                   MS. GAZA:  Would it be possible, Your Honor, to

| 12:33:23 | 1 | provide a written submission to you? |
| 12:33:26 | 2 | THE COURT:  Oh, yes, absolutely. |
| 12:33:27 | 3 | MS. GAZA:  Thank you. |
| 12:33:28 | 4 | THE COURT:  To respond to this. |
| 12:33:29 | 5 | MS. GAZA:  To respond to this. |
| 12:33:31 | 6 | THE COURT:  Yes.  Absolutely. |
| 12:33:33 | 7 | MS. GAZA:  Thank you. |
| 12:33:34 | 8 | THE COURT:  Are we ready to go? |
| 12:33:35 | 9 | MR. SCHLADWEILER:  Your Honor, putting aside |
| 12:33:37 | 10 | these two issues we've been discussing, there's also the |
| 12:33:39 | 11 | issue of whether or not we're allowed on cross to go beyond |
| 12:33:41 | 12 | the scope of Mr. Ogata's direct. |
| 12:33:44 | 13 | THE COURT:  Well -- |
| 12:33:50 | 14 | MR. SCHLADWEILER:  If I could speak to it. |
| 12:33:51 | 15 | THE COURT:  I don't know the answer to that.  So |
| 12:33:53 | 16 | there has been some back and forth about this and I don't |
| 12:33:56 | 17 | know how much -- to be honest with you, I'm pretty forgiving |
| 12:34:02 | 18 | on the scope of direct, okay, but I'm not going to let you |
| 12:34:08 | 19 | go crazy.  Of course, where is the guideline?  You don't |
| 12:34:11 | 20 | know what it is because you've never been in my Court before |
| 12:34:13 | 21 | and sometimes I'm not too sure what that guideline is. |
| 12:34:18 | 22 | Okay. |
| 12:34:18 | 23 | And, Ms. Gaza, you went through a whole bunch of |
| 12:34:23 | 24 | procedural issues that say that you were not aware of this |
| 12:34:26 | 25 | and on and on. |

12:34:29  1      So how do you want to do this?  I can tell you

12:34:31  2  this, that if you let him do direct examination, effectively

12:34:36  3  direct examination outside the scope of the direct, that

12:34:39  4  means it's less likely that your client is going to be

12:34:42  5  called in their case-in-chief.  That's the only thing I can

12:34:45  6  tell you.

12:34:46  7      So tell me what you want to do.

12:34:48  8      MS. GAZA:  And, Your Honor, we think it's

12:34:50  9  patently unfair for them to be able to go beyond the scope

12:34:53  10  today and then call him back.

12:34:54  11      THE COURT:  Okay.

12:34:55  12      MS. GAZA:  So they get one or the other.  But if

12:34:57  13  it's today, we think that they should not be permitted to

12:35:00  14  use those two exhibits with him.

12:35:02  15      THE COURT:  Okay.  That's fine.  So that is what

12:35:06  16  it will be, ladies and gentlemen.

12:35:08  17      So the answer is, you don't get to go beyond the

12:35:10  18  scope of direct examination, but you'll be able to call him

12:35:14  19  in your case-in-chief because he's going to be here and so

12:35:17  20  will his interpreter.

12:35:18  21      MS. GAZA:  But, Your Honor, we do not believe he

12:35:21  22  should be called in their case-in-chief.

12:35:22  23      THE COURT:  They can call him in their

12:35:24  24  case-in-chief if they want to.  I don't know why they can't.

12:35:26  25      MS. GAZA:  Well --

```
12:35:27    1        THE COURT:  Because you say that he is not

12:35:30    2   designated as a witness in their pretrial order?

12:35:32    3        MS. GAZA:  It was in their pretrial order, but

12:35:35    4   subsequent to their pretrial order, they specifically said

12:35:37    5   to Your Honor on cross that they were only calling Mr. Bo

12:35:43    6   Gao and their two experts, Mr. Ordover --

12:35:45    7        THE COURT:  You can put your case on the way you

12:35:47    8   want to put your case on.  They can put their case on the

12:35:50    9   way they want to put their case on.  They get to call any

12:35:53   10   witnesses that are in the witness list.  You're both under

12:35:56   11   the clock.  You both get to do it that way.

12:35:58   12        The answer to the question is, if they want to

12:36:00   13   call your client in their case-in-chief, they can do it,

12:36:04   14   period, the end.

12:36:06   15        MS. GAZA:  Given the late nature of the

12:36:10   16   disclosure, can we have a requirement that they have to

12:36:14   17   disclose what exhibits they plan on using with him, because

12:36:16   18   we have not prepared Mr. Ogata to be called in their direct

12:36:19   19   case.

12:36:19   20        THE COURT:  All right.  And, counsel, are you

12:36:21   21   willing to do that?

12:36:21   22        MR. SCHLADWEILER:  Well, we'll do that per the

12:36:23   23   schedule in the pretrial order, what it sets forth, a

12:36:29   24   procedure for that.

12:36:29   25        THE COURT:  Right.
```

459

| | | |
|---|---|---|
| 12:36:30 | 1 | MS. GAZA:  But they will not argue that it's |
| 12:36:32 | 2 | cross or an adverse direct, that they will not disclose |
| 12:36:35 | 3 | them. |
| 12:36:35 | 4 | THE COURT:  Now you're past what I -- I don't |
| 12:36:37 | 5 | understand. |
| 12:36:39 | 6 | MS. GAZA:  So they may argue -- |
| 12:36:40 | 7 | THE COURT:  I understand if they are going to |
| 12:36:41 | 8 | call him in their case-in-chief, you want to know what |
| 12:36:44 | 9 | exhibits they're going to be discussing. |
| 12:36:46 | 10 | MS. GAZA:  Correct, Your Honor. |
| 12:36:47 | 11 | THE COURT:  And they indicated that they'll do |
| 12:36:49 | 12 | that.  Now, the next thing you want to do is what? |
| 12:36:52 | 13 | MS. GAZA:  No.  No.  All I wanted to do is... |
| 12:36:58 | 14 | (Pause while counsel conferred.) |
| 12:37:03 | 15 | MS. GAZA:  Well, Your Honor, how about a |
| 12:37:05 | 16 | compromise? |
| 12:37:06 | 17 | THE COURT:  I'm always willing for a compromise, |
| 12:37:09 | 18 | but I would like to get started. |
| 12:37:10 | 19 | MS. GAZA:  I understand. |
| 12:37:11 | 20 | THE COURT:  Okay. |
| 12:37:12 | 21 | MS. GAZA:  And our compromise would be to have, |
| 12:37:14 | 22 | to permit them go beyond the scope today except as to those |
| 12:37:17 | 23 | two documents and only address those two documents after the |
| 12:37:20 | 24 | expert. |
| 12:37:22 | 25 | MR. NILSSON:  That's fine. |

| | | |
|---|---|---|
| 12:37:23 | 1 | THE COURT:  That's a wonderful idea.  I think |
| 12:37:25 | 2 | that's what I said in the beginning. |
| 12:37:26 | 3 | Okay.  So let's get the jury out here and let |
| 12:37:29 | 4 | Mr. Nilsson do his opening statement. |
| 12:37:33 | 5 | MR. NILSSON:  May I turn this? |
| 12:37:34 | 6 | THE COURT:  Yes, you may. |
| 12:37:47 | 7 | MR. NILSSON:  The courtroom is sealed because |
| 12:37:50 | 8 | we're showing that. |
| 12:37:50 | 9 | THE COURT:  We're still sealed.  We're all |
| 12:37:52 | 10 | locked in here. |
| 12:37:52 | 11 | MR. NILSSON:  Thank you. |
| 12:37:55 | 12 | THE COURT:  Mr. Ogata should be able to come |
| 12:37:57 | 13 | in. |
| 12:37:59 | 14 | MS. GAZA:  Mr. Ogata cannot because it's |
| 12:38:01 | 15 | actually third-party confidential information, Your Honor. |
| 12:38:07 | 16 | THE COURT:  Oh. |
| 12:38:07 | 17 | MS. GAZA:  So Mr. Ogata will not be here.  Will |
| 12:38:10 | 18 | it be possible to take a break after he's called?  I can |
| 12:38:14 | 19 | just explain to him. |
| 12:38:15 | 20 | THE COURT:  Yes. |
| 12:38:15 | 21 | MS. GAZA:  Thank you, Your Honor. |
| 12:38:17 | 22 | (The jury entered the courtroom.) |
| 12:38:32 | 23 | THE COURT:  Please be seated, ladies and |
| 12:38:36 | 24 | gentlemen. |
| 12:38:37 | 25 | Mr. Nilsson? |

12:38:39    1                    MR. NILSSON:  Yes, Your Honor.

12:38:40    2                    THE COURT:  You may proceed.

12:38:41    3                    MR. NILSSON:  Thank you.

12:38:44    4                    THE COURT:  Just let this gentleman get into the

12:38:46    5      well of the courtroom.

12:38:53    6                    MR. NILSSON:  Okay.

12:38:55    7                    THE COURT:  All right.  Let's let the courtroom

12:38:57    8      settle down before we give you our undivided attention.

12:39:07    9                         (Pause.)

12:39:15   10                    THE COURT:  All right.  Mr. Nilsson, you may

12:39:17   11      proceed.

12:39:17   12                    MR. NILSSON:  Thank you, Your Honor.

12:39:18   13                    Good afternoon.  My name is John Nilsson and I'm

12:39:24   14      going to introduce the rest of my team and my clients in a

12:39:27   15      moment, but before I do, I'd like to look back at something

12:39:32   16      that you saw right before lunch.  It was one of the first

12:39:35   17      things you saw.

12:39:37   18                    These are the two patents at issue in this case,

12:39:42   19      the '239 patent, the '538 patent.  They're the only two

12:39:45   20      patents being asserted against TCL at this trial.  I want

12:39:50   21      you to look for a moment at some of the information that you

12:39:53   22      are looking at in the context of this patent.

12:39:56   23                    So here are the named inventors of the '239

12:40:02   24      patent it's Mr. Elbwart, Mr. Wengerter, Mr. Löhr.  They did

12:40:13   25      the pioneering research that Mr. Batchelder was mentioning.

| | | |
|---|---|---|
| 12:40:18 | 1 | Remember, it was an elegant solution to a vexing problem. |
| 12:40:20 | 2 | You are not going to hear a single word from any of them at |
| 12:40:24 | 3 | this trial.  None of them are going to be here to talk about |
| 12:40:26 | 4 | that.  You are not going to see them testify on the video |
| 12:40:29 | 5 | screens in front of you, not Mr. Elbwart, Mr. Wengerter, not |
| 12:40:35 | 6 | Mr. Löhr. |
| 12:40:36 | 7 | I think Dr. Wells will be talking about how |
| 12:40:38 | 8 | Mr. Wengerter participated in these some of these 3GPP |
| 12:40:43 | 9 | meetings, but you are going to hear he didn't talk to |
| 12:40:46 | 10 | Mr. Wengerter. |
| 12:40:47 | 11 | You'll also notice at the bottom Panasonic |
| 12:40:50 | 12 | Corporation.  That's the original owner of these patents. |
| 12:40:53 | 13 | There's not going to be a single witness here, either at |
| 12:40:55 | 14 | trial or on video from Panasonic to talk about all the |
| 12:40:58 | 15 | work that went into this for them, how important it was to |
| 12:41:01 | 16 | them. |
| 12:41:03 | 17 | So let's look at the '538 patent.  Again, we see |
| 12:41:07 | 18 | the inventors.  Mr. Nakao, Mr. Imamura, Mr. Ogawa, |
| 12:41:15 | 19 | Mr. Matsumoto, Mr. Hiramatsu.  Not a single one of those |
| 12:41:22 | 20 | witnesses will appear here either.  Remember, you heard |
| 12:41:24 | 21 | they worked hard to solve this issue of interference |
| 12:41:27 | 22 | between signals on your phone.  They are not going to talk |
| 12:41:29 | 23 | about how they did that or whether it was really very |
| 12:41:32 | 24 | different from anything that came before, whether it solved |
| 12:41:35 | 25 | a really difficult problem, whether it was really essential |

12:41:37  1    to LTE.

12:41:40  2                And you're going to actually hear that

12:41:44  3    Mr. Ogawa, the third name on that list, he actually works

12:41:46  4    with Mr. Ogata.  He works at IP Bridge, Inc., right now.  He

12:41:51  5    still does, yet they didn't bring him to trial.  They didn't

12:41:54  6    make him available to testify on the video for you.  I will

12:42:00  7    be asking Mr. Ogata about that, whether he would be the more

12:42:04  8    knowledgeable person.  We'll see what he says.

12:42:06  9                And, again, no one from Panasonic is going to

12:42:09  10   talk about this patent, this technology, how important it

12:42:12  11   was either.

12:42:13  12               So I've been talking about some of the evidence

12:42:17  13   you won't see.  I'm going to talk about some of the evidence

12:42:20  14   you will see, but before I do, I want to introduce some

12:42:25  15   folks on our team.  This is Ed Hahn.  I think I introduced

12:42:28  16   him to you yesterday.  He's my partner.  Ben Schladweiler,

12:42:32  17   he's an attorney in Delaware.  He's assisting as well.

12:42:35  18               I introduced some of our team members in the

12:42:37  19   front row here.  I will introduce some other participants

12:42:40  20   during the course of this presentation.  There's Mr. James

12:42:44  21   Beale that's going to be putting these things in front of

12:42:46  22   you that you see, which is a tough job, and I'm glad we have

12:42:49  23   him to help us with it.

12:42:50  24               So let me tell you a little bit about TCL and

12:42:53  25   TCT, my client, the defendants.

| | |
|---|---|
| 12:42:56 | 1 |

There was mention about TCL being a really big electronics company. That's actually not a defendant in this case. It's TCL Communications and TCT Mobile U.S. So TCL Communications is headquartered in China. It actually researches, develops the cellphones that are sold here in the U.S. around the world. It's not very big. Its market share is maybe five percent or so in the cellphone market, a lot smaller than Apple or Samsung, but it's growing. Here in the U.S., it sells its phones through TCT Mobile U.S. So I will be referring to them generally often as TCL, but sometimes we'll make a distinction.

We expect very soon at trial, Mr. Bo Gao, who is a director at TCT Mobile U.S., will be testifying to you about how the two companies interact, how TCT Mobile goes about supplying its phones to its customers here in the U.S., their carriers like AT&T Wireless, T-Mobile, Cricket Wireless, some other customers like that. And he's going to tell you, these are LTE phones. That's one thing there's going to be no dispute about and there's going to be no dispute that LTE is great, that it has resulted in a lot of great benefits to everyone.

I think there was some suggestion though that these two patents that we were just looking at, they're the LTE patents. I don't think the evidence is going to support that.

12:44:31    1        So this is another pie chart.  You saw one at

12:44:35    2   the end of Mr. Batchelder's presentation.  On the blue you

12:44:43    3   see all of the patents that have been declared to LTE.  All

12:44:46    4   right.  Essential to LTE.  Over 5800.  Right.  The little

12:44:52    5   orange line, that's the two patents at issue here.  If it

12:44:59    6   were any skinnier, I don't think we could see it.  Right.

12:45:03    7        So LTE has a lot of patents that are essential

12:45:06    8   to it, thousands.  You're not going to hear a single piece

12:45:09    9   of evidence.  These are in the top 100, the top 1,000.

12:45:16   10        So let me step back for a second.  What does it

12:45:18   11   mean for a patent to be declared standard essential, because

12:45:23   12   I don't think we really got a good sense of that.  So I

12:45:26   13   tried to think of an analogy, and this was the best that I

12:45:29   14   can do.

12:45:31   15        Imagine that the cars and trucks that we see

12:45:34   16   here are cellphone makers like TCL, right, and imagine that

12:45:38   17   that bridge on the other side of the toll, that's LTE.  They

12:45:42   18   all want to, they want to get across.  They want to use LTE

12:45:46   19   for those interoperability reasons that we were just talking

12:45:49   20   about, but here's where the analogy breaks down a little

12:45:54   21   bit, because there's no standard toll.  Instead, when they

12:45:58   22   get to the toll booth, there's a negotiation that goes on

12:46:01   23   between the standard essential patentholders in the toll

12:46:07   24   booth and the cellphone manufacturer that wants to be able

12:46:10   25   to be LTE compatible so that his phones work on LTE

12:46:10  1  networks.

12:46:12  2          So how does somebody get into the toll booth to

12:46:19  3  be on that side of the negotiation?  Basically, what happens

12:46:23  4  is, there are two promises that have to be made, two

12:46:27  5  commitments.  The first promise, and it's a promise, is that

12:46:32  6  your patent truly is standard essential.  You can't be LTE

12:46:37  7  compatible without using this patent.  All right.

12:46:41  8          The second promise is that if someone wants to

12:46:46  9  use it, they can.  You're not -- you are going to allow

12:46:50  10 everyone, every cellphone manufacturer who wants to use

12:46:53  11 it to use it on fair, reasonable, and non-discriminatory

12:46:58  12 terms.

12:46:58  13         So what does that mean in the context of this

12:47:01  14 analogy?  It means you can't stop someone at the toll booth

12:47:04  15 and say, you can't go through.  You're going back.  You

12:47:07  16 can't charge one car, one truck vastly more than you just

12:47:13  17 charged a car that you let pass onto the LTE bridge.

12:47:17  18         So let's start with this first prong.  Okay.

12:47:20  19 Mr. Batchelder suggested, I think, that when a patent is

12:47:24  20 declared standard essential, but you can conclude that it

12:47:32  21 is, it automatically is.  And a device that's compatible

12:47:34  22 with the standard also has to use that patent.

12:47:38  23         Remember he wrote it on the board.  You can't

12:47:43  24 use a phone on an LTE network without using what is exactly

12:47:47  25 in the '239 patent, A equals B equals C.  Well, if it were

12:47:54   1   that simple, I don't think we'd be here.  It's not going to

12:47:59   2   be high school geometry or algebra.

12:48:04   3          So when Panasonic told ETSI, that was the

12:48:09   4   standard setting organization, the European

12:48:14   5   Telecommunications Standards Institute, when it told ETSI

12:48:16   6   the '239 patent and '538 patent, these are standard

12:48:19   7   essential, ETSI didn't analyze them at all.  The evidence is

12:48:24   8   undisputed on that.  No team of experts at ETSI said, okay,

12:48:29   9   let's check.  Let's make sure these really are standard

12:48:31  10   essential.  That didn't happen.  They took Panasonic at its

12:48:35  11   word.  That's why it's a promise.

12:48:38  12          So what is a problem from that?  Well, you will

12:48:45  13   hear this leads to a problem, and I think Mr. Kennedy, who

12:48:49  14   you heard about in IP Bridge's opening, will admit this,

12:48:53  15   this leads to a problem called over declaration.  Patent

12:48:57  16   owners declare a patent to be essential and it's not.

12:49:05  17          This is a document that Mr. Kennedy actually

12:49:07  18   relies on.  He cited it.  It's part of an analysis done by a

12:49:13  19   group called PA Consulting.  All right.  And they actually

12:49:18  20   looked and they said, our analysis shows that of the 5846

12:49:27  21   patents declared standard essential, just 2142 actually

12:49:31  22   work.  All right.  Little bit more than a third.

12:49:34  23          So, now I think that Professor Min is likely to

12:49:41  24   testify, well, I did look at these patents, I did what ETSI

12:49:45  25   didn't do, and I concluded they actually are essential to

12:49:49   1   LTE, but not everyone is going to agree.

12:49:53   2         This is Professor Stephen Wicker.  He's in the

12:49:58   3   courtroom.  And I think there was a suggestion that

12:50:03   4   Professor Wicker is going to agree with Professor Min.  He

12:50:08   5   actually won't.  He'll be watching the evidence unfold with

12:50:12   6   you and he'll be testifying during our portion of the case,

12:50:15   7   which comes after IP Bridge has their chance to put on their

12:50:20   8   evidence.

12:50:20   9         He has been teaching courses, writing books,

12:50:23  10  writing papers, researching, consulting in wireless

12:50:30  11  networking technology for 30 years.  His credentials, I

12:50:33  12  think you'll be as every bit as impressive as Professor Min,

12:50:38  13  but I'm not going to waste time on that right now.

12:50:42  14         He reviewed Dr. Min's analysis, and he's going

12:50:45  15  to explain why he disagrees with it.  But in order to put

12:50:48  16  that in context, I want to provide some background.

12:50:51  17         So if you actually took apart your smart phone,

12:50:55  18  this is basically what you would see.  There are lots of

12:50:57  19  different pieces in there.  You can see the battery, the

12:51:00  20  touchscreen module, the audio jack, the camera module.

12:51:05  21  That's some of the most interesting stuff for us right now.

12:51:08  22  But everything that actually happens that's in dispute in

12:51:14  23  this case, everything that is important for these two

12:51:16  24  patents happens in terms of dispute between the parties,

12:51:22  25  happens in what's called the main PCB that's highlighted

12:51:25  1    there.

12:51:26  2              What is that?  It's called the main printed

12:51:29  3    circuit board.  So you have various chips here.  You see a

12:51:35  4    touchscreen controller chip, flash memory, audio codec.

12:51:40  5    That's what translates your voice into digital binary

12:51:44  6    digits, power management, and everything that's important

12:51:48  7    for this case, everything that is in dispute happens in the

12:51:53  8    baseband processor chip, that chip.

12:51:57  9              So what will we hear about how that baseband

12:52:04  10   processor actually works?  These are two witnesses.  They're

12:52:11  11   engineers who worked for TCL.  You'll hear their testimony

12:52:16  12   by video.  Mr. Zheng on the left will testify through an

12:52:23  13   interpreter, and they'll both explain that what TCL does is

12:52:26  14   it purchases that baseband processor chip from one or two

12:52:30  15   companies, Qualcomm or Media Tech.  The companies make them.

12:52:35  16   They design them.  And, most importantly, they write the

12:52:40  17   source code that actually controls how they work, how they

12:52:44  18   send the signalling information that Mr. Batchelder was

12:52:48  19   referring to back and forth to the carrier's network.  And

12:52:53  20   they'll tell you, these two witnesses, that TCL doesn't even

12:52:57  21   have a right to access that source code.  In fact, that's

12:53:01  22   why this courtroom is sealed right now.

12:53:04  23             So you'll also hear from engineers who work with

12:53:08  24   Qualcomm, and they'll confirm that it's the actual executed

12:53:15  25   source code that runs on the chip sets, the baseband

| | |
|---|---|
| 12:53:19 | 1 |
| 12:53:23 | 2 |
| 12:53:28 | 3 |
| 12:53:31 | 4 |
| 12:53:34 | 5 |
| 12:53:40 | 6 |
| 12:53:45 | 7 |
| 12:53:48 | 8 |
| 12:53:52 | 9 |
| 12:53:54 | 10 |
| 12:54:00 | 11 |
| 12:54:07 | 12 |
| 12:54:10 | 13 |
| 12:54:14 | 14 |
| 12:54:17 | 15 |
| 12:54:20 | 16 |
| 12:54:23 | 17 |
| 12:54:27 | 18 |
| 12:54:31 | 19 |
| 12:54:34 | 20 |
| 12:54:38 | 21 |
| 12:54:40 | 22 |
| 12:54:45 | 23 |
| 12:54:49 | 24 |
| 12:54:52 | 25 |

processor chip that determines how it works, how it

operates.  It's not the LTE standard, it's not the 3GPP

specification, it's not the comments written along the code.

It's the actual code itself, which they work on.

Now, Dr. Wicker will testify that he actually

examined the code and he compared the code to the

requirements of the claim.  Remember the preliminary

instructions.  You must compare the accused products with

every one of the requirements of the claim to determine

whether the requirements of the claim are met.

So this is claim 8 of the '239 patent.  I was

surprised, quite frankly, that we didn't even see the actual

claim during IP Bridge's opening, not even a piece of them.

Remember Judge Foler in that patent video.  He said the

claims are the most important thing.  They actually define

the property that your patent covers.

Now, IP Bridge is actually asserting what are

called two dependent claims.  You heard that concept, but

they depend from or on this claim.  This is the independent

claim, claim 8, and it's the most important claim, the one

we're going to be talking the most about.

And if you read it, and it's in your notebook as

well, it's complicated.  I believe we have experts on both

sides who will walk us through some of these consents.  It's

a lot harder than high school algebra, but there's a lot of

12:54:57  1    information in this patent that everyone will agree wasn't

12:55:02  2    new, wasn't new at the time.

12:55:03  3              I think, as Mr. Batchelder admitted, there's a

12:55:07  4    lot of existing technology reflected here.  These concepts,

12:55:12  5    for instance, control channel signals, base stations,

12:55:17  6    resource blocks, a periodic channel quality indicator

12:55:23  7    report.  Looking to whether a triggering effect, the uplink

12:55:29  8    shared channel.  These are just tools of networking that

12:55:32  9    existed at that time.

12:55:35  10             So what is it that the inventors said was their

12:55:41  11   invention?  Well, Mr. Batchelder touched on this a little.

12:55:45  12   It's what's called an a periodic channel quality indicator

12:55:49  13   report.  When does your phone send it?  And that means it's

12:55:52  14   not sent at regular intervals, it's sent when the network

12:55:56  15   says, hey, we need a report on channel quality.  How is it

12:55:59  16   doing?  And so it sends what's called a channel quality

12:56:03  17   indicator trigger.  And then what does the phone do under

12:56:07  18   the claims?  This is what is required.  This is what you are

12:56:11  19   going to have to look at.

12:56:12  20

12:56:18  21

12:56:21  22

12:56:27  23

12:56:33  24

12:56:36  25



And what's
very interesting is, it's not in the 3GP specification
either.

So what do we know as a result of that?  First,
just because a patent is declared standard essential doesn't
mean that it's actually LTE required, 3GPP required, and it
doesn't mean that you have to do it to be LTE compatible,
because we know the phones with these chips are LTE
compatible.

So remember the bedrock facts that we saw up
here?  The first one is wrong.  So maybe the quotes can be
taken off.

There's another problem, too.  This is a little
bit more detailed.  Professor Wicker is going to walk us

12:58:26   1   through it.  But basically, what IP Bridge has said, well,

12:58:30   2   ████████████████████████████████████████████

12:58:33   3   ████████████████████████████████████

12:58:38   4            Well, if you actually look at the source code,

12:58:40   5   as Dr. Wicker did, ████████████████████████

12:58:43   6   ████████████████████████████████████████

12:58:50   7   ████████████████████████████████████████████████

12:58:56   8   ████████████████████████████████████████████

12:59:00   9   ████████████  and you heard from the preliminary instructions,

12:59:04   10  you heard in the patent video, for literal infringement

12:59:09   11  there has to be exactly as is in the claim language, which,

12:59:12   12  again, you didn't see during IP Bridge's presentation.

12:59:17   13           And here is another problem.  These are all

12:59:21   14  accused products sold by TCL, and no one has looked at this

12:59:28   15  source code.  It hasn't been available to Professor Wicker

12:59:31   16  or Professor Min.  They have not inspected it.  So you don't

12:59:36   17  see any evidence in this case about how these phone's

12:59:41   18  processors actually work, how the code is actually executed

12:59:44   19  on those.

12:59:45   20           So we heard a lot during the patent video and

12:59:57   21  even a little bit in the instructions about how even a

13:00:00   22  patent that has been granted by the Patent Office, even when

13:00:03   23  it's issued, it later can be determined by a Court or

13:00:06   24  another tribunal to be invalid even if it has a gold sticker

13:00:13   25  on it.

474

13:00:14  1      So what will the evidence be on that?  This is a

13:00:19  2  timeline.  All right.  On the right you can see the '239

13:00:23  3  patent, some of the documents leading up to it.  On the

13:00:26  4  left, you can see prior art.  Remember that term?  These are

13:00:32  5  publications and patents that were done before by inventors

13:00:36  6  working before.  These are all channel optimization patents,

13:00:43  7  all channel optimization publications.

13:00:48  8      Now, there are three of them that are identified

13:00:51  9  here.  Professor Wicker is going to be walking through them

13:00:54  10  and it's going to take a little while, because this is our

13:00:57  11  burden of proof.  We have to prove that these match up to

13:01:00  12  the patent language in the same way that IP Bridge has to

13:01:05  13  prove that the source code, the function, our actual accused

13:01:12  14  products match up with the patent language.  It's going to

13:01:14  15  take a little bit.

13:01:17  16      But the most important one of them is this one

13:01:19  17  for purposes of the '239 patent.  This is called the Kim

13:01:23  18  '168 patent.  These inventors, Mr. Kim and his colleagues,

13:01:26  19  were working for LG in Korea.  They were working on the

13:01:29  20  exact same issue.

13:01:32  21      Do you see the numbers?  Checking to see whether

13:01:34  22  the MCS index value is 29.  Checking to see whether the

13:01:39  23  number of resource blocks is less than or equal to 24.  If

13:01:42  24  so, sending the CQI report on a public uplink shared

13:01:49  25  channel.  That's the exact language you will see on the

13:01:51   1   claim if you turn to it in your notebook.  They were working

13:01:55   2   on the same thing, but they did it earlier.  Dr. Min will be

13:01:59   3   asked about this and I don't think he'll dispute these

13:02:02   4   disclosures in any real way.

13:02:06   5          Now, Professor Wicker will also testify how

13:02:12   6   similar inventors, including Mr. Kim and his colleagues,

13:02:16   7   including a Mr. Moharavitch, were working on the same issue,

13:02:21   8   and how as a result the patent has nothing new in   it.

13:02:25   9          So if you wrote down channel optimization on the

13:02:28   10   copy of '239 patent in your juror notebook, I think you

13:02:33   11   could put a question mark there.  Right.  That's something

13:02:35   12   that you are going to be looking at.

13:02:36   13          So let's talk about the second patent.  This is

13:02:40   14   the '538 patent.  Again, I was surprised we didn't see it

13:02:45   15   during IP Bridge's opening.  Again, it's complicated.  It's

13:02:49   16   probably even more complicated than the '239 patent to be

13:02:52   17   frank.  But as in the case of the '239 patent, a lot of this

13:02:59   18   isn't anything that the inventors actually invented.  These

13:03:01   19   are all, again, tools in the toolkit that were available at

13:03:08   20   the time, including sending out signals, placing them in

13:03:13   21   certain signals in a transmission slot so that they reduced

13:03:17   22   interference with reference signals, including placing CQI

13:03:22   23   signals in certain places in a transmission spot to reduce

13:03:26   24   interference, and this concept of using orthoganality, but

13:03:30   25   that orthoganality concept, that's actually going to be very

13:03:33  1     important.

13:03:34  2            So what does that mean?  Well, this is what the

13:03:36  3     3GPP specification says.  These sequences of ones and

13:03:42  4     negative ones, these are orthogonal.  Dr. Wicker is going to

13:03:48  5     explain why.  What it means basically is they have opposite

13:03:52  6     vectors and so they cancel each other out.

13:03:55  7            So let's look at the Qualcomm source code.

13:03:57  8     Again, remember, we actually have to look at the Qualcomm

13:04:00  9     source code.  ████████████████████████████████

13:04:06  10    ████████████████████████████████████████████

13:04:09  11    ████████████████████████████████████████████████████

13:04:14  12    ████████████████████████████████████████████████

13:04:18  13    ████████████████████████████████████████████

13:04:22  14    ████████████████████████████████████████████████

13:04:25  15    ████████████

13:04:26  16            So what does that show?  Again, the source code

13:04:31  17    shows that Qualcomm ████████████████████████████████

13:04:33  18    ████████████████████████████████████████████████

13:04:38  19    ████████████████████████████████████████████████████

13:04:43  20    ████████████████████████████████████████████████.

13:04:45  21    Those Qualcomm phones that we used, the processors, they're

13:04:48  22    LTE compatible.  They certainly are.

13:04:51  23            And as in the case of the '239 patent, we'll

13:04:56  24    also see that this wasn't really even new.  On the right we

13:05:02  25    see the '538 patent and documents leading up to it.  On the

| | | |
|---|---|---|
| 13:05:07 | 1 | left we see key pieces of prior art that came before with |
| 13:05:13 | 2 | exactly the same concepts.  All of these prior art patents |
| 13:05:18 | 3 | and publications are interference reduction patents talking |
| 13:05:23 | 4 | about reduction of interference between signals like the CQI |
| 13:05:28 | 5 | signal, the ACK/NACK signal and the reference signal, |
| 13:05:33 | 6 | exactly what is being discussed in the '538 patent. |
| 13:05:35 | 7 | So what does that mean?  Well, it means that the |
| 13:05:37 | 8 | concepts in that patent would have been obvious to one of |
| 13:05:41 | 9 | skill in the art, not to you or me, someone skilled like |
| 13:05:45 | 10 | Professor Wicker, like Professor Min, working at that time |
| 13:05:49 | 11 | would have known, yes, you can do this.  This is something |
| 13:05:51 | 12 | you can do based upon Texas Instruments, based upon |
| 13:05:54 | 13 | Motorola, based on the Moharavitch patent.  These are |
| 13:05:59 | 14 | concepts that are out there for us to use.  All right. |
| 13:06:02 | 15 | Those are out there. |
| 13:06:03 | 16 | So if that's the case that the patents would |
| 13:06:06 | 17 | have been obvious, then it's not valid, and a valid patent |
| 13:06:12 | 18 | isn't essential to anyone or any standard.  It's not. |
| 13:06:16 | 19 | So we've been talking about that first promise, |
| 13:06:21 | 20 | the patents are actually standard essential.  Let's talk |
| 13:06:26 | 21 | about the second promise.  All right. |
| 13:06:33 | 22 | The second promise was we promised to make the |
| 13:06:35 | 23 | patents available based on a fair, reasonable and |
| 13:06:39 | 24 | non-discriminatory basis.  Right?  Remember that's the |
| 13:06:41 | 25 | promise that Panasonic made to ETSI.  That's what Panasonic |

13:06:46    1    had to do.

13:06:46    2            And you see there -- sorry, you see on the

13:06:50    3    right, you see the actual form that Panasonic filled out

13:06:54    4    that checked that box, and when it did that, signed onto the

13:06:57    5    language on the left.  It adopted that language.  We will

13:07:02    6    undertake irrevocably to grant irrevocable licenses on fair,

13:07:10    7    reasonable and non-discriminatory terms and conditions.

13:07:15    8    Panasonic made that promise, but I think the evidence will

13:07:19    9    show at trial that IP Bridge hasn't kept it.  So let me

13:07:21   10    explain why.

13:07:22   11            We heard at a high level about IP Bridge's

13:07:28   12    expert, Mr. Kennedy's, royalty calculation in this case.

13:07:34   13    This methodology, it's called a topdown methodology, and it

13:07:39   14    basically works from the top moving downward.  And so the

13:07:45   15    point here is he didn't invent that.  This is a pretty

13:07:47   16    standard methodology for doing this kind of royalty

13:07:50   17    calculation, but like any standard method, if you have bad

13:07:55   18    inputs, if you put in the wrong numbers, it's going to

13:07:58   19    result in bad information and a wrong bottom.

13:08:07   20            So this is Professor Janusz Ordover.  You

13:08:12   21    heard about him a little bit.  There he is in the courtroom

13:08:14   22    right there.  And you see some of his credentials to the

13:08:17   23    left.

13:08:17   24            Now, I think Mr. Batchelder suggested that

13:08:23   25    Professor Ordover didn't do his own analysis, and that's not

479

13:08:28   1   correct.  As he'll explain, that topdown methodology, this,

13:08:31   2   this is just an accepted methodology for someone like him,

13:08:36   3   someone like Mr. Kennedy.  Neither of them invented it.

13:08:39   4   They both just employed it.

13:08:42   5            All right.  The problem is that the numbers that

13:08:46   6   Mr. Kennedy put in, the assumptions, are unsupported.  So

13:08:51   7   every assumption I've highlighted here in kind of the pink

13:08:55   8   color is actually, as Professor Ordover will explain, is not

13:09:01   9   supported.  There's no evidence in favor or to support the

13:09:03  10   principle that the total royalty rate for LTE patents for

13:09:10  11   anyone in any industry is 27 percent.  That's way, way, way

13:09:13  12   beyond what's actually supported.

13:09:16  13            There's no support for that, no support for that

13:09:19  14   middle box that IP Bridge's share of that total royalty rate

13:09:24  15   should be that high.  Again, you're going to see that

13:09:27  16   there's no support for that either.

13:09:29  17            And there's absolutely no support for what is in

13:09:32  18   the second to the bottom box, this adjustment, this

13:09:37  19   80 percent multiplication figure that's applied to these two

13:09:40  20   patents.  I snow that's complicated.  What I'm just saying

13:09:44  21   is you'll hear that during our portion of the case and

13:09:48  22   you'll be thinking perhaps of some of those issues when I

13:09:52  23   talk to Mr. Kennedy.

13:09:53  24            So there's another piece of evidence though that

13:09:58  25   I think you'll find relevant on this point, because this is

13:10:02   1   the point that leads IP Bridge to say my client should pay

13:10:06   2   millions and millions of dollars for these two patents.

13:10:12   3          Remember, this is Panasonic.  It was the first

13:10:16   4   owner of these two patents.  It then assigned the patents to

13:10:23   5   IP Bridge.  Assigned in the context of patents means it sold

13:10:28   6   them.  It didn't turn to IP Bridge for licensing them.  I

13:10:32   7   think Panasonic knows pretty well how to engage in

13:10:36   8   licensing.  It's a pretty big, sophisticated company.  It

13:10:39   9   sold its patents.  And I'm going to ask Mr. Ogata about

13:10:44   10  this, but I think the evidence will show, I think he'll

13:10:46   11  testify to me that when it did that, ██████████████████

13:10:52   12  ████████████████████████████████

13:10:54   13          So how much is ████████████  How much was that at

13:10:57   14  the time?  It was ████████████████  That's how much it

13:11:02   15  was.  ██████████████████████████████████, for these

13:11:12   16  two patents that IP Bridge is now claiming is so essential

13:11:15   17  to LTE, so crucial.

13:11:17   18          So before I finish, I want to talk about the

13:11:23   19  accusation that my client TCL hasn't been acting in good

13:11:27   20  faith and some of those letters that we saw.

13:11:32   21          Here is the first one.  We saw something

13:11:35   22  highlighted, but not everything highlighted in this letter.

13:11:37   23  This is the letter to target -- I apologize for it, but I've

13:11:42   24  highlighted something important.  This first letter to Dr.

13:11:47   25  Goa at TCL, it identifies two patents.  These are them.

13:11:51  1    Look at the last three numbers.   These are the only two

13:11:54  2    patents it identified and says, look, we think you're

13:11:57  3    infringing these.   Neither of those is the '239 or the '583

13:12:06  4    patent asserted here.   I apologize.   I'm getting tired.   The

13:12:10  5    '538.   I'm sorry.

13:12:12  6            So in the followup letters that Mr. Batchelder

13:12:15  7    mentioned, neither the '239 nor the '538 patent are

13:12:18  8    mentioned in any of them.   If they had been, I think you

13:12:21  9    would have seen those languages, those terms blown out as

13:12:25  10   well.

13:12:26  11           They just refer back to this letter, which

13:12:31  12   identifies two other patents, not the '239, not the '538

13:12:34  13   patent.   But here's the final one, and we did see this, but

13:12:38  14   we didn't see this language.   So this was the letter sent by

13:12:44  15   IP Bridge's lawyers right before the suit was filed.

13:12:49  16           And you see here, they say, we represent IP

13:12:52  17   Bridge in the licensing and enforcement of its W-CDMA and

13:12:57  18   LTE patent portfolio.

13:12:58  19           So what is a patent portfolio?   It means the

13:13:01  20   entire collection of my patents.   Your entire collection of

13:13:04  21   patents is your portfolio.   And then it says, we want to

13:13:08  22   talk with you about our licensing program for these

13:13:13  23   portfolios.   That's what we were trying to get at with those

13:13:16  24   three letters that we just sent.

13:13:19  25           So what does that mean?   It means they didn't

| | |
|---|---|
| 13:13:24 | 1 |
| 13:13:29 | 2 |
| 13:13:32 | 3 |
| 13:13:37 | 4 |
| 13:13:41 | 5 |

say, hey, you need to take a license to the '239 patent,

'538 patent.  They said, we want to talk about licensing all

of our patents in our portfolio, and Mr. Ogata, I believe,

will testify when we talk with him that there are about 700

patents in that portfolio.  Right.  Not just two.

And the evidence I think will show that IP

Bridge insisted that TCL take a license to all of them.  It

didn't offer TCL the opportunity just to license the '239

and '538 patents.  TCL didn't have the opportunity.  It

wasn't on the table.

So I would like to end up where Mr. Batchelder

began.  As you can probably tell, he and I are going to

disagree about a good number of things, but we're going to

agree on things, too.  And one of the most important of

those things is that your willingness to serve as jurors in

a case like this is really, really, really important.

Companies like my clients accuse defendants in cases like

this.  They depend on jurors like you who are willing to

come spend a week, use your time, your attention to really

listen to the evidence, to really watch the evidence, to

consider it, and then try to come to a fair verdict.

So   on behalf of my clients, my team, we also really

want to thank you and thanks for your patience and your

attention.

THE COURT:  Ladies and gentlemen, it's going to

13:15:09   1   take the lawyers just a little while to get the courtroom

13:15:10   2   set up for testimony and to display the exhibits, so we're

13:15:15   3   going to take about ten minutes, okay, and then come back

13:15:21   4   and start the openings.  We're in recess.

13:15:33   5                    (Short recess taken.)

13:15:33   6                         -  -

13:26:44   7                    (Proceedings resumed after the short recess.)

13:26:46   8                    THE COURT:  Are we ready to go?

13:26:48   9                    MR. NILSSON:  Your Honor, Samantha Wilson from

13:26:50   10   Young Conaway for plaintiff.

13:26:52   11                    Ms. Gaza shall be joining us quickly.  I believe

13:26:57   12   she's taking a quick bio break.

13:27:00   13                    THE COURT:  All right.  That's fine.  We'll

13:27:01   14   wait.

13:27:02   15                    MR. NILSSON:  Thank you, Your Honor.

13:27:18   16                    Your Honor, if I may rotate the podium while we

13:27:21   17   await?

13:27:21   18                    THE COURT:  Yes.  That's a good idea.

13:27:45   19                    (Pause.)

13:29:04   20                    THE COURT:  Off the record.

13:29:04   21                    (Discussion held off the record.)

13:29:07   22                    THE COURT:  Are we prepared to proceed?

13:29:10   23                    MS. GAZA:  We are Your Honor.  I apologize for

13:29:12   24   the delay.  I was speaking with the witness and taking care

13:29:16   25   of some personal business.

| | | |
|---|---|---|
| 13:29:17 | 1 | THE COURT:  I understand.  Is the witness ready? |
| 13:29:18 | 2 | MS. GAZA:  He is, Your Honor.  Actually, the |
| 13:29:21 | 3 | courtroom does not need to be under seal. |
| 13:29:22 | 4 | THE COURT:  Okay. |
| 13:29:23 | 5 | MS. GAZA:  And we do have some of the stipulated |
| 13:29:26 | 6 | facts to read in first. |
| 13:29:28 | 7 | THE COURT:  Oh, is that what you are going to do |
| 13:29:30 | 8 | first? |
| 13:29:30 | 9 | MS. GAZA:  Correct. |
| 13:29:31 | 10 | THE COURT:  All right.  Let's get the jury. |
| 13:29:43 | 11 | (The jury entered the courtroom.) |
| 13:30:03 | 12 | THE COURT:  Please be seated, ladies and |
| 13:30:06 | 13 | gentlemen. |
| 13:30:07 | 14 | Ms. Gaza, you may proceed. |
| 13:30:13 | 15 | MS. GAZA:  Thank you, Your Honor.  Anne Gaza a |
| 13:30:18 | 16 | from the Delaware law firm of Young Conaway Stargatt & |
| 13:30:20 | 17 | Taylor here on behalf of plaintiff IP Bridge. |
| 13:30:24 | 18 | With the Court's permission, I would like to |
| 13:30:28 | 19 | begin by addressing a portion of the uncontested facts and |
| 13:30:36 | 20 | reading them to the jury at this time. |
| 13:30:38 | 21 | THE COURT:  Yes, you may. |
| 13:30:39 | 22 | Ladies and gentlemen of the jury, you'll recall |
| 13:30:42 | 23 | in many of the myriad instructions that you received that |
| 13:30:45 | 24 | there can be stipulations.  You will also recall that I told |
| 13:30:48 | 25 | you that what lawyers say is generally not evidence.  This |

13:30:54   1   is an exception to that rule.  When the lawyers and the

13:30:57   2   parties agree on certain facts, that's called a stipulation.

13:31:02   3   If they agree on those facts, then when they read those

13:31:04   4   facts to you, those are evidence and they're information,

13:31:08   5   and it's information that is undisputed between the parties.

13:31:11   6          So Ms. Gaza will read these facts.  Mr. Nilsson

13:31:16   7   will agree, so stipulated.  And it's my understanding that

13:31:20   8   we will provide you a copy of those facts for your

13:31:24   9   notebooks.

13:31:24   10          MS. GAZA:  That's correct.

13:31:25   11          THE COURT:  So you may proceed, Ms. Gaza.

13:31:27   12          MS. GAZA:  Thank you, Your Honor.

13:31:28   13          What follows are the facts agreed to buy the

13:31:31   14   parties.

13:31:34   15          One, the asserted patents for trial in this case

13:31:37   16   are U.S. Patent No. 8,351,538, the '538 patent, and

13:31:45   17   '8,385,239, the '239 patent, collectively referred to as the

13:31:52   18   asserted patents.

13:31:54   19          The asserted claims for trial in this case are

13:31:56   20   claims 15 and 16 of the '538 patent and claims 9 and 12 of

13:32:03   21   the '239 patent, collectively referred to as the asserted

13:32:09   22   claims.

13:32:10   23          The '538 patent is entitled radio transmission

13:32:15   24   device and radio transmission method.  The '538 patent

13:32:20   25   identifies a 35 U.S.C., Section 371 (c)(1),(2)(4) date of

13:32:30   1    February 10th, 2010.

13:32:33   2              The '538 patent is based on PTC application

13:32:38   3    PTC/JP2008/02197, referred in short to PTC197.

13:32:52   4              PTC 197 was filed on August 12th, 2008, and

13:32:58   5    identifies the United States among others as a designated

13:33:03   6    state.

13:33:04   7              The '538 patent issued on January 8th, 2013.

13:33:09   8              Under Foreign Application Priority Data, the

13:33:13   9    '538 patent identifies two applications.  One, Japanese

13:33:18   10   patent application number JP2007-211101, which is referred

13:33:27   11   to as JP101, filed on August 13th, 2007, and Japanese

13:33:36   12   Application Number JP2007-280797, referred to in short as

13:33:44   13   JP797, filed October 29th, 2007.

13:33:49   14             The '538 patent generally relates to resolving

13:33:53   15   problems created by interference between two types of

13:33:56   16   signals, the ACK/NACK and CQI sent by mobile stations to a

13:34:08   17   base station.

13:34:09   18             The '239 patent is entitled Control Channel

13:34:13   19   Signalling For Triggering the independent transmission of a

13:34:17   20   channel quality indicator.  The '239 patent identifies a 35

13:34:23   21   U.S.C., Section 371(c)(1), (c)(2) and (c)(4) date of

13:34:29   22   December 29th, 2010.  The '239 patent is based on PTC

13:34:35   23   application PTC/ EP-2009/002422, in short referred to as PTC

13:34:46   24   422.  PTC 422 was filed on April 2nd, 2009, and identifies

13:34:53   25   the United States among others as a designated state.

13:34:57  1          The '239 patent issued February 26th, 2013.

13:35:02  2          Under Foreign Application Priority Data, the

13:35:08  3  '239 patent identifies European Patent Application 08008539,

13:35:16  4  referred in short to EP539, filed on May 6th, 2008.

13:35:22  5          The '239 patent generally relates to providing

13:35:26  6  control signalling for a mobile terminal to provide a

13:35:30  7  channel quality indicator report with or without data to a

13:35:37  8  base station.

13:35:38  9          The named inventors of the asserted patents

13:35:41  10  assigned their entitle rights, title and interest in the

13:35:45  11  asserted patents to Panasonic Corporation.

13:35:50  12          The asserted patents were conveyed by Panasonic

13:35:54  13  to IP Bridge through an assignment executed on January 17th,

13:35:58  14  2014, which was recorded by the United States Patent and

13:36:04  15  Trademark Office on February 3rd, 2014.

13:36:07  16          IP Bridge is the owner of '538 and '239 patents.

13:36:13  17          TCL Communication Technology Holdings Ltd.,

13:36:20  18  referred to as TCL Communication, is a Chinese company with

13:36:24  19  its principal place of business at 15/F TCL Tower, Gaoxin

13:36:24  20  Nan Yi Road, Nanshan District, Shenzhen, Gauangdon, P.R.C.

13:36:24  21  518057.

13:36:45  22          On December 15th, 2014, Shigeharu Yoshii, the

13:36:45  23  Executive manager of IP Bridge and President of IP Bridge,

13:36:45  24  Inc., sent a letter to Dr. Aipin Guo, the CEO and Executive

13:36:54  25  Director of TCL Communication Holdings, copying Mr. Steven

13:36:58  1   Zhou, the CEO and Executive Director of TCL Communication

13:37:01  2   Technology Holdings Ltd., stating that IP Bridge is the

13:37:16  3   owner of portfolios of patents relevant to the WCDMA

13:37:21  4   standard and the LTE standard, including standard essential

13:37:26  5   patents.

13:37:28  6          The December 15th, 2014 letter further stated

13:37:32  7   that IP Bridge has determined that TCL Communication

13:37:37  8   technology holdings limited directly or indirectly infringes

13:37:43  9   one or more claims of both the '389 and '356 patents through

13:37:50  10  the manufacture, use, sale, offer to sell, and/or

13:37:55  11  importation of its Alcatel OneTouch series, including Pop,

13:38:02  12  Fierce2, Evolve 2, and Sonic LTE.

13:38:07  13         The letter further stated that, as a result of

13:38:11  14  TCL's infringement of the '389 and '356 patents, IP Bridge

13:38:17  15  has suffered damages and will continue to suffer damages in

13:38:21  16  the future, and that IP Bridge also believes that TCL

13:38:26  17  infringes numerous other patents in its portfolio.  In light

13:38:32  18  of this, IP Bridge would like to discuss how to resolve this

13:38:36  19  matter through an appropriately structured business

13:38:39  20  arrangement.

13:38:42  21         In IP Bridge's December 15, 2014 letter, IP

13:38:47  22  Bridge indicated it was interested in licensing its

13:38:49  23  portfolio to defendants as stated IP Bridge is willing to

13:38:54  24  offer a discount to licensees who, one, respond to this

13:38:59  25  letter on or before January 30th, 2015, Japan time, with an

13:39:05    1    expression of good faith willingness to meet or otherwise

13:39:09    2    engage in discussions leading toward a license.

13:39:13    3        And, two, agree to the bake terms of a licensing

13:39:17    4    agreement on or before September 30th, 2015.

13:39:21    5        On January 26th, 2015, Mr. Shigeharu Yoshii sent

13:39:29    6    a letter to TCL Communication Technology Holdings Limited

13:39:32    7    and TCL Corporation.  The letter made reference to

13:39:37    8    Mr. Yoshii's letter of December 15th, 2014, and stated, a

13:39:43    9    response on or before January 30th, 2015, Japan time with an

13:39:50    10    expression of a good faith willingness to meet or otherwise

13:39:54    11    engage in discussions leading toward a license is an

13:39:57    12    essential predicate to eligibility for significant

13:40:02    13    discounts.  The letter also stated that, due to the FRAND

13:40:07    14    nature of IP Bridge's licensing program, it will not be

13:40:11    15    possible for IP Bridge to extend this important deadline.

13:40:16    16    The letter further stated that IP Bridge remains interested

13:40:21    17    in resolving this matter amicably.

13:40:25    18        On February 27th, 2015, Hideyuki Ogata, the

13:40:32    19    Executive Manager of IP Bridge and Vice President of IP

13:40:35    20    Bridge, Inc., sent a letter to TCL Communication Technology

13:40:40    21    Holdings Limited and TCL Corporation, stating that IP Bridge

13:40:45    22    has twice attempted to initiate good faith negotiation

13:40:50    23    leading to a license under IP Bridge's WCDMA and LTE

13:40:56    24    standard essential patents, and we have been twice ignored.

13:41:01    25        The letter also stated, you should recognize

13:41:07   1   that in order to remain eligible for the FRAND rate that we

13:41:10   2   offer, you have an obligation to negotiate with us in good

13:41:14   3   faith.  The letter further stated that IP Bridge remained

13:41:18   4   interested in resolving this matter amicably, but cannot do

13:41:24   5   so unless you respond.  Please do so immediately.

13:41:29   6          On April 6th, 2015, Michael A Jacobs of the law

13:41:34   7   firm Morrison & Foerster, sent a letter to TCL Communication

13:41:41   8   Technology Holdings Limited and TCL Corporation.  The letter

13:41:44   9   stated that Mr. Jacobs and his law firm represent IP Bridge

13:41:50   10  in the licensing and enforcement of its WCDMA and LTE patent

13:41:56   11  portfolio.  The letter references the above mentioned letter

13:42:00   12  dated February 27th, 2015, January 26th, 2015, and

13:42:05   13  December 15th, 2014 in connection with its licensing -- I'm

13:42:13   14  sorry.  In connection with its licensing program for these

13:42:16   15  portfolios and stated that TCL failed to respond.

13:42:21   16          The letter further states that to remain

13:42:24   17  eligible for FRAND rates on IP Bridge's patents, TCL must

13:42:28   18  negotiate with IP Bridge in good faith.

13:42:32   19          The letter further stated that TCL's refusal so

13:42:36   20  far to respond to IP Bridge's communication places at risk

13:42:41   21  your eligibility for FRAND rates.  The letter further

13:42:46   22  stated, if TCL wishes to negotiate with IP Bridge, please

13:42:51   23  contact us immediately.

13:42:53   24          TCL, I'm sorry, defendants did not respond to

13:42:57   25  any of the for going letters.

13:43:01    1          Thank you, Your Honor.  That concludes it.

13:43:03    2          THE COURT:  So stipulated.

13:43:05    3          MR. NILSSON:  We stipulate to the language in

13:43:07    4   the stipulation.

13:43:07    5          THE COURT:  All right.

13:43:09    6          MS. GAZA:  Thank you, Your Honor.

13:43:11    7          At this time, IP Bridge calls as its first

13:43:13    8   witness Hideyuki Ogata.

13:43:17    9          THE COURT:  So, Mr. Ogata and an interpreter are

13:43:22    10  here.  Correct?

13:43:23    11         MS. GAZA:  That's correct, your Honor.

13:43:25    12  Mr. Ogata is accompanied by Koko Peters, the Court approved

13:43:29    13  interpreter for the Japanese language.

13:43:30    14         THE COURT:  All right.  If the interpreter would

13:43:32    15  come forward, we'll swear her and we'll swear Mr. Ogata in.

13:43:42    16         (KOKO PETERS, Interpreter, sworn.)

13:44:12    17         THE COURT:  And then when we gets up here, we'll

13:44:15    18  swear him, too.

13:44:17    19         MS. GAZA:  Your Honor, we provided Ms. Peters

13:44:18    20  with a microphone so that she can be heard as well without

13:44:23    21  having to lean over the witness.

13:44:25    22         THE COURT:  That's fine.

13:44:27    23         So just a second.  If you have the witness stand

13:44:30    24  and raise his right hand.

13:44:33    25         ... HIDEYUKI OGATO, having been duly

492

Ogata - direct

| | | |
|---|---|---|
| 13:44:38 | 1 | affirmed as a witness, was examined and |
| 13:44:38 | 2 | testified as follows... |
| 13:44:49 | 3 | THE COURT:  Please be seated, sir. |
| 13:44:51 | 4 | MS. GAZA:  May I proceed, Your Honor? |
| 13:44:53 | 5 | THE COURT:  Yes, you may. |
| 13:44:54 | 6 | MS. GAZA:  Thank you. |
| 13:44:54 | 7 | DIRECT EXAMINATION. |
| 13:44:56 | 8 | BY MS. GAZA: |
| 13:44:56 | 9 | Q.    Good afternoon. |
| 13:44:57 | 10 | A.    Good afternoon. |
| 13:44:58 | 11 | Q.    There is water next to you should you need it, so |
| 13:45:02 | 12 | please let me know if you need any refills. |
| 13:45:05 | 13 | A.    Thank you. |
| 13:45:06 | 14 | MS. GAZA:  Your Honor, we have witness binders |
| 13:45:08 | 15 | for Mr. Ogata.  Would it be possible to hand them out now? |
| 13:45:15 | 16 | THE COURT:  Yes, you may. |
| 13:45:16 | 17 | MS. GAZA:  Thank you. |
| 13:45:40 | 18 | DIRECT EXAMINATION |
| 13:45:41 | 19 | BY MS. GAZA: |
| 13:45:42 | 20 | Q.    My I call you Mr. Ogata? |
| 13:45:44 | 21 | A.    Yes. |
| 13:45:45 | 22 | Q.    Thank you. |
| 13:45:45 | 23 | Mr. Ogata, have you ever testified in court |
| 13:45:48 | 24 | before? |
| 13:45:48 | 25 | A.    No. |

Ogata - direct

| | | |
|---|---|---|
| 13:45:49 | 1 | Q.   Please introduce yourself to the jury. |
| 13:45:52 | 2 | A.   Yes.   Good afternoon.   My name is Hideyuki Ogata. |
| 13:45:57 | 3 | Q.   Thank you, sir. |
| 13:45:59 | 4 |      And let me just ask you two preliminary |
| 13:46:02 | 5 | questions.   Mr. Ogata, were you allowed to be present in the |
| 13:46:05 | 6 | courtroom when TCL gave its opening statement? |
| 13:46:17 | 7 | A.   No. |
| 13:46:17 | 8 | Q.   Mr. Ogata, were you able to be here then -- just to |
| 13:46:23 | 9 | confirm, you were not able to be here when TCL spoke about |
| 13:46:29 | 10 | IP Bridge or about you; is that correct, sir? |
| 13:46:44 | 11 |      MR. NILSSON:   Objection, Your Honor. |
| 13:46:44 | 12 |      THE COURT:   Your objection is? |
| 13:46:45 | 13 |      MR. NILSSON:   I think it's somewhat prejudicial |
| 13:46:48 | 14 | given the circumstances of why the courtroom was sealed. |
| 13:46:51 | 15 |      THE COURT:   Well, you can cover that later, so |
| 13:46:54 | 16 | your objection is overruled. |
| 13:46:55 | 17 |      And the answer is, ma'am? |
| 13:47:00 | 18 |      THE INTERPRETER:   That's right. |
| 13:47:02 | 19 | BY MS. GAZA: |
| 13:47:02 | 20 | Q.   So just to clarify, you have an intervening objection. |
| 13:47:06 | 21 | You were not allowed to be here, sir, to hear what TCL had |
| 13:47:09 | 22 | to say about IP Bridge and you personally; is that correct? |
| 13:47:13 | 23 | A.   That's right. |
| 13:47:13 | 24 | Q.   Mr. Ogata, where do you live? |
| 13:47:17 | 25 | A.   I am in Tokyo, Japan. |

Ogata - direct

13:47:21  1   Q.    And what is your native language?

13:47:24  2   A.    Japanese.

13:47:25  3   Q.    How comfortable are you with the English language?

13:47:29  4   A.    I understand English to some extent.  I speak English

13:47:35  5   to some extent, but still it's a second language for me, so

13:47:43  6   sometimes I may have a problem understanding a word or a

13:47:52  7   phrase, so it would be very helpful for me to have an

13:47:55  8   interpreter.

13:47:56  9   Q.    And certainly, Mr. Ogata, the Court is permitting a

13:48:02  10  Japanese language interpreter, Ms. Peters, to be present

13:48:05  11  here during all of your testimony, both on direct and cross

13:48:10  12  as you need her, so please feel free to work with Ms. Peters

13:48:14  13  as needed.

13:48:15  14  A.    Thank you.

13:48:16  15  Q.    Mr. Ogata, where are you employed?

13:48:19  16  A.    By Godo Kaisha IP Bridge, the plaintiff in this case,

13:48:31  17  we call it.  IP Bridge, or simply GK1.

13:48:36  18  Q.    And what is your title at IP Bridge?

13:48:39  19  A.    Executive manager.

13:48:40  20  Q.    Are you the only executive manager at IP Bridge?

13:48:45  21  A.    No.

13:48:46  22  Q.    Is there another executive manager?

13:48:49  23  A.    Yes.  Another person.  Mr. Yoshii is also a manager of

13:48:57  24  IP Bridge.

13:48:58  25  Q.    And are you, sir, employed by any other company?

Ogata - direct

| 13:49:02 | 1 | A.    Yes.  By INCJ.  IP Bridge, Japanese.  The English name |
| 13:49:12 | 2 | is IP Bridge, Inc.  We call it KK IP Bridge. |
| 13:49:16 | 3 | Q.    To avoid confusion, can we agree that whenever you or |
| 13:49:21 | 4 | I refer to GK1, we're referring to the plaintiff IP Bridge |
| 13:49:25 | 5 | in this case? |
| 13:49:27 | 6 | A.    Yes. |
| 13:49:28 | 7 | Q.    And whenever you or I refer to KK IP Bridge, we're |
| 13:49:32 | 8 | referring to IP Bridge, Inc.? |
| 13:49:34 | 9 | A.    Yes. |
| 13:49:35 | 10 | Q.    Thank you. |
| 13:49:36 | 11 | What is your title at KK IP Bridge? |
| 13:49:39 | 12 | A.    Executive Vice President and Chief Intellectual |
| 13:49:46 | 13 | Property Officer. |
| 13:49:47 | 14 | Q.    And does Mr. Yoshii also hold a position at IP Bridge? |
| 13:49:52 | 15 | A.    Yes.  He's President of KK IP Bridge. |
| 13:49:55 | 16 | Q.    And what is the relationship between IP Bridge and KK |
| 13:50:01 | 17 | IP Bridge? |
| 13:50:02 | 18 | A.    KK IP Bridge has 100 percent share of IP Bridge. |
| 13:50:09 | 19 | Q.    And were there any particular concerns IP Bridge was |
| 13:50:14 | 20 | formed to address? |
| 13:50:57 | 21 | THE INTERPRETER:  Many Japanese companies invest |
| 13:50:59 | 22 | R&D funds into a variety of different technological areas |
| 13:51:04 | 23 | and would then give birth to different innovations and |
| 13:51:08 | 24 | inventions, and even if they do that and they patent it, |
| 13:51:12 | 25 | there were problems with other companies using these without |

Ogata - direct

| | |
|---|---|
| 13:51:17 | 1 | their permission or paying for them.  And as a result of |
| 13:51:32 | 2 | that, the investment would go to waste, and that was a major |
| 13:51:36 | 3 | issue. |
| 13:51:37 | 4 | Q.   Thank you, Mr. Ogata. |
| 13:51:43 | 5 |     Mr. Ogata, does IP Bridge manufacture any of its |
| 13:51:46 | 6 | own products? |
| 13:51:47 | 7 | A.   No. |
| 13:51:49 | 8 | Q.   What does IP Bridge do? |
| 13:51:51 | 9 | A.   It buys, patents, licenses them, and then receives |
| 13:52:21 | 10 | royalties for them and then would return part of that to the |
| 13:52:26 | 11 | inventors or the companies that brought them to life. |
| 13:52:29 | 12 | Q.   And could you identify a few of the companies that IP |
| 13:52:36 | 13 | Bridge has purchased patents from? |
| 13:52:38 | 14 | A.   Oh, yes.  We bought the patents from Panasonic, |
| 13:52:44 | 15 | Hitachi, Funai and others. |
| 13:52:49 | 16 | Q.   Thank you. |
| 13:52:52 | 17 |     What does IP Bridge do once it owns the patents? |
| 13:52:55 | 18 | A.   We license those patents and get the royalties for |
| 13:53:03 | 19 | those licenses. |
| 13:53:04 | 20 | Q.   And who receives the proceeds of the royalties? |
| 13:53:12 | 21 | A.   Inventors and investors and KK IP Bridge as well. |
| 13:53:23 | 22 | Q.   You mentioned investors.  Who are those investors? |
| 13:53:31 | 23 | A.   Panasonic, Mitrium (phonetic) Company and INCJ |
| 13:53:39 | 24 | Limited. |
| 13:53:39 | 25 | Q.   If you could, sir, what does INCJ Limited stand for? |

Ogata - direct

13:53:45  1  A.      Innovation network, corporation of Japan.

13:53:49  2  Q.      You also mentioned, sir, that KK IP Bridge, I believe,

13:53:53  3  receives a portion of the proceeds; is that correct?

13:53:57  4  A.      That's correct.

13:53:57  5  Q.      And who owns KK IP Bridge?

13:54:00  6  A.      90 percent by INCJ Limited, six percent by our

13:54:11  7  president, Mr. Yoshii, and four percent by myself.

13:54:16  8  Q.      Thank you.

13:54:17  9          And what are your responsibilities at IP Bridge?

13:54:24  10  A.      I oversee all IP Bridge IP activities.

13:54:31  11  Q.      And what types of activities are those?

13:54:36  12  A.      The major activities, licensing patents and licensing

13:54:42  13  negotiation.

13:54:42  14  Q.      And what do you mean by licensing the patents?  What

13:54:48  15  does that entail?

13:54:50  16  A.      We license our own patents and ask for royalties,

13:55:05  17  and as I said, some royalties to the inventor for the

13:55:13  18  companies.

13:55:15  19  Q.      Thank you.

13:55:16  20          And you also mentioned litigation.  What does

13:55:18  21  litigation entail?

13:55:37  22          THE INTERPRETER:  I guess that would first start

13:55:40  23  with filing a complaint.

13:55:42  24  BY MS. GAZA:

13:55:42  25  Q.      And would you file a complaint against someone who has

Ogata - direct

13:55:46  1   agreed to take a license and you've reached agreeable terms

13:55:52  2   with?

13:56:10  3   A.    No.   Only the company.

13:56:19  4   Q.    Thank you.

13:56:19  5         Does IP Bridge prefer one of those options that

13:56:22  6   you mentioned, licensing or litigation over the other?

13:56:27  7   A.    Yes.   We refer, you know, licensing normally, you

13:56:33  8   know.   Negotiation.

13:56:37  9   Q.    Thank you.

13:56:38  10        And why is that?

13:56:39  11  A.    Well, the litigation is, you know, time-consuming and

13:56:46  12  costly, so maybe in regards to inventors or companies, we

13:56:57  13  will be decreased.

13:56:58  14  Q.    You do you personally handle all of the licensing and

13:57:03  15  litigation activities for IP Bridge?

13:57:04  16  A.    No, no.   I cannot do that.   My team members and also

13:57:15  17  outside counsel and experts, those people.

13:57:22  18  Q.    Who do you mean when you say experts?   For instance,

13:57:27  19  in this case?

13:57:27  20  A.    In this case, Dr. Min, Dr. Wells and Mr. Kennedy.

13:57:32  21  Q.    Thank you.

13:57:34  22        Let's talk now about the patents that IP Bridge

13:57:36  23  is asserting in this litigation.

13:57:39  24        In the binder that you have in front of you, if

13:57:42  25  you could please turn to the document marked JTX-6.

Ogata - direct

13:57:50    1    A.    Okay.

13:57:50    2    Q.    Have you seen what has been marked as JTX-6 before?

13:57:56    3    A.    Yes.

13:57:57    4    Q.    And what is JTX-6?

13:57:58    5    A.    The '538 patent.

13:58:02    6    Q.    And is that patent asserted in this case?

13:58:04    7    A.    Yes.   It's one of the asserted patents.

13:58:07    8    Q.    And who issued the '538 patent?

13:58:11    9    A.    United States Patent and Trademark Office.

13:58:14    10   Q.    And does IP Bridge own the '538 patent?

13:58:18    11   A.    Yes.

13:58:18    12   Q.    Thank you, sir.

13:58:20    13              If you could now turn to JTX-7, please.

13:58:26    14   A.    Mm-hmm.

13:58:29    15   Q.    Have you seen what has been marked as JTX-7 before?

13:58:34    16   A.    Yes.

13:58:34    17   Q.    And what is this document, sir?

13:58:37    18   A.    The '239 patent.

13:58:38    19   Q.    And is that patent asserted in this case?

13:58:41    20   A.    Yes.   The other of the asserted patents.

13:58:46    21   Q.    And who issued the '239 patent?

13:58:48    22   A.    United States Patent and Trademark Office.

13:58:52    23   Q.    And does IP Bridge own the '239 patent?

13:58:59    24   A.    Yes.

13:59:00    25   Q.    To avoid confusion, can we agree that whenever you or

Ogata - direct

| 13:59:05 | 1 | I refer to the patents, we are referring to the '538 and |
| 13:59:10 | 2 | '239 patents that issued in this case? |
| 13:59:12 | 3 | A.    Yes. |
| 13:59:13 | 4 | Q.    Are the patents part of an IP Bridge portfolio? |
| 13:59:18 | 5 | A.    Yes.  It is part of a wireless communications |
| 13:59:48 | 6 | portfolio, a portfolio that we call the Nozomi portfolio. |
| 13:59:53 | 7 | Q.    And by wireless communications, does that include LTE |
| 14:00:00 | 8 | standard essential patents? |
| 14:00:02 | 9 | A.    Yes. |
| 14:00:03 | 10 | Q.    And do the '538 and '239 patents in this case have any |
| 14:00:16 | 11 | other characteristics in addition to being in the Nozomi |
| 14:00:20 | 12 | portfolio? |
| 14:00:21 | 13 | A.    Yes.  These patents declare essential patents to the |
| 14:00:29 | 14 | standard, standard of LTE. |
| 14:00:33 | 15 | Q.    And how do you know that, sir? |
| 14:00:35 | 16 | A.    I learned from Dr. Min that those patents are declared |
| 14:00:41 | 17 | and those are essential. |
| 14:00:47 | 18 | Q.    Mr. Ogata, are there any licensing requirements for |
| 14:00:51 | 19 | standard essential patents? |
| 14:00:52 | 20 | A.    Yes.  The owner of SEPs are required to license their |
| 14:01:15 | 21 | patents on fair, reasonable terms. |
| 14:01:24 | 22 | Q.    And is that also referred to as FRAND? |
| 14:01:26 | 23 | A.    Yes. |
| 14:01:27 | 24 | Q.    Thank you. |
| 14:01:29 | 25 | Mr. Ogata, do you believe the '538 and '239 |

| | | |
|---|---|---|
| 14:01:36 | 1 | patents are infringed are infringed by TCL? |
| 14:01:40 | 2 | A.    Yes, I do. |
| 14:01:40 | 3 | Q.    Why do you believe that? |
| 14:01:41 | 4 | A.    I talked with Dr. Min and I learned that those patents |
| 14:01:47 | 5 | are infringed by TCL's products. |
| 14:01:53 | 6 | Q.    And did he explain to you why he believed that TCL |
| 14:02:03 | 7 | infringes the '538 and '239 patents? |
| 14:02:08 | 8 | MR. NILSSON:  Objection.  Hearsay. |
| 14:02:09 | 9 | THE COURT:  I think the answer can be yes or no |
| 14:02:12 | 10 | and then after that, it's hearsay.  So the witness may |
| 14:02:17 | 11 | answer the question. |
| 14:02:23 | 12 | THE WITNESS:  Can you repeat the question? |
| 14:02:25 | 13 | MS. GAZA:  Can you read it back? |
| 14:02:42 | 14 | (The court reporter read back the question as |
| 14:02:45 | 15 | follows.) |
| 14:01:58 | 16 | "Question:  And did he explain to you why he |
| 14:02:01 | 17 | believed that TCL infringes the '538 and '239 patents?" |
| 14:02:52 | 18 | THE WITNESS:  Yes. |
| 14:02:53 | 19 | BY MS. GAZA: |
| 14:02:53 | 20 | Q.    And what is your understanding as to why TCL infringes |
| 14:02:58 | 21 | the '538 and '239 patents? |
| 14:03:02 | 22 | MR. NILSSON:  Objection.  Lack of foundation. |
| 14:03:04 | 23 | THE COURT:  Sustained. |
| 14:03:06 | 24 | BY MS. GAZA: |
| 14:03:10 | 25 | Q.    Prior to the filing of this complaint, were you aware |

502

Ogata - direct

14:03:13    1    of what prior art is?

14:03:24    2    A.    Yes.

14:03:24    3    Q.    And do you believe that the '538 and '239 patents are

14:03:30    4    valid?

14:03:31    5    A.    Yes, I do.

14:03:33    6              MR. NILSSON:  Objection.  Lack of foundation.

14:03:35    7              THE COURT:  Overruled.  It's just not timely

14:03:43    8    interposed really, and I think that the witness' credibility

14:03:48    9    on this issue is subject to cross-examination.

14:03:54    10             You may continue.

14:03:56    11             MS. GAZA:  Thank you, Your Honor.

14:03:57    12   BY MS. GAZA:

14:03:58    13   Q.    Mr. Ogata, why do you believe that the '538 and '239

14:04:01    14   patents are valid?

14:04:02    15   A.    I learned from Dr. Min those patents are valid.

14:04:09    16   Q.    Thank you.

14:04:16    17             MS. GAZA:  Your Honor, unfortunately at this

14:04:18    18   time we do need to ask to seal the courtroom for a portion,

14:04:23    19   just a portion of Mr. Ogata's testimony, because there's

14:04:26    20   certainly highly sensitive third party information that

14:04:30    21   we anticipate will be disclosed in the next several

14:04:33    22   questions.

14:04:34    23             THE COURT:  Any objection to that, Mr. Nilsson?

14:04:37    24             MR. NILSSON:  No, Your Honor.

14:04:38    25             THE COURT:  So if you both check to see if

Ogata - direct

14:04:41   1    anybody should not be in the courtroom.

14:04:44   2                MS. GAZA:  Thank you, Your Honor.

14:04:45   3                ***(The following portion of the transcript is

14:04:48   4    sealed.)

14:05:02   5                THE COURT:  All right.  Are we okay?

14:05:05   6                MS. GAZA:  We are, Your Honor.  Thank you.

14:05:07   7                THE COURT:  All right.  Please seal the

14:05:08   8    courtroom.  Thank you.

14:05:14   9                You may continue.

14:05:16   10               MS. GAZA:  Thank you.

14:05:16   11   BY MS. GAZA:

14:05:17   12   Q.    Mr. Ogata, has IP Bridge successfully licensed the

14:05:32   13   '538 and '239 patents to anyone?

14:05:34   14   A.    Yes.

14:05:35   15   Q.    And to whom?

14:05:36   16   A.    █████████████████████.

14:05:38   17   Q.    In your binder, could you please turn to JTX-100.  It

14:05:45   18   should be the third tab in your binder.

14:05:47   19   A.    Okay.

14:05:48   20   Q.    And have you seen what has been marked as JTX-100

14:05:51   21   before?

14:05:52   22   A.    Yes.

14:05:53   23   Q.    And what is JTX-100?

14:05:55   24   A.    This is the license agreement between IP Bridge and

14:06:01   25   █████████

Ogata - direct

14:06:02  1   Q.    And what does the ███████ license cover?

14:06:08  2   A.    It covers the Nozomi portfolio, including two patents.

14:06:16  3   Q.    Thank you.

14:06:19  4         And before ███████ took the license, did IP

14:06:22  5   Bridge have to sue ███████ for infringement of any patents in

14:06:28  6   the Nozomi portfolio?

14:06:30  7   A.    No.

14:06:30  8   Q.    And did IP Bridge view that as a good thing?

14:06:33  9   A.    Yes, that's good.

14:06:34  10  Q.    And why is that?

14:07:04  11        THE INTERPRETER:  That is because as a result of

14:07:07  12  litigation which was, which would incur costs and time,

14:07:12  13  inventors and the companies that are providing the patent

14:07:16  14  will not be able to receive their return in a timely fashion

14:07:19  15  and they would also receive less return.

14:07:25  16  BY MS. GAZA:

14:07:25  17  Q.    Mr. Ogata, how long does the ███████ license last?

14:07:29  18  A.    For ███████.

14:07:30  19  Q.    And how much did ███████ pay for its license?

14:07:33  20  A.    ███████████████████.

14:07:37  21  Q.    And what factors did IP Bridge take into account

14:07:42  22  before agreeing to a ███████ license for ███████ with

14:07:47  23  ███?

14:08:50  24        THE INTERPRETER:  Of all first of all, ███████

14:08:53  25  ███████████████████████████.  They were the

Ogata - direct

| 14:08:57 | 1 | ████████████ and they also, ████████████████████ |
|---|---|---|
| 14:09:01 | 2 | ████████████████████ -- strike that. |

14:08:57   1   ████████████ and they also, ████████████████████

14:09:01   2   ████████████████████ -- strike that.

14:09:05   3          And also the fact that ████████████████████████

14:09:07   4   ████████████████████████████████████████████████████

14:09:14   5   ████████████████████████████████████████████████

14:09:19   6   ██████████████████████████████████████████████████████

14:09:23   7   ████████████████, and ████████████████████████████████

14:09:29   8   ██████████████████████████████████████████████████████

14:09:35   9   ████████████████████████████████████

14:09:40   10          THE COURT:  So for the benefit of the jury, if

14:09:42   11   you would spell Nozomi.

14:09:45   12          MS. GAZA:  Certainly, Your Honor.  It's

14:09:48   13   N-a-z-o-m-i.

14:09:52   14   BY MS. GAZA:

14:09:53   15   Q.    To clarify the last point that you testified to,

14:09:55   16   Mr. Ogata, ████████████████████████████████████████████

14:09:59   17   ████████████████████████████████████████████

14:10:03   18   ████████████████████

14:10:06   19   A.    Yes.

14:10:30   20   Q.    Let's turn next to the ████████ license, sir.  It is

14:10:34   21   marked JTX-76 in your binder, and it should be the next

14:10:40   22   tab.

14:10:46   23          Have you seen what has been marked as JTX-76

14:10:49   24   before?

14:10:49   25   A.    Yes.

Ogata - direct

| | | |
|---|---|---|
| 14:10:51 | 1 | Q.    And what is this document? |
| 14:10:52 | 2 | A.    This is the patent license agreement between IP Bridge |
| 14:10:58 | 3 | and ███████. |
| 14:10:59 | 4 | Q.    And what does the ████████ license cover? |
| 14:11:03 | 5 | A.    It covers Nozomi portfolio, including the two patents. |
| 14:11:10 | 6 | Q.    And how much did ████████ agree to pay for the license |
| 14:11:15 | 7 | to the Nozomi portfolio? |
| 14:11:18 | 8 | A.    ████████████████████████ |
| 14:11:21 | 9 | Q.    And how long does the ████████ license last? |
| 14:11:24 | 10 | A.    It lasts ████████. |
| 14:11:27 | 11 | Q.    Is the ████████████████ license for a longer term |
| 14:11:35 | 12 | than the ████████████ license? |
| 14:11:39 | 13 | A.    Yes.  ████████████. |
| 14:11:42 | 14 | Q.    And -- |
| 14:11:42 | 15 | A.    Yes.  ████████?  I don't know. |
| 14:11:44 | 16 | Q.    I apologize for talking over you, sir. |
| 14:11:47 | 17 |         What factors did IP Bridge take into account |
| 14:11:51 | 18 | before agreeing to a ████████ license with ██████? |
| 14:12:29 | 19 |         THE INTERPRETER:  First of all, like ███████, |
| 14:13:10 | 20 | ████████ ████████████████ and ████████████████████ |
| 14:13:19 | 21 | ██████████████████████████████████████████████████████ |
| 14:13:22 | 22 | █████. |
| 14:13:24 | 23 |         Also that they have ██████████████████, and |
| 14:13:28 | 24 | furthermore, the fact that the agreement terms for them |
| 14:13:34 | 25 | would be ████████ or, rather, ████████████, which was ████████ |

Ogata - direct

```
14:13:38   1      ███ .
14:13:38   2               In addition to that, the fact that ████████
14:13:42   3   ████  ████████████████████████████████████████████████
14:13:48   4   ███████████████████████████████████████████████████
14:13:54   5   ██████████ , that we considered.
14:13:59   6   Q.     Thank you, sir.
14:14:02   7               And does IP Bridge believe that TCL needs a
14:14:05   8   license to the '538 and '239 patents?
14:14:09   9   A.     Yes.
14:14:10  10   Q.     And did IP Bridge attempt to contact TCL to offer a
14:14:15  11   license to the '538 and '239 patents?
14:14:18  12   A.     Yes.
14:14:20  13               MS. GAZA:  Your Honor, the courtroom can now be
14:14:22  14   unsealed.
14:14:22  15               THE COURT:  Thank you.  The courtroom is ordered
14:14:27  16   unsealed.
14:14:28  17               ***(End of portion of transcript under seal.)
14:14:59  18               MS. GAZA:  With the Court's indulgence, I will
14:15:01  19   just repeat the last question since it was not confidential
14:15:04  20   either.
14:15:04  21   BY MS. GAZA:
14:15:05  22   Q.     Did IP Bridge attempt to contact TCL to offer a
14:15:08  23   license to the '538 and '239 patents?
14:15:10  24   A.     Yes.
14:15:11  25   Q.     And how did IP Bridge attempt to do that?
```

Ogata - direct

14:15:14   1    A.    We sent a letter.

14:15:17   2    Q.    And why did IP Bridge reach out to TCL?

14:15:20   3    A.    We wanted to start negotiations with TCL for licenses

14:15:34   4    under our products.

14:15:35   5    Q.    In your binder, sir, please turn to the document

14:15:40   6    marked JTX-178.

14:15:48   7          Have you seen what has been marked as JTX-178

14:15:51   8    before?

14:15:51   9    A.    Yes.

14:15:52   10   Q.    And what is JTX-178?

14:15:54   11   A.    This is our first letter to TCL.

14:15:59   12   Q.    And what is the date of that letter, sir?

14:16:02   13   A.    December 15th, 2014.

14:16:06   14   Q.    And is this the letter that you just referenced?

14:16:09   15   A.    That's right.

14:16:10   16   Q.    And I believe that JTX-178 is unobjected to, Your

14:16:15   17   Honor, and would ask that it be published to the screen.

14:16:19   18          THE COURT:  It may.

14:16:23   19   BY MS. GAZA:

14:16:26   20   Q.    If you could for me, please, sir, please read out the

14:16:29   21   first sentence of the letter.

14:16:31   22   A.    IP Bridge is the owner of portfolios of patents

14:16:39   23   relevant to the W-CDMA standard and the LTE standard,

14:16:46   24   including standard essential patents.

14:16:49   25   Q.    And does what you just read include the '538 and '239

Ogata - direct

14:16:53    1    patents in this case?

14:16:55    2    A.    Yes.

14:16:56    3    Q.    And did IP Bridge hear any response back from TCL to

14:17:01    4    this December 2014, letter?

14:17:06    5    A.    Nothing.

14:17:08    6    Q.    Did IP Bridge attempt to contact TCL again?

14:17:12    7    A.    Yes.

14:17:13    8    Q.    How?

14:17:13    9    A.    We sent a second letter.

14:17:18    10   Q.    If you could please turn, sir, in your binder to

14:17:23    11   JTX-179.   Have you seen what has been marked as JTX-179

14:17:28    12   before?

14:17:28    13   A.    Yes.

14:17:28    14   Q.    And what is JTX-179?

14:17:33    15   A.    This is the second letter we sent to TCL.

14:17:36    16   Q.    And what is the date of the second letter sent to TCL?

14:17:40    17   A.    January 26, 2015.

14:17:42    18           MS. GAZA:  And, Your Honor, we believe this

14:17:45    19   document is also unobjected to and ask to have it published.

14:17:48    20           THE COURT:  You may.

14:17:49    21           MS. GAZA:  Thank you.  Mr. Miller, please

14:17:51    22   publish.  Thank you.

14:17:51    23   BY MS. GAZA:

14:17:52    24   Q.    Mr. Ogata, did IP Bridge hear any response this time?

14:17:56    25   A.    Nothing.

510

Ogata - direct

| | | |
|---|---|---|
| 14:17:58 | 1 | Q. Did IP Bridge attempt to contact TCL a third time? |
| 14:18:02 | 2 | A. That's right. |
| 14:18:03 | 3 | Q. And how did IP Bridge attempt to do that? |
| 14:18:05 | 4 | A. We sent a third letter. |
| 14:18:06 | 5 | Q. If you could please turn, sir, in your binder to |
| 14:18:12 | 6 | JTX-177. |
| 14:18:13 | 7 | Have you seen what has been marked as JTX-177 |
| 14:18:17 | 8 | before, sir? |
| 14:18:18 | 9 | A. Yes. |
| 14:18:18 | 10 | Q. And what is JTX-177? |
| 14:18:22 | 11 | A. This is the third letter we sent to TCL. |
| 14:18:26 | 12 | Q. And what date was that letter sent out? |
| 14:18:29 | 13 | A. February 27th, 2015. |
| 14:18:35 | 14 | Q. So this is the same letter you reference as the second |
| 14:18:37 | 15 | letter to TCL; is that correct? |
| 14:18:40 | 16 | A. That's right. |
| 14:18:41 | 17 | MS. GAZA: Your Honor, may we publish what we |
| 14:18:43 | 18 | believe to is unobjected to, JTX-177? |
| 14:18:47 | 19 | THE COURT: You may. |
| 14:18:49 | 20 | MS. GAZA: Thank you. Thank your Honor |
| 14:18:50 | 21 | Mr. Miller. |
| 14:18:51 | 22 | BY MS. GAZA: |
| 14:18:51 | 23 | Q. Did TCL ever respond to this third letter? |
| 14:18:54 | 24 | A. No. |
| 14:18:54 | 25 | Q. Did IP Bridge attempt to contact TCL a fourth time? |

Ogata - direct

14:18:59      1    A.      That's right.

14:19:00      2    Q.      And how did IP Bridge attempt to do that?

14:19:02      3    A.      We asked our outside counsel lawyer to send a fourth

14:19:10      4    letter.

14:19:10      5    Q.      If you could, please, sir, turn to JTX-176 in your

14:19:14      6    binder.

14:19:16      7            Have you seen what has been marked as JTX-176

14:19:19      8    before?

14:19:20      9    A.      Yes.

14:19:21     10    Q.      And what is JTX-176?

14:19:23     11    A.      This is the fourth letter that our outside counsel,

14:19:30     12    Mr. Michael Jacobs at Morrison & Foerster, sent to TCL.

14:19:37     13    Q.      Thank you, Mr. Ogata.

14:19:39     14            What date was this letter sent out?

14:19:41     15    A.      April 6th, 2015.

14:19:43     16    Q.      And was the April 6th, 2015, letter to IP Bridge,

14:19:49     17    letter from IP Bridge its fourth attempt to contact TCL to

14:19:53     18    offer a license to the '538 and '239 patents?

14:19:57     19    A.      That's right.

14:20:01     20            MS. GAZA:  Your Honor, could we please publish

14:20:03     21    unobjected to JTX-176?

14:20:07     22            THE COURT:  You may.

14:20:07     23            MS. GAZA:  Thank you, Mr. Miller.

14:20:09     24    BY MS. GAZA:

14:20:09     25    Q.      And, Mr. Ogata, did TCL ever respond to this fourth

Ogata - direct

14:20:13  1  letter?

14:20:14  2  A.    No.

14:20:15  3  Q.    What did IP Bridge do then?

14:20:20  4  A.    We had no choice but to sue them.

14:20:22  5  Q.    And was that because TCL had been unwilling to take a

14:20:28  6  license and had not negotiated with you in the good faith

14:20:30  7  that you asked?

14:20:31  8  A.    That's right.

14:20:31  9  Q.    Now, how did IP Bridge bring suit against TCL?

14:20:51  10  A.    We filed complaint in this court.

14:20:54  11  Q.    And have you reviewed that complaint, sir?

14:20:56  12  A.    Yes.

14:20:57  13  Q.    And if you could, please, Mr. Ogata, why did IP Bridge

14:21:07  14  sue TCL in your words?

14:21:10  15  A.    They were a company which did not respond to the four

14:21:48  16  letters and therefore we determined that they were an

14:21:54  17  unwilling licensee and decided to sue them.

14:21:57  18  Q.    And to be clear, Mr. Ogata, did TCL ever respond to IP

14:22:06  19  Bridge any of the four letters before IP Bridge filed the

14:22:11  20  complaint in this court?

14:22:13  21  A.    Nothing.

14:22:33  22        MS. GAZA:   Thank you, Mr. Ogata.   No further

14:22:36  23  questions at this time.

14:22:37  24        ***(The following portion of the transcript is

14:22:37  25  under seal.)

Ogata - direct

| | | |
|---|---|---|
| 14:22:37 | 1 | MS. GAZA:  Your Honor, IP Bridge respectfully |
| 14:22:39 | 2 | moves the admission of JTX-6, the '538 patent, JTX-7, the |
| 14:22:45 | 3 | '239 patent, JTX-178, the December 15th, 2014 letter from IP |
| 14:22:52 | 4 | Bridge to TCL, JTX- 179, the January 26th, 2015, letter from |
| 14:22:58 | 5 | IP Bridge to TCL, JTX-177, the February 27th, 2015, letter |
| 14:23:06 | 6 | from IP Bridge to TCL, and JTX-176, the April 6th, 2015, |
| 14:23:12 | 7 | letter from IP Bridge to TCL, and IP Bridge also moves the |
| 14:23:18 | 8 | admission under seal of JTX-100, the ███████████████ |
| 14:23:24 | 9 | license, and JTX-76, the █████████████  license. |
| 14:23:31 | 10 | THE COURT:  Any objection? |
| 14:23:33 | 11 | MR. NILSSON:  No objection. |
| 14:23:34 | 12 | THE COURT:  Received. |
| 14:23:35 | 13 | (The above-referenced exhibits were admitted |
| 14:23:37 | 14 | into evidence.) |
| 14:23:38 | 15 | ***(End of portion under seal.) |
| 14:23:39 | 16 | MS. GAZA:  Thank you, Your Honor.  I pass the |
| 14:23:40 | 17 | witness. |
| 14:23:42 | 18 | MR. BATCHELDER:  Your Honor, I believe the |
| 14:23:43 | 19 | courtroom was not sealed for the reference of those last two |
| 14:23:48 | 20 | license.  I believe it needs to be stricken from the public |
| 14:23:50 | 21 | record. |
| 14:23:51 | 22 | MS. GAZA:  Oh, my apology.  That was supposed to |
| 14:23:53 | 23 | be. |
| 14:23:53 | 24 | THE COURT:  Okay.  The motion to receive the |
| 14:24:00 | 25 | exhibits is sealed along with the statement therefore. |

Ogata - cross

| | | |
|---|---|---|
| 14:24:05 | 1 | MS. GAZA:  Thank you, Your Honor.  And can there |
| 14:24:07 | 2 | be instruction that anyone is required to keep it |
| 14:24:09 | 3 | confidential? |
| 14:24:11 | 4 | THE COURT:  Oh, because of the people that were |
| 14:24:12 | 5 | sitting in the courtroom? |
| 14:24:13 | 6 | MS. GAZA:  Correct, Your Honor. |
| 14:24:14 | 7 | THE COURT:  So instructed. |
| 14:24:15 | 8 | MS. GAZA:  Thank you, Your Honor. |
| 14:24:16 | 9 | THE COURT:  Okay.  Mr. Nilsson? |
| 14:24:25 | 10 | MR. NILSSON:  Yes, Your Honor? |
| 14:24:26 | 11 | THE COURT:  You may proceed. |
| 14:24:28 | 12 | MR. NILSSON:  Thank you, Your Honor. |
| 14:24:29 | 13 | CROSS-EXAMINATION |
| 14:24:31 | 14 | BY MR. NILSSON: |
| 14:24:35 | 15 | Q.    Good afternoon, Mr. Ogata. |
| 14:24:37 | 16 | A.    Good afternoon. |
| 14:24:38 | 17 | Q.    So feel free at any time if any of my questions you |
| 14:24:42 | 18 | would prefer to answer through your interpreter, go ahead |
| 14:24:46 | 19 | and do that. |
| 14:24:50 | 20 | I believe at the beginning of the questioning by |
| 14:24:54 | 21 | Ms. Gaza -- |
| 14:25:00 | 22 | MR. NILSSON:  Actually, there's a notebook that |
| 14:25:02 | 23 | we have as well.  We should have brought it up there for |
| 14:25:04 | 24 | you. |
| 14:25:05 | 25 | Your Honor, may I hand it to -- |

Ogata - cross

| | | |
|---|---|---|
| 14:25:07 | 1 | THE COURT:  Yes.  The courtroom deputy will be |
| 14:25:08 | 2 | more than happy to take care of it.  Does the witness need |
| 14:25:12 | 3 | it as well as me? |
| 14:25:14 | 4 | MR. NILSSON:  I think there should be one up |
| 14:25:16 | 5 | there. |
| 14:25:16 | 6 | THE COURT:  For the witness? |
| 14:25:19 | 7 | MR. NILSSON:  Oh, this is for the witness. |
| 14:25:20 | 8 | THE COURT:  That's for the witness.  Okay. |
| 14:25:22 | 9 | Thank you very much. |
| 14:25:24 | 10 | MR. NILSSON:  Thank you, Your Honor. |
| 14:25:26 | 11 | (A notebook was handed to the witness.) |
| 14:25:29 | 12 | MR. NILSSON:  Thank you. |
| 14:25:30 | 13 | THE COURT:  Thank you very much, Mr. Nilsson. |
| 14:25:33 | 14 | THE WITNESS:  Thank you. |
| 14:25:34 | 15 | THE COURT:  You may continue. |
| 14:25:35 | 16 | BY MR. NILSSON: |
| 14:25:36 | 17 | Q.    So, Mr. Ogata, I believe when Ms. Gaza started talking |
| 14:25:40 | 18 | with you, she talked about a distinction between GK IP |
| 14:25:45 | 19 | Bridge and KK IP Bridge. |
| 14:25:46 | 20 | Do you recall that? |
| 14:25:47 | 21 | A.    Yes. |
| 14:26:00 | 22 | Q.    And if we can, let's proceed with the same |
| 14:26:06 | 23 | understanding that when I talk about IP Bridge, I'm talking |
| 14:26:10 | 24 | about Godo Kaisha, GK IP Bridge.  Is that all right? |
| 14:26:16 | 25 | A.    Yes. |

Ogata - cross

| | | |
|---|---|---|
| 14:26:31 | 1 | Q.    So I believe you testified in response to the earlier |
| 14:26:37 | 2 | questions that IP Bridge doesn't manufacture any products; |
| 14:26:41 | 3 | is that correct? |
| 14:26:41 | 4 | A.    That's right. |
| 14:26:43 | 5 | Q.    And IP Bridge also doesn't research or develop any |
| 14:26:47 | 6 | products, does it? |
| 14:26:48 | 7 | A.    That's right. |
| 14:26:49 | 8 | Q.    Can you turn to PTX-281, so it will be toward the end |
| 14:26:58 | 9 | of the notebook that you have in front of you. |
| 14:27:10 | 10 | Three-quarters of the way, sir. |
| 14:27:14 | 11 | A.    PTX-. |
| 14:27:18 | 12 | THE INTERPRETER:  PTX-281. |
| 14:27:30 | 13 | MS. GAZA:  Do you have a copy of it? |
| 14:27:33 | 14 | MR. NILSSON:  I'm not sure if we do or not. |
| 14:27:36 | 15 | MS. GAZA:  Do you have another one?  My |
| 14:27:37 | 16 | apologies. |
| 14:27:39 | 17 | BY MR. NILSSON: |
| 14:27:39 | 18 | Q.    Mr. Ogata, document PTX-1 or 281, I apologize, is a, |
| 14:27:46 | 19 | it looks like a website printout called reputation built on |
| 14:27:50 | 20 | solid expertise, strong relationships, quality assets. |
| 14:27:53 | 21 | Do you recognize this? |
| 14:27:54 | 22 | A.    Yes. |
| 14:27:57 | 23 | Q.    And can you briefly describe for the jury what it is? |
| 14:28:01 | 24 | A.    Oh, yes.  This is part of our English website. |
| 14:28:11 | 25 | MR. NILSSON:  And I don't believe there are any |

Ogata - cross

| | | |
|---|---|---|
| 14:28:14 | 1 | objections to this particular exhibit.  Can we publish it? |
| 14:28:18 | 2 | THE COURT:  Any objection, Ms. Gaza? |
| 14:28:20 | 3 | MS. GAZA:  No objection, Your Honor. |
| 14:28:21 | 4 | THE COURT:  All right.  You may publish. |
| 14:28:25 | 5 | MR. NILSSON:  Thank you. |
| 14:28:28 | 6 | BY MR. NILSSON: |
| 14:28:29 | 7 | Q.    So I believe when you were talking with Ms. Gaza, you |
| 14:28:35 | 8 | discussed an entity called Innovation Network.  Am I |
| 14:28:39 | 9 | correct? |
| 14:28:44 | 10 | A.    Yes.  I said that the Innovation Network Corporation |
| 14:28:56 | 11 | of Japan. |
| 14:28:57 | 12 | Q.    Thank you. |
| 14:28:59 | 13 | And the Innovation Network Corporation of Japan |
| 14:29:02 | 14 | owns 90 percent of KK IP Bridge, Inc.; is that correct? |
| 14:29:06 | 15 | A.    Right now, this is the -- INCJ Limited owns 90 percent |
| 14:29:22 | 16 | of KK IP Bridge. |
| 14:29:24 | 17 | Q.    And so in any case, it's true that what it says here, |
| 14:29:29 | 18 | that we work with our investors and we work with IP Bridge, |
| 14:29:35 | 19 | including Innovation Network of Japan, and that's a |
| 14:29:40 | 20 | partnership between 26 major corporations and the Japanese |
| 14:29:44 | 21 | government; is that correct? |
| 14:30:08 | 22 | A.    Well, as of the end of September this year, this |
| 14:31:34 | 23 | company, Innovation Network Corporation of Japan, underwent |
| 14:31:41 | 24 | structural changes, and the name, Innovation Network |
| 14:31:45 | 25 | Corporation of Japan, was changed to Japan investment |

Ogata - cross

14:31:49   1    corporation.

14:31:50   2              Furthermore, INCJ Limited was split off from

14:31:55   3    Innovation Network Corporation of Japan, and that included

14:32:02   4    KK IP Bridge as well as their assets, which were moved.  So

14:32:09   5    what is reflected here is not, does not necessarily reflect

14:32:14   6    the way it is right now.

14:32:17   7    Q.    Fair enough.  We all have to have our web pages

14:32:20   8    updated sometimes.

14:32:21   9              If you could turn to the next page just to

14:32:24  10    confirm something.  You mentioned IP Bridge's assets, I

14:32:30  11    believe, in your prior answer.

14:32:32  12              With you referring to what we see in this first

14:32:38  13    bullet point, approximately $300 million fund focused on IP

14:32:42  14    and innovation?

14:33:18  15              THE INTERPRETER:  I'm sorry, counsel.  What was

14:33:20  16    your question?  So what was the actual question?

14:33:22  17    BY MR. NILSSON:

14:33:22  18    Q.    So the question is:  Are IP Bridge's assets of

14:33:26  19    $300 million fund focused on IP and innovation?

14:34:20  20              THE INTERPRETER:  Perhaps my use of asset was

14:34:22  21    the no that appropriate.  What I'm trying to say is that the

14:34:27  22    maximum amount in the fund gives, in the level of

14:34:35  23    approximately $300 million.  However, investments are made

14:34:40  24    by the INCJ Limited as well as other investors as needed,

14:34:46  25    and so what I was trying to say was that in total, it would

Ogata - cross

| | | |
|---|---|---|
| 14:34:50 | 1 | be approximately $300 million. |
| 14:34:56 | 2 | BY MR. NILSSON: |
| 14:34:57 | 3 | Q.    Thank you. |
| 14:34:57 | 4 |         And just sort of scanning down on the same page. |
| 14:35:00 | 5 | So we see two photos here.  We see you, of course, and you |
| 14:35:03 | 6 | were talking about Mr. Yoshii, I believe a little bit |
| 14:35:07 | 7 | earlier with Ms. Gaza; is that correct? |
| 14:35:25 | 8 | A.    Yes, that's right. |
| 14:35:26 | 9 | Q.    And any decisions that are made at IP Bridge are made |
| 14:35:29 | 10 | by yourself or Mr. Yoshii; is that right? |
| 14:35:33 | 11 |         MS. GAZA:  Objection, Your Honor.  Lack of |
| 14:35:36 | 12 | foundation. |
| 14:35:37 | 13 |         THE COURT:  Overruled. |
| 14:35:51 | 14 |         THE WITNESS:  Yes. |
| 14:35:53 | 15 | BY MR. NILSSON: |
| 14:35:53 | 16 | Q.    So Ms. Gaza was also asking you about the two patents |
| 14:35:56 | 17 | that are at issue here, so I'd like to start by asking a few |
| 14:36:00 | 18 | questions about the '239 patent, and I believe it's at JTX-7 |
| 14:36:07 | 19 | in your notebook. |
| 14:36:38 | 20 |         So it would be fair to say you don't know the |
| 14:36:42 | 21 | technical details of the '239 patent; is that correct? |
| 14:36:55 | 22 | A.    That's correct. |
| 14:36:55 | 23 | Q.    And I believe you were asked whether you thought the |
| 14:36:58 | 24 | patent was standard essential, but if I asked you, you |
| 14:37:01 | 25 | wouldn't be able to compare the claim elements of the |

Ogata - cross

14:37:04    1    claims of the '239 patent with the LTE specifications, would

14:37:11    2    you?

14:37:11    3    A.    No, I cannot.

14:37:38    4    Q.    And you don't know yourself what features of the '239

14:37:43    5    patent may have been novel or new when compared with

14:37:48    6    previous methods of generating and transmitting CQI reports,

14:37:55    7    do you?

14:37:57    8    A.    I definitely don't know.

14:38:14    9    Q.    And it's also correct that you wouldn't know whether

14:38:20   10    prior to the invention of the '239 patent, whether others

14:38:25   11    had failed to achieve the same results as the invention in

14:38:29   12    that patent?

14:38:29   13    A.    That's right.

14:38:51   14    Q.    So I have just a couple of similar questions about the

14:38:56   15    '538 patent, and that's at tab JTX-6.  And I believe when

14:39:11   16    you were talking with Ms. Gaza, you testified that you

14:39:14   17    believed that the '538 is essential to the LTE

14:39:19   18    specification.  Am I right?

14:39:20   19    A.    That's right.

14:39:21   20    Q.    But if I asked you, you wouldn't be able to compare

14:39:24   21    the claim elements of the claims of the '538 patent with the

14:39:29   22    LTE specification to identify which portion of the

14:39:33   23    specifications correspond to which claim limitations, would

14:39:38   24    you?

14:40:01   25    A.    I can't.

Ogata - cross

14:40:02   1   Q.    Now, one of the named inventors on this '538 patent is

14:40:07   2   someone named Yoshihiko Ogawa; is that correct?

14:40:30   3   A.    Yes.

14:40:30   4   Q.    Mr. Ogawa works as a program manager for IP Bridge,

14:40:35   5   Inc.; right?

14:40:44   6   A.    He did in the past.  He has resigned.

14:40:48   7   Q.    And when did Mr. Ogawa resign?

14:40:50   8   A.    I think half a year ago.

14:41:01   9   Q.    Prior to his resignation, did you talk with him about

14:41:05   10   possibly coming to trial to talk to the jury in this case?

14:41:24   11        MS. GAZA:  Objection, Your Honor.  I would just

14:41:25   12   ask that the witness be reminded not to reveal any

14:41:28   13   privileged information with respect to this question.

14:41:32   14        THE COURT:  You may.  Go ahead.

14:41:37   15        MS. GAZA:  To the extent that this question may

14:41:38   16   call for any information you learned or discussed with

14:41:43   17   attorneys in the case, please do not disclose anything in

14:41:48   18   that regard.

14:42:06   19        THE COURT:  So the witness can answer the

14:42:09   20   question.

14:42:10   21        THE WITNESS:  No, I didn't.

14:42:12   22   BY MR. NILSSON:

14:42:13   23   Q.    After Mr. Ogawa resigned, did you ask him whether he

14:42:17   24   would still be willing to come here to talk to the witnesses

14:42:20   25   or provide his testimony by video?

Ogata - cross

| | |
|---|---|
| 14:42:24 | 1 |

                    MS. GAZA:  Same objection, Your Honor, or
instruction.
                    THE COURT:  All right.
                    MS. GAZA:  The instruction being, please do not
reveal any privileged information.
                    THE COURT:  And the witness may answer the
question.
                    THE WITNESS:  At first I didn't personally do.
BY MR. NILSSON:
Q.    I'm sorry.  I didn't quite understand it.  Did you say
you did possibly do?
A.    No.  I didn't.
Q.    So looking at the face of the '538 patent, we see the
assignee is Panasonic Corporation.  That was the original
owner; is that correct?
A.    Yes, that's right.
Q.    Do you know whether Panasonic ever sold any products
that actually practiced or used either the '239 patent or
the '538 patent?
                    MS. GAZA:  Objection, Your Honor.  Lack of
foundation.
                    THE COURT:  I will sustain that objection until
I hear some foundation on it.  He's not an executive at
Panasonic.
                    MR. NILSSON:  Fair.  Understood, Your Honor.

Ogata - cross

14:44:36    1    Let me move on.

14:44:37    2    BY MR. NILSSON:

14:44:38    3    Q.      There's an assignment agreement, correct, between

14:44:40    4    Panasonic and IP Bridge?

14:44:41    5    A.      Yes.

14:44:50    6    Q.      And can you turn to DX-442 in your notebook.

14:45:06    7    A.      Yes.

14:45:07    8    Q.      And DX-442 is both a document in Japanese as well as

14:45:15    9    what appears to be a certified translation of that document;

14:45:20   10    is that correct?

14:45:41   11              THE INTERPRETER:  I don't -- I can't tell

14:45:48   12    whether it's certified or not, but I do see Japanese and

14:45:53   13    English documents.

14:45:55   14    BY MR. NILSSON:

14:45:56   15    Q.      Focusing on the Japanese portion of DX-442, is this

14:46:00   16    the assignment agreement between Panasonic and IP Bridge

14:46:06   17    that conveyed the '239 patent, the '538 patent to IP Bridge?

14:46:13   18    A.      Yes, I believe so.

14:46:43   19    Q.      And the agreement, I believe, was dated June 28th,

14:46:51   20    2013; is that correct?

14:46:52   21    A.      It says July 25th, 2013.

14:47:13   22    Q.      I apologize.  I must have gotten that wrong.

14:47:16   23    July 25th, 2013; is that correct?

14:47:19   24    A.      That's correct.

14:47:20   25    Q.      So --

Ogata - cross

| | | |
|---|---|---|
| 14:47:21 | 1 | MS. GAZA:  Objection, Your Honor.  At this time |
| 14:47:23 | 2 | I believe counsel is about to ask Mr. Ogata about a |
| 14:47:27 | 3 | confidential document that may require sealing of the |
| 14:47:31 | 4 | courtroom. |
| 14:47:32 | 5 | THE COURT:  Well, I tell you what.  It's time |
| 14:47:34 | 6 | for a break, so we're going to take ten minutes and then |
| 14:47:37 | 7 | after we come back, we will seal the courtroom. |
| 14:47:41 | 8 | MS. GAZA:  Thank you, Your Honor. |
| 14:47:42 | 9 | THE COURT:  So, ladies and gentlemen, we're |
| 14:47:47 | 10 | taking ten minutes. |
| 14:47:47 | 11 | (The jury was excused for a short recess.) |
| 14:48:24 | 12 | THE COURT:  All right.  The jury is outside. |
| 14:48:26 | 13 | We're outside the presence of the jury. |
| 14:48:28 | 14 | I'm looking at Exhibit DX-422 or 442, and that's |
| 14:48:38 | 15 | the exhibit we're talking about; is that correct? |
| 14:48:41 | 16 | MR. NILSSON:  Yes, Your Honor. |
| 14:48:41 | 17 | THE COURT:  So where does it say July 25th, |
| 14:48:44 | 18 | 2013? |
| 14:48:44 | 19 | MR. NILSSON:  Well, perhaps -- I see June 28th, |
| 14:48:49 | 20 | 2013. |
| 14:48:50 | 21 | THE COURT:  That's what it says. |
| 14:48:52 | 22 | MR. NILSSON:  I think that probably for the |
| 14:48:58 | 23 | record, I should clarify whether that is somehow a |
| 14:49:04 | 24 | mistranscription of something in the Japanese. |
| 14:49:07 | 25 | THE COURT:  Okay. |

Ogata - cross

14:49:09  1    MS. GAZA:  Your Honor, if it's helpful, we have

14:49:11  2  translation of the document into English as well that we

14:49:13  3  think may be a little more precise.  We're checking it right

14:49:16  4  now, and if so, we're happy to have counsel use that version

14:49:20  5  if it's easier.

14:49:24  6    THE COURT:  Well, I assume the date is going to

14:49:28  7  mean something.

14:49:29  8    MR. NILSSON:  It actually is not of great

14:49:32  9  significance, the date.

14:49:33  10    THE COURT:  Oh.

14:49:34  11    MR. NILSSON:  I was just setting it and I was

14:49:36  12  hoping at some point to introduce this into evidence.

14:49:38  13    THE COURT:  All right.  Well, see what you can

14:49:41  14  do about it.

14:49:41  15    MR. NILSSON:  Okay.

14:49:42  16    THE COURT:  We're in recess.

14:49:43  17    MR. NILSSON:  Thank you.

14:49:44  18    MS. GAZA:  Thank you, Your Honor.

14:49:52  19    (Short recess taken.)

14:53:32  20       -  -  -

14:58:27  21    (Proceedings resumed after the short recess.)

14:58:27  22    MS. GAZA:  Your Honor, as a reminder, I believe

14:58:38  23  the courtroom needs to be sealed.

14:58:40  24    THE COURT:  We are set for sealing.  The

14:58:44  25  courtroom is sealed.

Ogata - cross

| | | |
|---|---|---|
| 14:58:48 | 1 | MS. GAZA:  Thank you, Your Honor. |
| 14:58:54 | 2 | (Courtroom sealed.) |
| 14:58:58 | 3 | (Jury entering the courtroom at 3:00 p.m.) |
| 14:59:08 | 4 | THE COURT:  Please be seated, ladies and |
| 14:59:10 | 5 | gentlemen.  Mr. Nilsson, you may the continue your |
| 14:59:19 | 6 | examination. |
| 14:59:19 | 7 | MR. NILSSON:  Thank you, Your Honor. |
| 14:59:22 | 8 | BY MR. NILSSON: |
| 14:59:23 | 9 | Q.    Mr. Ogata, Ms. Gaza has provided very helpfully the IP |
| 14:59:30 | 10 | Bridge's own translation of the document that we were just |
| 14:59:32 | 11 | referring to, DX-442.  If I might approach, perhaps I could |
| 14:59:39 | 12 | put that in front of you and ask you about that. |
| 15:00:06 | 13 | A.    Yes, please. |
| 15:00:23 | 14 | THE COURT:  You may continue, counsel. |
| 15:00:25 | 15 | BY MR. NILSSON: |
| 15:00:26 | 16 | Q.    And so, Mr.  Ogata, if you would not mind, could you |
| 15:00:30 | 17 | turn to the third page of the document that I just provided |
| 15:00:34 | 18 | to you.  And I'm looking at ▮▮▮▮▮▮ of this agreement |
| 15:00:49 | 19 | or this translated agreement.  So I'm going to read this |
| 15:00:59 | 20 | translation.  It's very brief.  It states, ▮▮▮▮▮ |
| 15:01:03 | 21 | ▮▮▮▮▮▮▮▮▮▮ |
| 15:01:07 | 22 | ▮▮▮▮▮▮▮▮▮▮▮ |
| 15:01:13 | 23 | ▮▮▮▮▮▮▮ |
| 15:01:19 | 24 | ▮▮▮▮▮▮▮▮▮ |
| 15:01:25 | 25 | ▮▮▮▮▮▮ |

Ogata - cross

| | | |
|---|---|---|
| 15:01:30 | 1 | ████████████████████████████████████ |
| 15:01:34 | 2 | ████████████████████████ |
| 15:01:37 | 3 | Do you see that language? |
| 15:02:46 | 4 | A.    Yes. |
| 15:02:46 | 5 | Q.    And is that an accurate translation to your mind of |
| 15:02:50 | 6 | the original ████████ from the Japanese agreement between |
| 15:02:58 | 7 | ████████ and IP Bridge? |
| 15:03:01 | 8 | MS. GAZA:  Objection, Your Honor.  Counsel |
| 15:03:04 | 9 | hasn't shown him and had him read both to compare. |
| 15:03:08 | 10 | THE COURT:  I understand.  But let's just short |
| 15:03:10 | 11 | track this.  You have provided this translation; correct? |
| 15:03:15 | 12 | MS. GAZA:  That's correct, Your Honor. |
| 15:03:17 | 13 | THE COURT:  And that is a correct translation? |
| 15:03:19 | 14 | MS. GAZA:  We do not object to it. |
| 15:03:21 | 15 | THE COURT:  Is that sufficient, counsel? |
| 15:03:23 | 16 | MR. NILSSON:  Sure.  Thank you, Your Honor. |
| 15:03:25 | 17 | Thank you for that help. |
| 15:03:26 | 18 | BY MR. NILSSON: |
| 15:03:27 | 19 | Q.    Is the document correct that IP Bridge paid ████████ |
| 15:03:33 | 20 | ████████████████████? |
| 15:03:47 | 21 | A.    At the time of transfer, ████████████████ |
| 15:03:50 | 22 | Q.    And IP Bridge didn't ████████████████████ for |
| 15:03:54 | 23 | either the '239 patent or the '538 patent, did it? |
| 15:03:58 | 24 | MS. GAZA:  Objection, Your Honor.  Counsel |
| 15:04:01 | 25 | hasn't provided a time frame for the question in which he's |

Ogata - cross

| | | |
|---|---|---|
| 15:04:04 | 1 | asking. |
| 15:04:05 | 2 | THE COURT:  I'll sustain that. |
| 15:04:08 | 3 | BY MR. NILSSON: |
| 15:04:09 | 4 | Q.   At any point in time, did IP Bridge ever pay ███████ |
| 15:04:14 | 5 | ████████████████████ for either the '239 patent or the '538 |
| 15:04:22 | 6 | patent? |
| 15:04:41 | 7 | MS. GAZA:  Objection, Your Honor.  Clarify, is |
| 15:04:44 | 8 | counsel is referring to any time up until today, Your Honor, |
| 15:04:46 | 9 | or any time in the future? |
| 15:04:47 | 10 | THE COURT:  I think he said any time.  That will |
| 15:04:49 | 11 | probably include up until today. |
| 15:04:51 | 12 | MS. GAZA:  Thank you, Your Honor. |
| 15:04:51 | 13 | THE COURT:  Is that acceptable, counsel? |
| 15:04:53 | 14 | MR. NILSSON:  Yes, Your Honor. |
| 15:05:21 | 15 | THE WITNESS:  If it is meant to be up to today, |
| 15:05:23 | 16 | the payment has not been made. |
| 15:05:37 | 17 | Q.   Do you recall your deposition was taken in this |
| 15:05:41 | 18 | matter, Mr. Ogata? |
| 15:05:53 | 19 | A.   Yes, I do. |
| 15:05:54 | 20 | Q.   Can you turn to page 97 of your deposition.  It's a |
| 15:05:58 | 21 | tab in your notebook. |
| 15:06:00 | 22 | MS. GAZA:  Objection, Your Honor, to the |
| 15:06:02 | 23 | publication. |
| 15:06:07 | 24 | THE COURT:  You're objecting to the publication |
| 15:06:11 | 25 | of what? |

Ogata - cross

| | | |
|---|---|---|
| 15:06:11 | 1 | MS. GAZA:  Of the deposition transcript.  I |
| 15:06:15 | 2 | believe counsel may be trying to impeach the witness. |
| 15:06:19 | 3 | THE COURT:  He's trying to impeach the witness. |
| 15:06:21 | 4 | MS. GAZA:  And he has not asked the proper |
| 15:06:23 | 5 | foundational questions. |
| 15:06:24 | 6 | THE COURT:  Which is? |
| 15:06:27 | 7 | MS. GAZA:  Did he ask the question and give that |
| 15:06:31 | 8 | answer. |
| 15:06:31 | 9 | THE COURT:  Okay.  I don't care.  You can put it |
| 15:06:36 | 10 | up.  Overruled. |
| 15:06:37 | 11 | MS. GAZA:  Thank you, Your Honor. |
| 15:06:39 | 12 | BY MR. NILSSON: |
| 15:06:39 | 13 | Q.   At line 19 of this deposition, you were asked how much |
| 15:06:42 | 14 | did GK1 pay ███████ for the patents-in-suit.  And the |
| 15:06:52 | 15 | record, the transcript it said, "According to the patent |
| 15:06:56 | 16 | assignment agreements we had paid ████████████████ |
| 15:06:59 | 17 | ██████ |
| 15:07:00 | 18 | Do you see that? |
| 15:07:44 | 19 | A.   Yes. |
| 15:07:45 | 20 | Q.   And that was your testimony during the deposition; |
| 15:07:48 | 21 | correct? |
| 15:07:52 | 22 | A.   Yes. |
| 15:07:53 | 23 | Q.   And was there any case where you paid ████████████ |
| 15:07:58 | 24 | ███ per patent for? |
| 15:08:00 | 25 | THE COURT:  ████████? |

Ogata - cross

15:08:01   1          MR. NILSSON:  █████████

15:08:04   2          THE COURT:  Why don't you rephrase it.

15:08:07   3   Q.    Let me rephrase the question.

15:08:09   4        Were there any cases where you paid ███████████

15:08:11   5   ███   for either of the patents-in-suit?

15:08:13   6          MS. GAZA:  Objection, Your Honor.  Confusing and

15:08:16   7   misleading question.  Any case, is that relating --

15:08:22   8          THE COURT:  Overruled.

15:09:05   9          THE WITNESS:  Whether you're referring to this

15:09:07   10   patent or the Nozomi portfolio or IP Bridge as a whole would

15:09:13   11   change what you mean, so I would appreciate it if you could

15:09:17   12   be more specific.

15:09:18   13   Q.    Well, you were asked that exact same question at your

15:09:22   14   deposition; correct?  Can we turn to page 98 of your

15:09:33   15   deposition.  And you were asked during your deposition:

15:09:40   16        "Question:  Was there any cases where you paid

15:09:46   17   --"

15:09:46   18          MS. GAZA:  Objection, Your Honor.  I don't

15:09:48   19   believe either we or the witness have a copy of this

15:09:50   20   document in the witness binder.

15:09:53   21          MR. NILSSON:  The deposition transcript?

15:09:55   22          THE COURT:  It's the deposition transcript.  You

15:09:57   23   don't have a copy of the deposition transcript?  You forgot

15:10:00   24   to order it?

15:10:01   25          MS. GAZA:  I do, Your Honor.  I do not believe

Ogata - cross

15:10:03    1   the witness does.

15:10:04    2                   THE COURT:  Can he see it from here?

15:10:05    3                   MS. GAZA:  He can see what little bit he's

15:10:07    4   showing him.

15:10:08    5                   THE COURT:  Do you want to provide him a copy

15:10:11    6   with the complete transcript.

15:10:13    7                   MS. GAZA:  We're happy to do so, Your Honor.

15:10:16    8                   MR. NILSSON:  The witness does have a copy in

15:10:18    9   his binder, I believe.

15:10:20   10                   MS. GAZA:  Of both dates?

15:10:21   11                   THE COURT:  Of the entire deposition.

15:10:23   12                   MR. NILSSON:  Of anything I have.

15:10:24   13                   THE COURT:  He's entitled to have a copy of the

15:10:27   14   deposition, so let's do that.

15:10:34   15                   MS. GAZA:  Thank you, Your Honor.

15:10:36   16                   THE COURT:  You're welcome.

15:10:44   17                   MR. NILSSON:  We have one day of the deposition,

15:10:46   18   not two.

15:10:47   19                   THE COURT:  So there is two depositions;

15:10:49   20   correct?

15:10:49   21                   MS. GAZA:  It was one deposition, Your Honor,

15:10:51   22   over two days.

15:10:52   23                   THE COURT:  So he has two volumes?

15:10:54   24                   MS. GAZA:  Correct, Your Honor.

15:10:55   25                   THE COURT:  So if you can refer the witness to

Ogata - cross

15:10:58   1   the volume and page.  Are they numbered consecutively?

15:11:03   2                  MS. GAZA:  I believe they are, Your Honor.

15:11:05   3                  THE COURT:  So we're at page what?

15:11:08   4                  MR. NILSSON:  98.

15:11:09   5                  THE COURT:  Page 98, line two.

15:11:16   6                  MR. NILSSON:  This is volume one.

15:11:30   7                  THE COURT:  And your question is?

15:11:32   8   BY MR. NILSSON:

15:11:32   9   Q.    And you were asked:

15:11:33   10                  "Question:  Was there any cases where you paid

15:11:36   11   █████████████████ per patent for any of the

15:11:38   12   patents-in-suit?"

15:11:40   13                  And your testimony was:

15:11:42   14                  "Answer:  My understanding is that there were no

15:11:45   15   such cases."

15:11:47   16   A.    Correct.

15:12:22   17   Q.    Thank you, Mr. Ogata.  You can close your binder now

15:12:27   18   with the deposition transcript, but if you could keep them

15:12:30   19   there, that would be helpful.

15:12:33   20        Now, ████████ has never approached IP Bridge requesting

15:12:37   21   a license for the '239 patent or the '538 patent, have they?

15:13:03   22   A.    Not at least -- no, not at least since after IP Bridge

15:13:10   23   received the transfer.

15:13:11   24   Q.    And ████████ has never sought a license to the '239

15:13:17   25   patent or the '538 patent from IP Bridge, have they?

Ogata - cross

15:13:35   1    A.     Not to my knowledge.

15:13:37   2    Q.     IP Bridge has told other companies other than TCL that

15:13:42   3    it believes that those companies use its patented

15:13:47   4    technology; correct?

15:14:01   5    A.     Yes.

15:14:02   6    Q.     IP Bridge has contacted ███████; correct?

15:14:06   7                    MS. GAZA:  Objection, Your Honor.

15:14:08   8                    THE COURT:  And the objection is?

15:14:10   9                    MS. GAZA:  This goes to the issues addressed

15:14:13   10   during the break earlier today.

15:14:15   11                   THE COURT:  I don't think it opens the door.

15:14:18   12   And I think that he's allowed to ask the question because he

15:14:22   13   objected with respect to ███████ and ████████ so it's the

15:14:26   14   same question.

15:14:27   15                   Overruled.  You may continue.

15:14:29   16                   MS. GAZA:  Thank you, Your Honor.

15:14:37   17   A.     Yes.

15:14:37   18   Q.     And IP Bridge has contacted ███; correct?

15:14:42   19   A.     Yes.

15:14:42   20   Q.     And IP Bridge has contacted ██████; correct?

15:14:50   21   A.     Yes.

15:14:51   22   Q.     And IP Bridge has contacted ██; correct?

15:14:58   23   A.     Yes.

15:14:59   24   Q.     And it's also contacted ██; correct?

15:15:05   25   A.     That's correct.

Ogata - cross

15:15:07   1   Q.    And as we heard, IP Bridge has contacted ████████

15:15:11   2   correct?

15:15:18   3   A.    Yes.

15:15:18   4   Q.    But of all the companies that I just mentioned, only

15:15:23   5   ████████ has taken a license to any of IP Bridge's patents;

15:15:29   6   correct?

15:15:48   7   A.    That's right.

15:15:49   8   Q.    So I would like to talk with you briefly about the

15:15:54   9   ████████ license that Ms. Gaza asked you about.  And I

15:15:59   10  believe it's at JTX-76.

15:16:25   11         MR. NILSSON:  So I only intend to ask Mr. Ogata

15:16:28   12  about the scope of the license in terms of the number of

15:16:32   13  patents, but I don't know whether -- we're still under seal.

15:16:37   14         MS. GAZA:  Yes, we are.

15:16:38   15         MR. NILSSON:  I'm sorry.  I apologize, Your

15:16:40   16  Honor.

15:16:40   17  BY MR. NILSSON:

15:16:40   18  Q.    So the patents that are actually licensed or were

15:16:43   19  licensed to ████████ are at appendix two of that document;

15:16:48   20  correct?

15:17:05   21  A.    Yes, I think so.

15:17:06   22  Q.    That starts on page 19.

15:17:24   23  A.    Yes.

15:17:25   24  Q.    And that ████████████████████████████████████████████

15:17:28   25  ████████████████████████████████; correct?

Ogata - cross

| | | |
|---|---|---|
| 15:17:40 | 1 | A.    Yes, that's right. |
| 15:17:42 | 2 | Q.    And it ████████████████████████████████ |
| 15:17:46 | 3 | ████████████████  correct? |
| 15:18:01 | 4 | A.    That's correct. |
| 15:18:02 | 5 | Q.    Now, you're aware, aren't you, that IP Bridge's |
| 15:18:07 | 6 | royalty expert in this case has said that this license with |
| 15:18:10 | 7 | ████████ is not comparable to -- strike that. |
| 15:18:17 | 8 | Mr. Kennedy has said that ████████ is not comparable or |
| 15:18:21 | 9 | closely situated to TCL? |
| 15:18:51 | 10 | A.    That is my understanding. |
| 15:18:53 | 11 | Q.    And are you aware that Mr. Kennedy also pointed out |
| 15:18:57 | 12 | that ████████████████████ that were licensed through the |
| 15:19:01 | 13 | ████████ license far exceed ████████████████████ that would be |
| 15:19:05 | 14 | licensed in a negotiation between ████████ and TCL? |
| 15:19:48 | 15 | A.    Yes. |
| 15:19:48 | 16 | Q.    So let me ask about the other license you were |
| 15:19:51 | 17 | discussing with Ms. Gaza.  The only other license to IP |
| 15:19:56 | 18 | Bridge's Nozomi portfolio is a license between IP Bridge and |
| 15:20:05 | 19 | ████████; right? |
| 15:20:25 | 20 | A.    Yes. |
| 15:20:26 | 21 | Q.    And to obtain a license to IP Bridge's Nozomi |
| 15:20:33 | 22 | portfolio, ████████████████████████████████? |
| 15:20:50 | 23 | A.    Yes. |
| 15:20:51 | 24 | Q.    And that license with ████████ also ████████████████ |
| 15:20:56 | 25 | ████████████████████████████████; |



Ogata - cross

| | | |
|---|---|---|
| 15:20:59 | 1 | correct? |
| 15:21:17 | 2 | A.    Because it's the Nozomi portfolio, I think that would |
| 15:21:22 | 3 | cover worldwide. |
| 15:21:24 | 4 | Q.    So let's talk about IP Bridge's attempts to negotiate |
| 15:21:31 | 5 | with TCL before the complaint was filed here. |
| 15:21:37 | 6 | When IP Bridge first contacted TCL, it was in that |
| 15:21:43 | 7 | December 15, 2014 letter, JTX-178, which I think we can |
| 15:21:50 | 8 | show, we can publish.  And the only two patents mentioned in |
| 15:22:25 | 9 | this particular letter are U.S. Patent No. 8,897,389 and |
| 15:22:35 | 10 | U.S. Patent No. 7,024,356; correct? |
| 15:23:04 | 11 | A.    Those are the two that are specified by number. |
| 15:23:10 | 12 | Q.    And in this exhibit, Joint Exhibit 178, does IP Bridge |
| 15:23:21 | 13 | ever indicate to TCL that it might be infringing the '239 |
| 15:23:26 | 14 | patent or the '538 patent? |
| 15:23:50 | 15 | A.    Yes, we did. |
| 15:23:52 | 16 | Q.    In this letter? |
| 15:23:54 | 17 | A.    Yes. |
| 15:23:54 | 18 | Q.    Can you point out where? |
| 15:24:29 | 19 | A.    The first sentence in the first paragraph, IP Bridge |
| 15:24:29 | 20 | indicate those two patents are included in the patent |
| 15:24:30 | 21 | portfolio. |
| 15:24:30 | 22 | Q.    So it's your testimony to the jury that the first |
| 15:24:33 | 23 | paragraph of this letter put TCL on notice that IP Bridge |
| 15:24:38 | 24 | believed it infringed the '239 patent and the '538 patent? |
| 15:25:25 | 25 | A.    That is correct, although they are not specified by |

Ogata - cross

| | |
|---|---|
| 15:25:31 | 1 |
| 15:25:37 | 2 |
| 15:25:41 | 3 |
| 15:25:45 | 4 |
| 15:25:53 | 5 |
| 15:25:58 | 6 |
| 15:26:26 | 7 |
| 15:26:32 | 8 |
| 15:26:42 | 9 |
| 15:26:59 | 10 |
| 15:27:05 | 11 |
| 15:27:18 | 12 |
| 15:27:20 | 13 |
| 15:27:26 | 14 |
| 15:27:30 | 15 |
| 15:28:02 | 16 |
| 15:28:03 | 17 |
| 15:28:11 | 18 |
| 15:28:15 | 19 |
| 15:28:16 | 20 |
| 15:28:20 | 21 |
| 15:28:25 | 22 |
| 15:28:26 | 23 |
| 15:28:28 | 24 |
| 15:28:29 | 25 |

number, a normal -- those who are usually involved in

patents would be able to tell right away that that would

include the '239 and '538 patents.

Q.    So did IP Bridge before filing suit ever specifically

identify the '239 patent or the '538 patent as patents that

it believed TCL had infringed?

A.    It never specified it by number such as those.

Q.    So could you turn, and this is my last few questions.

Can you turn to JTX-176.  And I believe this was the final

letter that you discussed with Ms. Gaza before IP Bridge

filed this lawsuit; is that right?

A.    That's right.

Q.    And in this letter, IP Bridge's law firm says that it

represents IP Bridge in the licensing and enforcement of its

W-CDMA and LTE patent portfolio; is that right?

A.    Yes, that's right.

Q.    And there are around 700 patents in the Nozomi

portfolio; correct?

A.    Yes, that's right.

Q.    And there are some from the United States; is that

right?

A.    Yes.

Q.    Some from Japan?

A.    Yes.

Q.    Some from Germany?

Ogata - cross

15:28:32  1   A.    Yes.

15:28:32  2   Q.    Some from other European countries?

15:28:37  3   A.    Yes.

15:28:38  4   Q.    Some from China?

15:28:41  5   A.    Yes.

15:28:43  6   Q.    Did IP Bridge ever offer TCL the opportunity to

15:28:49  7   license just the '239 patent and/or -- let's strike that.

15:28:54  8        Did IP Bridge ever offer TCL the opportunity to

15:28:58  9   license just the '239 patent and the '538 patent?

15:29:02  10            MS. GAZA:  Objection, Your Honor.  Goes to the

15:29:05  11   timeliness aspect of the question again.

15:29:11  12            THE COURT:  Overruled.  He can answer the

15:29:13  13   question.

15:29:14  14            MS. GAZA:  Your Honor, it also implicates the

15:29:17  15   issues we discussed during the earlier recess.

15:29:20  16            MR. NILSSON:  Let me rephrase the question.

15:29:22  17            THE COURT:  All right.

15:29:22  18   BY MR. NILSSON:

15:29:23  19   Q.    Prior to filing suit, did IP Bridge ever offer TCL the

15:29:27  20   opportunity to license just the '239 patent and the '538

15:29:31  21   patent?

15:29:56  22   A.    There was no such opportunity because we never were

15:30:00  23   able to meet with them.

15:30:03  24   Q.    Prior to filing suit, did IP Bridge ever send a letter

15:30:07  25   to TCL suggesting that it could license just the '239 patent

Ogata - cross

15:30:13    1    and the '538 patent?

15:30:48    2    A.    We never sent anything back, only specified those two.

15:30:54    3    What we did send were the four letters in which we offered

15:30:59    4    to have discussions on licensing the portfolio.

15:31:07    5              MR. NILSSON:   Thank you, Mr. Ogata.   I'll pass

15:31:10    6    the witness.

15:31:10    7              THE COURT:   Any redirect?

15:31:12    8              MS. GAZA:   Your Honor, if possible, would this

15:31:14    9    be an appropriate time to take a break and give us time to

15:31:19   10    address the expanded scope of the cross?

15:31:32   11              THE COURT:   To gather your thoughts, is that the

15:31:35   12    idea.

15:31:36   13              MS. GAZA:   Your Honor, I just want to grab the

15:31:40   14    appropriate documents so I have the right translation,

15:31:42   15    frankly.

15:31:42   16              THE COURT:   How much time do you need?

15:31:44   17              MS. GAZA:   Five minutes.

15:31:45   18              THE COURT:   Okay.   We'll take five, ladies and

15:31:48   19    gentlemen.

15:31:48   20              MS. GAZA:   Thank you, Your Honor.

15:31:50   21              THE COURT:   You're welcome.

15:37:26   22              (Jury exiting the courtroom.)

15:37:26   23              THE COURT:   Please be seated.   Are you ready to

15:37:28   24    go.

15:37:28   25              MS. GAZA:   I am, Your Honor, thank you.

Ogata - redirect

| | |
|---|---|
| 15:37:30 | 1 |
| | THE COURT:  You're welcome.  Bring the jury in. |
| 15:38:08 | 2 |
| | (Jury entering the courtroom at 3:38 p.m.) |
| 15:38:15 | 3 |
| | THE COURT:  Please be seated, ladies and |
| 15:38:23 | 4 |
| | gentlemen. |
| 15:38:26 | 5 |
| | You may proceed, Ms. Gaza. |
| 15:38:29 | 6 |
| | MS. GAZA:  Thank you, Your Honor. |
| 15:38:32 | 7 |
| | BY MS. GAZA: |
| 15:38:32 | 8 |
| | Q.    Just a few questions, Mr. Ogata.  I wanted actually to |
| 15:38:39 | 9 |
| | ask you about Mr. Ogawa which is O-G-A-W-A.  Just to |
| 15:38:45 | 10 |
| | clarify, was Ogawa employed on a full-time or contract basis |
| 15:38:52 | 11 |
| | by IP Bridge? |
| 15:39:07 | 12 |
| | A.    He was an official employee.  He was contracted from |
| 15:39:25 | 13 |
| | ███████  and worked for us as an official employee. |
| 15:39:28 | 14 |
| | Q.    To clarify, do you mean that he was on a contract |
| 15:39:32 | 15 |
| | basis? |
| 15:39:36 | 16 |
| | A.    That's right. |
| 15:39:37 | 17 |
| | Q.    And when he no longer worked with IP Bridge, is that |
| 15:39:44 | 18 |
| | because his contract had ended? |
| 15:39:53 | 19 |
| | A.    That's right. |
| 15:39:54 | 20 |
| | Q.    Thank you, Mr. Ogata. |
| 15:39:56 | 21 |
| | Turning to the Patent Transfer Agreement that you had |
| 15:40:00 | 22 |
| | discussed with counsel for TCL, ██████████████ |
| 15:40:08 | 23 |
| | ████████████████████████████████ |
| 15:40:13 | 24 |
| | ██████████ |
| 15:40:13 | 25 |
| | MR. NILSSON:  Your Honor, may I ask for a |

Ogata - redirect

15:40:15  1    side-bar?

15:40:16  2            THE COURT:  No.  I think I know exactly where

15:40:18  3    this is going and you opened the door, young man, so your

15:40:21  4    objection is overruled.  You can make a record after the

15:40:24  5    questions are asked.

15:40:26  6            You can continue.

15:40:27  7            MS. GAZA:  Thank you.

15:40:29  8            Would you like me to repeat the question?

15:40:33  9            THE COURT:  Yes.

15:40:34  10           MS. GAZA:  I will.

15:40:34  11   BY MS. GAZA:

15:40:35  12   Q.    Mr. Ogata, under the Patent Transfer Agreement, ███

15:40:39  13   ████████████████████████████████████████████████████?

15:41:20  14   A.    First of all, ███████████████████████████████████

15:41:27  15   ██████

15:41:28  16   Q.    And do you recall, Mr. Ogata, ██████████████████████

15:41:32  17   ████████████████████████████████

15:41:45  18   A.    ███

15:41:45  19   Q.    ████████████████████████████████████

15:41:51  20   ███████████████████████████████████████████████

15:41:55  21   ██████████████████████████████████

15:42:23  22   A.    ███

15:42:25  23   Q.    ████████████████████████████████

15:42:32  24   ████████████████████████████████████████████████

15:42:36  25   ████████████████████████████████████████



15:42:40   1

15:43:35   2    A.

15:43:40   3

15:43:44   4

15:43:48   5

15:43:52   6

15:43:58   7

15:44:01   8    Q.

15:44:30   9    A.

15:44:36   10

15:44:41   11

15:44:45   12

15:44:47   13

15:44:51   14

15:44:55   15            MS. GAZA:  Thank you.

15:44:56   16            No further questions, Your Honor.

15:44:59   17            THE COURT:  Brief recross?

15:45:00   18            MR. NILSSON:  No, Your Honor.

15:45:02   19            THE COURT:  Ladies and gentlemen of the jury, do

15:45:04   20    you have any questions for this witness?

15:45:08   21            The witness may step down.

15:45:11   22            (Witness excused.)

15:45:11   23            You may call your next witness.  And for the

15:45:16   24    record, Mr. Nilsson, at the close of business today you can

15:45:21   25    make your record with respect to your objection that was

15:45:24   1    previously lodged.

15:45:26   2            MR. NILSSON:  Thank you, Your Honor.

15:45:27   3            THE COURT:  You're welcome.

15:45:29   4            MS. WILSON:  Your Honor, at this time IP Bridge

15:45:32   5    would like to play three video deposition witnesses.  May I

15:45:41   6    and my colleagues approach with copies of those transcripts

15:45:44   7    for the court?

15:45:45   8            THE COURT:  Yes, please.

15:45:57   9            Ladies and gentlemen, in the instructions I told

15:45:59   10   you that sometimes witnesses are not available and the

15:46:02   11   parties agree that videotape depositions can be done.  And

15:46:06   12   you're to give this testimony as much credibility as is

15:46:10   13   possible just like if the witness was here.

15:46:13   14           So you may proceed, Ms. Wilson.

15:48:44   15           MR. NILSSON:  Thank you, Your Honor.

15:48:45   16           And simply to remind you, I am Samantha Wilson

15:48:50   17   from the Delaware law firm of Young Conaway, representing

15:48:52   18   plaintiff.  Hank you.

15:48:53   19           First, IP Bridge will offer the video deposition

15:48:57   20   testimony of Dalin Mao, who is legal counsel for TCL

15:49:05   21   Communications, TCL Ningbo.

15:49:09   22           Mr. Mao was designated as a 30(b)(6) witness for

15:49:14   23   the defendants in this case and the following video is from

15:49:18   24   Mr. Mao's June 23rd, 2017 deposition.

15:49:23   25           (The videotaped deposition was of Dalin Mao was

15:49:25    1    played as follows.)

15:49:26    2                "Question:  Would you please stated your full

15:49:37    3    name for the record?

15:49:39    4                "Answer:  My name is Dalin Mao.

15:49:42    5                "Question:  I should have asked this earlier

15:49:43    6    today, but I -- to make everybody's life easier today, when

15:49:46    7    I use the word TCL, I'd like to mean that to refer to all

15:49:50    8    four of the named defendants in this case.

15:49:52    9                "Is that okay?

15:49:54    10               "Answer:  Okay.

15:49:54    11               "Question:  And you'll let me know if I have

15:49:59    12   your answers are specific to any particular TCL entity.

15:50:02    13               "Is that fair?

15:50:04    14               "Answer:  Okay.

15:50:04    15               "Question:  Mr. Mao, you mentioned that you are

15:50:07    16   an employee of TCL Ningbo; is that correct?

15:50:07    17               "Answer:  Yes.

15:50:14    18               "Question:  What are your job responsibilities

15:50:16    19   at TCL Ningbo?

15:50:20    20               "Answer:  I work as an in-house counsel.

15:50:22    21               I'm hands go you a document previously marked

15:50:27    22   TCL Exhibit 25.  It's a document bearing two sets of Bates

15:50:30    23   numbers.  One set is TCT IP B 22213 through 22242 and is

15:50:37    24   entitled contract between Qualcomm incorporated and TCL

15:50:41    25   holdings company limited for the license of certain

Mao - designations

| | | |
|---|---|---|
| 15:50:44 | 1 | technology for the license of certain technology for the |
| 15:51:00 | 2 | manufacturing and sale of certain C.I. M A sub tractor |
| 15:51:04 | 3 | units. |
| 15:51:04 | 4 | Do you recognize this document? |
| 15:51:04 | 5 | "Answer:  Yes. |
| 15:51:06 | 6 | "Question:  What is this document? |
| 15:51:08 | 7 | "Answer:  That's a license agreement between |
| 15:51:10 | 8 | Qualcomm and our company. |
| 15:51:17 | 9 | "Question:  Do you know what the royalty rate |
| 15:51:21 | 10 | structure is under this agreement? |
| 15:51:23 | 11 | "Answer:  The royalty rate is described in |
| 15:51:25 | 12 | Section 5 .2. |
| 15:51:26 | 13 | "Question:  Do you know if this Qualcomm |
| 15:51:28 | 14 | agreement is still in force today? |
| 15:51:35 | 15 | "Answer:  I believe so. |
| 15:51:35 | 16 | "Question:  Do the royalty provisions under |
| 15:51:38 | 17 | Section 5 .2 still apply today? |
| 15:51:46 | 18 | "Answer:  I believe so. |
| 15:51:46 | 19 | "Question:  Were there any specific consider -- |
| 15:51:50 | 20 | withdrawn. |
| 15:51:51 | 21 | Do you know what percentages of the licensed |
| 15:51:57 | 22 | Qualcomm patents under this agreement are SEPs? |
| 15:52:05 | 23 | "Answer:  I don't know. |
| 15:52:07 | 24 | "Question:  Mr. Mao, when did TCL first become |
| 15:52:11 | 25 | aware of the patents being asserted in this litigation? |

15:52:14   1          "Answer:  The time when we received your

15:52:16   2    letter."

15:52:24   3          (End of videotaped deposition.)

15:52:28   4          MR. NILSSON:  Thank you.  IP Bridge next offers

15:52:33   5    the video deposition testimony of Mr. Sebastian Codeville.

15:52:39   6          Mr. Codeville is a former TCT Mobile U.S.

15:52:42   7    executive who held the title of VP product marketing program

15:52:47   8    North America, and his deposition is dated May 19th, 2017.

15:52:55   9          THE COURT:  So does the courtroom need to be

15:52:57   10   sealed for these depositions?

15:52:58   11         MR. NILSSON:  My apologies, Your Honor.  It no

15:53:00   12   longer needs to be sealed.

15:53:01   13         THE COURT:  The Court is not sealed or unsealed.

15:53:05   14         MR. NILSSON:  Thank you, Your Honor.

15:53:06   15         THE COURT:  You may continue.

15:53:06   16         MR. NILSSON:  Thank you.

15:53:08   17         (End of portion under seal.)

15:53:10   18         (The videotaped deposition of Sebastien

15:53:14   19   Codeville was played as follows.)

15:53:16   20         "Question:  Good morning, Mr. Codeville.

15:53:18   21         "Answer:  Good morning.

15:53:19   22         "Question:  Please state your name for the

15:53:21   23   record.

15:53:21   24         "Answer:  Sebastien Codeville.

15:53:23   25         "Question:  Can you please spell that?

Codeville - designations

| | | |
|---|---|---|
| 15:53:25 | 1 | "Answer:  Codeville, C-o-d-e-v-i-l-le. |
| 15:53:28 | 2 | "Question:  Mr. Codeville, what degrees do you |
| 15:53:30 | 3 | have after high school? |
| 15:53:31 | 4 | "Answer:  I did junior school in France, so with |
| 15:53:35 | 5 | a major in micro electronics and telecommunication.  So in |
| 15:53:39 | 6 | junior school in France, it's equivalent to a master degree |
| 15:53:45 | 7 | in the U.S.  And then I worked for some years, and then I |
| 15:53:48 | 8 | did an MBA. |
| 15:53:49 | 9 | "Question:  When did you get your first degree |
| 15:53:52 | 10 | after high school? |
| 15:54:08 | 11 | "Answer:  In 1996. |
| 15:54:09 | 12 | "Question:  And when was your MBA? |
| 15:54:13 | 13 | "Answer:  In 2010.  Graduation was in 2010. |
| 15:54:16 | 14 | "Question:  Who is your current employer? |
| 15:54:18 | 15 | "Answer:  TCL Communication Hong Kong.  It's |
| 15:54:20 | 16 | actually TCL Communication Ltd. Hong Kong. |
| 15:54:28 | 17 | "Question:  Sorry.  Could you state the full |
| 15:54:31 | 18 | name of the entity again? |
| 15:54:35 | 19 | "Answer:  I think it's TCL Communication Ltd. |
| 15:54:39 | 20 | Hong Kong.  And I also have -- because I am stationed in |
| 15:54:43 | 21 | China, in Shanghai, so I also have a contract with JRD in |
| 15:54:49 | 22 | Shanghai for visa purpose. |
| 15:54:50 | 23 | "Question:  I'd like to first ask about your |
| 15:54:56 | 24 | work for TCL Communication Ltd. what are your job |
| 15:55:02 | 25 | responsibilities for your work with TCL Communication Ltd. |

Codeville - designations

15:55:11  1    Hong Kong?

15:55:13  2            Answer:  Currently my job responsibilities

15:55:15  3    are -- actually it's a little bit complex because I am in a

15:55:20  4    transition period and I am just here with a company that we

15:55:24  5    created which is invested by TCL since December 2016.  But I

15:55:29  6    am going to be transferred to this company, but for the

15:55:35  7    moment, I still have a contract with -- my contract is still

15:55:41  8    with TCL Communications.  So I don't have a role per se in

15:55:50  9    TCL Communication today.  I used to work there, but I'm in a

15:55:54  10   transition period.

15:55:55  11           "Question:  What are your job responsibilities

15:55:58  12   in connection with the JRD Shanghai entity that you

15:56:07  13   mentioned?

15:56:08  14           "Answer:  It's the same situation as TCL

15:56:11  15   Communication.  JRD is more for sort of visa, it's a

15:56:14  16   necessity, contract necessity for the visa purpose.  But my

15:56:19  17   main employment is in TCL Communication Hong Kong.

15:56:22  18           "Question:  Before you started working for

15:56:27  19   KAOIS, what were your job responsibilities at TCL

15:56:32  20   Communication Ltd. Hong Kong?

15:56:39  21           "Answer:  I was in charge of product marketing

15:56:41  22   and programs for North America.

15:56:45  23           "Question:  What is product marketing?

15:56:48  24           "Answer:  Product marking, it's basically

15:56:49  25   defining the portfolio, the strategy, the product strategy

Codeville - designations

15:56:52  1    for our customer in North America and also preparing the

15:56:55  2    answer to the RFP from the -- of the mobile operator, and

15:56:59  3    working closely with the mobile operator and with the global

15:57:02  4    marketing team to get product selected by the carrier.

15:57:15  5         "Question:  I think you also mentioned programs;

15:57:18  6    is that correct?

15:57:18  7         "Answer:  Yes.

15:57:23  8         "Question:  What is that?

15:57:25  9         "Answer:  The program -- the whole of program is

15:57:28  10   something I was doing before also, so it's my original

15:57:31  11   mission in TCL Communication.  It's basically to drive all

15:57:34  12   the R&D project team for all the product we developed for

15:57:37  13   the U.S. market and Canada.

15:57:39  14        "Question:  So is it correct to say that you

15:57:43  15   were overseeing the R&D for TCL phones that were being sold

15:57:50  16   in the U.S.?

15:57:52  17        "Answer:  So I was overseeing the program

15:57:53  18   manager who managed -- so it was not functional leader of

15:58:00  19   the R&D team, but I was managing all the project for U.S.,

15:58:04  20   yes.

15:58:05  21        "Question:  Mr. Codeville, are you familiar with

15:58:07  22   the term LTE?

15:58:07  23        "Answer:  Yes.

15:58:09  24        "Question:  What does it stand for ?

15:58:13  25        "Answer:  It's the fourth generation of mobile

15:58:15   1   communication.

15:58:16   2           "Question:  What is your understanding of a

15:58:18   3   phone that is LTE compliant?

15:58:22   4           "Answer:  So a phone that is LTE compliant is

15:58:25   5   able to connect to an LTE network and to achieve some

15:58:29   6   certain speed of transmission and reception of data over

15:58:32   7   this network, which -- but LTE is a very generic -- you have

15:58:38   8   many parameters and capabilities under LTE which differ from

15:58:43   9   phone to phone, so it's difficult to answer precisely to

15:58:46   10   this question.

15:58:53   11           "Question:  Are you familiar with the term

15:59:01   12   3GPP?

15:59:01   13           "Answer:  Yes.

15:59:07   14           "Question:  What does it mean?

15:59:12   15           "Answer:  3GPP?  It's a set of recommendation

15:59:14   16   which can be the way -- the way some communication or some

15:59:18   17   standard have to be implemented or should, could be

15:59:20   18   implemented, and some of the test documentation, test

15:59:28   19   specification.  It's prepared by a kind of consortium of

15:59:37   20   mobile operator and mobile manufacturer.

15:59:40   21           "Question:  So if I'm understanding you

15:59:44   22   correctly, the 3GPP promulgates certain test specifications

15:59:57   23   that describe standards; is that correct?

16:00:04   24           "Answer:  It's not what I said.  What I tried to

16:00:06   25   say was you have two, basically, two big categories in 3GPP.

Codeville - designations

16:00:13   1   You have the -- you have some specification which explain

16:00:15   2   the way the standard can be implemented, and you have

16:00:19   3   another set of specifications which describe the way -- the

16:00:25   4   performance or the behavior of the device can be tested.  So

16:00:30   5   you have these two types of documents in a 3GPP.

16:00:34   6           "Question:  I'd like to focus on the documents

16:00:39   7   that are talking about the way that the standards can be

16:00:44   8   implemented.

16:00:49   9           "Answer:  Yes.

16:00:49   10          "Question:  How does 3GPP set forth the ways in

16:00:57   11  which the standards can be implemented?

16:00:59   12          "Answer:  What do you want to say?  You want to

16:01:00   13  know in which format, in which --

16:01:03   14          "Question:  Yes.

16:01:04   15          "Answer:  -- kind of documents?

16:01:11   16          "Question:  Yes.

16:01:12   17          "Answer:  Okay.  So if you have a lot of

16:01:14   18  documents, actually, which are available on the website, the

16:01:17   19  3GPP website for all members, so everybody can download

16:01:20   20  these documents, and actually it's classified -- not

16:01:23   21  classified, it's sorted, topics, so you can have

16:01:25   22  communication with SIM, SIM communication with the network,

16:01:31   23  the RF, implementation and so on.  There are series of 3GPP

16:01:37   24  recommendation, and every series will deal with a specific

16:01:40   25  matter and purpose and foundation, knowing that the

16:01:44    1    manufacture of the chipset more often the chipset

16:01:53    2    manufacturer, can follow the implementation, but usually

16:02:02    3    they do another way or they do their own way to implement

16:02:05    4    the specification.  So it's a kind of recommendation or kind

16:02:08    5    of a proposition which is not all the time the way the

16:02:14    6    chipset manufacturer implement.

16:02:16    7             "Question:  Does the 3GPP specification

16:02:20    8    distinguish between mandatory portions as opposed to

16:02:29    9    optional portions?

16:02:31    10            "Answer:  So in this specification, I don't

16:02:34    11   think there's mandatory portion, but I'm not completely

16:02:39    12   familiar with this.  In the test specification, it's

16:02:43    13   actually -- U.S., it's not mandatory to be -- to get PTCRB

16:02:51    14   or the GCF testing done, actually, which is the execution of

16:02:55    15   the tests specified in 3GPP.

16:03:08    16            "Question:  Mr. Codeville, does TCL purchase

16:03:15    17   baseband chips from Qualcomm?

16:03:15    18            "Answer:  Yes.

16:03:23    19            "Question:  Do you know if TCL possesses any

16:03:25    20   Qualcomm source code for the baseband chips that it

16:03:28    21   purchases?

16:03:29    22            "Answer:  It's a -- as I explained before,

16:03:32    23   baseband is made of -- there are several parts in the

16:03:34    24   software running there.  So, yes, some part of the software

16:03:38    25   is provided in source code on the application processor

Codeville - designations

16:03:41  1    side, for example, Android, all the Android packages, all

16:03:50  2    the driver, all the BSB area, there is source code.

16:03:55  3    On the modem side, which is telecom part, we don't have

16:04:04  4    source code.  So you have a distinction.  Some of the --

16:04:06  5    some parts of the software are very proprietary of the

16:04:09  6    chipset manufacturer and they are developing their own

16:04:12  7    source code.

16:04:14  8              "Question:  Do you know if TCL possesses any

16:04:19  9    technical specifications from Qualcomm that discuss the --

16:04:25  10   whether the Qualcomm baseband chip sets provide LTE

16:04:28  11   functionality?

16:04:29  12             "Answer:  It's a -- yes, there are documents

16:04:33  13   that describe LTE function, LTE functionality, but it's a

16:04:38  14   very, very broad question.

16:04:41  15             "Question:  Which TCL entities would have those

16:04:51  16   documents, to your knowledge?

16:04:52  17             "Answer:  The R&D teams would have some

16:04:54  18   specification or some application notes from Qualcomm about

16:04:58  19   the LTE capabilities.  But again, it's a very broad

16:05:02  20   question, and LTE capability can be just a category of

16:05:06  21   support or it can be perhaps more detailed parameters.

16:05:14  22   So... so it depends what document you mean.

16:05:20  23             "Question:  Would your answer be any different

16:05:32  24   if the question was about technical specifications

16:05:37  25   discussing 3GPP, implementation of 3GPP standards?

Codeville - designations

| | | |
|---|---|---|
| 16:05:42 | 1 | "Answer:  I don't think Qualcomm share any of |
| 16:05:46 | 2 | their OEM, at least TCL, the way they implement the 3GPP |
| 16:05:53 | 3 | standard.  I don't, I don't see why they would do that.  But |
| 16:05:56 | 4 | I didn't look at all the -- the different documents, were |
| 16:05:59 | 5 | they available.  But again, the way you implement 3GPP, it's |
| 16:06:05 | 6 | very -- it's proprietary, and the chipset maker keep that as |
| 16:06:15 | 7 | close as possible.  If they don't need to share it, they |
| 16:06:19 | 8 | would not share it. |
| 16:06:22 | 9 | "Question:  Mr. Codeville, the court reporter |
| 16:06:25 | 10 | has handed you a document that was previously marked TCL-7. |
| 16:06:30 | 11 | It's entitled TCT Mobile (U.S.) Inc.'s and TCT Mobile Inc.'s |
| 16:06:37 | 12 | sixth supplemental responses and objections to plaintiff's |
| 16:06:40 | 13 | first set of interrogatories (numbers 1 to 3). |
| 16:06:44 | 14 | "Do you see that document? |
| 16:06:44 | 15 | "Answer:  Yes. |
| 16:06:47 | 16 | "Question:  I'd like for you to turn to page 25 |
| 16:06:50 | 17 | of this document where it says, fourth up is supplemental |
| 16:06:54 | 18 | Appendix A.  There is a table here that has at the top model |
| 16:06:59 | 19 | name, model number, vendor, and chip said. |
| 16:07:02 | 20 | "Do you see that ? |
| 16:07:02 | 21 | "Answer:  Yes. |
| 16:07:13 | 22 | "Question:  I'd like for you to take a minute |
| 16:07:17 | 23 | just going through this table that goes onto the next page, |
| 16:07:20 | 24 | and just look at the model names that are listed in this |
| 16:07:26 | 25 | table.  Okay? |

Codeville - designations

16:07:26    1              "Answer:  Yes.

16:07:28    2              "Question:  Mr. Codeville, which of these

16:07:32    3    devices listed on this table can connected to the LTE

16:07:35    4    network?

16:07:36    5              "Answer:  I can tell you, based on the chipset.

16:07:38    6              "Question:  Okay.  Then I'd just like to

16:07:41    7    confirm them.  Going back to the first page then, so the

16:07:46    8    OneTouch Elevate, which has chipset MSM8909, that is --

16:07:55    9    supports LTE?

16:07:55   10              "Answer:  Yes.

16:07:57   11              "Question:  And the next one, the MSM8916

16:08:01   12    supports LTE?

16:08:01   13              "Answer:  Yes.

16:08:03   14              "Question:  Thank you.  So then the POP Star LTE

16:08:08   15    2 supports LTE?

16:08:08   16              "Answer:  Yes.

16:08:13   17              "Question:  Understood.  Then moving to the next

16:08:15   18    one, the Pixi Charm LTE, that supports LTE?

16:08:20   19              "Answer:  Yes.

16:08:23   20              "Question:  The next one, Pixi 3-4.5 MTM6735M.

16:08:28   21    That is LTE?

16:08:28   22              "Answer:  Yes.

16:08:31   23              "Question:  The OneTouch Idol 2S, the MSM8926,

16:08:36   24    that is -- I think we've covered that chipset -- LTE; is

16:08:40   25    that correct ?

Codeville - designations

| | |
|---|---|
| 16:08:40 | 1 |
| 16:08:42 | 2 |
| 16:08:43 | 3 |
| 16:08:44 | 4 |
| 16:08:47 | 5 |
| 16:09:07 | 6 |
| 16:09:08 | 7 |
| 16:09:08 | 8 |
| 16:09:12 | 9 |
| 16:09:15 | 10 |
| 16:09:15 | 11 |
| 16:09:17 | 12 |
| 16:09:18 | 13 |
| 16:09:22 | 14 |
| 16:09:25 | 15 |
| 16:09:25 | 16 |
| 16:09:31 | 17 |
| 16:09:34 | 18 |
| 16:09:35 | 19 |
| 16:09:36 | 20 |
| 16:09:39 | 21 |
| 16:09:40 | 22 |
| 16:09:43 | 23 |
| 16:09:44 | 24 |
| 16:09:46 | 25 |

"Answer:  Yes.

"Question:  Thank you, Mr. Codeville.  That was very helpful.

Mr. Codeville, how is it that you know this information for each of the phones?

"Answer:  Because it's products that I define and sole them to customer.

"Question:  There's a table here that has at the top model name, model number and vendor chipset.  Do you see that?

"Answer:  Yes.

"Question:  I'd like for you to take a minute just going through this table.  It goes onto the next page, and just look at the model names that were listed in this table.  Okay?

"Answer:  Yes.

"Question:  Then moving to the next one, the Pixi --

"Answer:  Yes.

"Question:  The next one, Pixi 3-  --

"Answer:  Yes.

"Question:  Thank you, Mr. Codeville.  That was very helpful.

Mr. Codeville, how is it that you know this information for each of these phones?

Codeville - designations

16:09:50  1      "Answer:  Because it's products that I define

16:09:52  2   and sold them to customer.

16:10:05  3      "Question:  Mr. Codeville, the court reporter is

16:10:07  4   handing you a document marked TCL Exhibit 43, which is a

16:10:12  5   printout of an Excel file that was produced at

16:10:17  6   TCT-IPB00005142.  Is this an internal product specification

16:10:23  7   file?

16:08:00  8      "Answer:  Yes.

16:08:00  9      "Question:  I'd like to then turn to the very

16:08:03  10  last page of this document where it has a chart.  In the

16:08:07  11  sixth column going across, it says 'LTE' at the top.  Do you

16:08:17  12  see that column?

16:08:19  13     "Answer:  Yes.

16:08:22  14     "Question:  Is it correct that the models 5054N,

16:08:31  15  5054W, 50540, and 5055W were sold in the US?

16:08:40  16     "Answer:  Yes, that's correct.

16:08:43  17     "Question:  And those models support the bands

16:08:47  18  for LTE that are listed in the sixth column; is that

16:08:52  19  correct?

16:08:52  20     "Answer:  Yes, it's correct.

16:08:54  21     "Question:  The court reporter has handed a

16:08:57  22  document marked TCL Exhibit 68 starting with Bates number

16:09:01  23  TCT-IPB00004511.  And on its face, it says Alcatel One Touch

16:09:10  24  POP Star LTE.  Do you see that?

16:09:14  25     "Answer:  Yes.

16:09:15   1          "Question:  Do you recognize this document?

16:09:15   2          "Answer:  Yes.

16:09:17   3          "Question:  What is this document?

16:09:18   4          "Answer:  It's the user manual of the TracFone

16:09:21   5   product called POP Star LTE.

16:09:26   6          "Question:  Perhaps if we turn to page ending in

16:09:30   7   4541.  Are you on that page?

16:09:32   8          "Answer:  Yes.

16:09:34   9          "Question:  Where it says, 'Connecting to the

16:09:43   10   internet', and then under that it lists several standards.

16:09:47   11   Do you see that?

16:09:48   12          "Answer:  Yes.  Yeah, I suppose -- anyway, it's

16:09:51   13   an LTE, it's said to be a POP Star LTE, so when we say LTE,

16:09:59   14   it means it supports LTE for sure, and the chipset supports

16:10:04   15   LTE.  But from the icon, I think it's not the right way to

16:10:09   16   define the product.

16:10:10   17          "Question:  Is it correct that the 50170 product

16:10:14   18   supports the LTE bands listed on this page?

16:10:19   19          "Answer:  Yes.  It supports six LTE bands.

16:10:27   20          "Question:  Is it correct that the Sonic LTE

16:10:30   21   supports the -- supports LTE in bands 4 and 17?

16:10:34   22          "Answer:  It supports two LTE bands, yes.

16:10:38   23          "Question:  Mr. Codeville, the court reporter

16:10:41   24   has handed you a document marked TCL Exhibit 79, bearing

16:10:47   25   Bates number TCT-IPB00003314, and on its face it makes

Codeville - designations

16:10:54  1    reference to an Idol 3-4.7 and Idol 3-5.5.  Do you see that?

16:11:01  2                "Answer:  Yes.

16:11:02  3                "Question:  I'd like you to turn to the page

16:11:06  4    with Bates number ending in 3317, where it lists 'Product

16:11:11  5    specification.'  Do you see that?

16:11:13  6                "Answer:  Yes.

16:11:14  7                "Question:  Is it correct that the Idol 3-5.5

16:11:20  8    supports LTE in the six bands on this page?

16:11:24  9                "Answer:  The product supports six LTE bands,

16:11:28  10   yes.

16:11:28  11                "Question:  Earlier, Mr. Irie asked you several

16:11:37  12   questions on whether or not certain devices support certain

16:11:40  13   LTE bands.  When you say a device supports an LTE band, what

16:11:45  14   do you mean by 'supports'?

16:11:47  15                "Answer:  'Supports' mean the RF component are

16:11:51  16   present to activate and to enable these bands on the device.

16:11:55  17   So the chipset support it, and then TCT, on the TCT product,

16:12:02  18   ready the component in order to route these bands to the

16:12:06  19   antenna.

16:12:08  20                "Question:  And do you know whether that means

16:12:11  21   -- let me rephrase that.

16:12:13  22                I think you earlier testified that LTE was

16:12:25  23   composed of two sets of -- I don't remember what exactly the

16:12:30  24   --

16:12:30  25                "Answer:  I said 3GPP is composed of two sets of

Codeville - designations

16:12:41  1  specification, the implementation specification and the test

16:12:44  2  specification.  Is that what you mean?

16:12:47  3            "Question:  Yes.  So when you said that when a

16:12:51  4  device supports an LTE band, does that mean that it actually

16:12:55  5  meets any particular set of specifications?  Or do you not

16:13:00  6  -- do you know?

16:13:03  7            "Answer:  It does not mean -- the 3GPP

16:13:07  8  specification are not mandatory.  So it simply means that

16:13:13  9  the device can connect -- have the components in order to

16:13:18  10  connect to these bands on the network.

16:13:21  11            "Question:  So when you were testifying earlier

16:13:26  12  about supporting LTE, does that mean that the -- when a

16:13:31  13  device supports LTE, that it supports the 3GPP

16:13:36  14  specifications for LTE that that network provides?  Is that

16:13:42  15  correct?

16:13:44  16            "Answer:  When we say -- when you say a product

16:13:48  17  support LTE bands, it mean it will connect to the network

16:13:57  18  and it will work with the network.  But this part basically

16:14:01  19  is ensured by the chipset design.  So let's put it -- I

16:14:11  20  mean, to explain this a little bit, the chipset

16:14:15  21  manufacturer, when they design their chipset, they will make

16:14:20  22  sure that the chipset protocol stack and the chipset

16:14:31  23  hardware works with the network.  And so they will test and

16:14:36  24  they will do interoperability testing with every big

16:14:46  25  network, mobile carrier, like AT&T, Verizon, Sprint, and so

Codeville - designations

16:14:55   1   on.  So they do a chipset certification with this mobile

16:14:59   2   carrier.  So when we get the chipset, the D&T works already

16:15:06   3   and is already tested with the mobile carriers.  So it's

16:15:12   4   something which is done by the chipset manufacturer.

16:15:19   5           Now, there's no requirement, no regulatory

16:15:24   6   requirement to sell a product in the US to re-pass this

16:15:29   7   test.  It's done by the chipset manufacturer with the

16:15:31   8   carrier, but it's not mandatory to re-run this test for

16:15:36   9   device manufacturer.  It might be requested by a carrier,

16:15:40   10   but it's not regulatory.

16:15:43   11           "Question:  So is it your understanding that

16:15:46   12   when a device supports LTE, that the chipset manufacturer

16:15:52   13   for that particular chipset has already done tests to

16:15:55   14   confirm that the chipset meets the 3GPP specifications for

16:16:04   15   LTE?

16:16:07   16           "Answer:  3GPP is a -- it's a set of tens of

16:16:12   17   documents of thousands of pages.  So it's impossible to say

16:16:16   18   a chipset is compliant with 3GPP.  It may be compliant with

16:16:23   19   part of 3GPP or tend to 3GPP in specific spec tests, test

16:16:32   20   spec, but can't say it's comparable or compliant with 3GPP.

16:16:42   21   You have to be precise.  So when -- if you -- there are some

16:16:48   22   tests which might be applicable, for example, if you run

16:16:57   23   PTCRB, you will find the capabilities of your product and

16:17:02   24   based on these capabilities, there's -- the test lab will

16:17:06   25   define a test spec, which is an extract of 3GPP.  You can

Codeville - designations

| | |
|---|---|
| 16:17:13 | 1 |

never say you are compatible with 3GPP.  It's too general.

"Question:  So going back to what you testified

about supporting LTE, it's your understanding that a device

that supports LTE can connect to an LTE-based network

provided by the mobile carrier?  Is that correct?

"Answer:  It's a -- yes, it's an assumption

because the chipset manufacturer designed the chipset so

that it -- it can interoperate with the network from the

carriers.  It -- again, this morning I explained that in the

3GPP specification, there is recommendation.  The chipset

manufacturer will -- most of the time will not follow the

recommendation as they are written in 3GPP, but they have to

pass the test part, but the recommendation is just

recommendation.

(End of videotape.)

MS. WILSON:  Thank you.  Your Honor, the last

clip that plaintiff has to play is about forty minutes long.

THE COURT:  You better do that tomorrow.

MS. WILSON:  That's fine with plaintiff, Your

Honor.

At this time I would like to move the admission

of certain exhibits referenced in these depositions.

THE COURT:  You may.

MS. WILSON:  I would like to move for admission

JTX-30, JTX-37, JTX-49, JTX-54, and JTX-25.

Codeville - designations

16:19:11  1          THE COURT:  Objection?

16:19:13  2          MR. NILSSON:  No objection.

16:19:14  3          THE COURT:  They're received.

16:19:15  4          MS. WILSON:  Thank you, Your Honor.

16:19:16  5          THE COURT:  You're welcome.

16:19:17  6          So ladies and gentlemen, we have reached a

16:19:20  7    logical break point in the day.  We have had a long day.  In

16:19:25  8    fact, it looks like some of you are having a hard time

16:19:28  9    paying attention.  So drink your extra energy or whatever

16:19:32  10   you have to do to make that necessary.

16:19:36  11         We will see you tomorrow morning at 9:00 o'clock

16:19:40  12   and we will continue evidence in this matter.

16:19:42  13         And before you go, remember, I forgot to do

16:19:47  14   this.  You're going to go home tonight, okay, and those of

16:19:51  15   you who live with somebody else, that person is going to ask

16:19:55  16   you right away, "What in the world you have been doing for

16:19:58  17   the last two days?"

16:20:00  18         And I don't know what you told them last night,

16:20:04  19   but I'm telling you today, you can't talk to them about

16:20:07  20   what's going on because what will happen is as soon as you

16:20:10  21   start talking about it, the look on their face is going to

16:20:14  22   tell you what you should do in that case.  Okay?  And they

16:20:18  23   didn't take the oath of office like you did.  And they

16:20:21  24   haven't heard the evidence.  And if they do give you

16:20:24  25   information, neither set of parties is going to have an

Codeville - designations

16:20:28    1    opportunity to question that person, your friend or your

16:20:32    2    husband or your wife, or your kids or whoever, on

16:20:36    3    cross-examination, or at least ask them questions about it.

16:20:42    4    So it's important for you to keep your own counsel and it's

16:20:45    5    important for you to keep an open mind until you have heard

16:20:48    6    all the evidence.

16:20:49    7                With that admonition, we'll see you tomorrow

16:20:53    8    morning at nine o'clock.

16:20:58    9                (Jury leaving the courtroom at 4:25 p.m.)

16:21:20   10                THE COURT:  We're outside the presence of the

16:21:24   11    jury.  We have one juror that's having a hard time staying

16:21:28   12    awake.  Okay?  So at some point, if one of you believes that

16:21:32   13    juror should go, then you need to tell me that.  Okay?  And

16:21:37   14    then we'll discuss it.  I asked the courtroom deputy to talk

16:21:41   15    to that juror and ask that juror if she needed any help

16:21:45   16    staying awake.  And it seems to me that if she doesn't do a

16:21:51   17    better job tomorrow, then I may be talking to you about

16:21:54   18    having her knocked off the jury.  So just so you know where

16:22:02   19    I'm coming from on this.  Okay?

16:22:04   20                So, Mr. Nilsson, you wanted to make an objection

16:22:08   21    and I very unpolitely cut you off and I apologize for that,

16:22:13   22    but I think it's important for you to be able to make your

16:22:16   23    record on the objection.  So I think it just comes with old

16:22:21   24    age and having managed as much money as I have over the

16:22:25   25    years.

Codeville - designations

16:22:25   1        So let's go, make your record.

16:22:27   2            MR. NILSSON:  Your Honor, I'm gratified at the

16:22:29   3    description of my being a young man at the moment.

16:22:32   4            THE COURT:  You are.

16:22:35   5            MR. NILSSON:  And it really was for the record

16:22:38   6    because I expected those questions and I expected the

16:22:41   7    answers to be allowed.  But for the record, my client, TCL

16:22:48   8    attempted very, very -- with a great deal of effort to bring

16:22:53   9    ▬▬▬▬▬▬▬  into this case.

16:22:54   10           THE COURT:  Yes.

16:22:54   11           MR. NILSSON:  It moved to amend its complaint

16:22:56   12   twice to assert that this transaction really wasn't an arm's

16:23:00   13   length transaction, that it was, in fact, something, an

16:23:04   14   ongoing conspiracy throughout which ▬▬▬▬▬▬▬  insulated --

16:23:09   15           THE COURT:  One person's conspiracy is another

16:23:11   16   person's contractual relationship.

16:23:13   17           MR. NILSSON:  That's exactly right.  That's why

16:23:15   18   those were allegations, and they were allegations to put it

16:23:19   19   fair --

16:23:20   20           MS. GAZA:  I believe those filings are under

16:23:23   21   seal.

16:23:24   22           THE COURT:  Well, be that as it may, we're just

16:23:27   23   talking about contractual relationships.

16:23:29   24           MS. GAZA:  I understand, Your Honor.  I just

16:23:31   25   wanted to advise counsel.

Codeville - designations

16:23:32    1              MR. NILSSON:  Without getting any of the factual

16:23:36    2    support.

16:23:36    3              THE COURT:  Nobody gives anything away for

16:23:38    4    nothing, but go ahead.

16:23:40    5              MR. NILSSON:  Yes, Your Honor.

16:23:40    6              And what was actually the quid pro quo was what

16:23:45    7    we sought to explore more fulsomely through those claims but

16:23:52    8    they were denied.  So that was the basis of what I was going

16:23:54    9    to talk about at side-bar.

16:23:56   10              THE COURT:  So you have preserved your record.

16:23:58   11              MR. NILSSON:  Yes.  And that's all that I need

16:24:00   12    to say.

16:24:01   13              THE COURT:  Okay.

16:24:02   14              So are there any other issues that we need to

16:24:05   15    take up before we start trial tomorrow?

16:24:09   16              Ms. Gaza?

16:24:10   17              MS. GAZA:  No, Your Honor.

16:24:12   18              THE COURT:  And Mr. Nilsson?

16:24:13   19              MR. NILSSON:  No, Your Honor.

16:24:14   20              THE COURT:  So I'll be here again tomorrow by

16:24:18   21    8:30.  If there is an issue that you need, simply let my

16:24:22   22    courtroom deputy know or me know and then we'll start a

16:24:25   23    little early.  But otherwise, we'll start evidence at nine

16:24:30   24    o'clock.

16:24:31   25              MS. GAZA:  Thank you, Your Honor.

Codeville - designations

16:24:32    1                    MR. NILSSON:  Thank you, Your Honor.

16:24:33    2                    THE COURT:  We're in recess.

16:24:33    3                    (Court recessed at 4:40 p.m.)

16:24:33    4                              -   -   -

            5

            6

            7

            8

            9

           10

           11

           12

           13

           14

           15

           16

           17

           18

           19

           20

           21

           22

           23

           24

           25